PROSKAUER ROSE LLP
Bettina B. Plevan (BP 7460)
Joshua F. Alloy (JA 4372)
1585 Broadway
New York, NY 10036-8299
(212) 969-3000
Attorneys for Defendant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
BETH AMENDOLA, on behalf of herself    :
and others similarly situated,    :
    :
                          Plaintiffs,    :        07 CV 6088 (DLC)
    :
              v.    :        **(ECF CASE)**
    :
BRISTOL-MYERS SQUIBB COMPANY,    :
and Does 1 through 20, inclusive,    :
    :
                          Defendant.    :
-----------------------------------------------------X

**DEFENDANT BRISTOL-MYERS SQUIBB COMPANY'S OPPOSITION
TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION,
<u>CLASS NOTICE, DISCOVERY, AND EQUITABLE TOLLING</u>**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................................................ii

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL BACKGROUND............................................................................................... 4

ARGUMENT ...................................................................................................................... 9

    I.      CLASS NOTICE IS INAPPROPRIATE BECAUSE
           PLAINTIFF HAS NOT DEMONSTRATED THAT OTHERS
           HAVE A SUFFICIENT INTEREST IN THIS ACTION ..................................... 9

    II.     CLASS NOTICE IS INAPPROPRIATE BECAUSE
           PLAINTIFF CANNOT DEMONSTRATE THAT SHE IS
           "SIMILARLY SITUATED" TO OTHER SALES REPS AS
           TO A UNIFORM UNLAWFUL POLICY ........................................................ 11

         A.      Application Of The "Outside Sales" Exemption
                Establishes That There Is No "Unlawful" Policy..................................... 13

         B.      Application Of The "Administrative" Exemption
                Precludes A Finding That Plaintiff Is "Similarly Situated"
                To All Sales Reps ................................................................................... 21

                1.      Plaintiff Has Not Established That She Was
                        "Unlawfully" Classified As An Exempt
                        Administrative Employee............................................................ 21

                2.      The Court Cannot Resolve The Administrative
                        Exemption On A Class-Wide Basis............................................. 27

         C.      The Highly Compensated and Motor Carrier Exemptions
                 Preclude A Finding That Plaintiff Is "Similarly Situated"
                To All Sales Reps ................................................................................... 31

    III.    DISCOVERY OF NAMES OF POTENTIAL CLASS
           MEMBERS IS NOT WARRANTED AND PLAINTIFF
           IS NOT ENTITLED TO EQUITABLE TOLLING OF THE
           STATUTE OF LIMITATIONS......................................................................... 33

    IV.    PLAINTIFF'S PROPOSED NOTICE IS INADEQUATE.................................. 35

CONCLUSION.................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aguirre v. SBC Commc'ns, Inc.*,
No. 05 Civ. 3198, 2006 U.S. Dist. LEXIS 22211 (S.D. Tex. Apr. 11, 2006) ........... 12, 23, 31

*Aguirre v. SBC Communications, Inc.*,
No. 05 Civ. 3198, 2007 U.S. Dist. LEXIS 17259 (S.D. Tex. Mar. 12, 2007 ........................31

*Anglada v. Linens 'N Things Inc.*,
No. 06 Civ. 12901, 2007 WL 1552511 (S.D.N.Y. May 29, 2007) .........................................9

*Barnick v. Wyeth*,
522 F. Supp. 2d 1257 (C.D. Cal. 2007) .....................................................................passim

*Barten v. KTK & Assocs.*,
No. 06 Civ. 1574, 2007 U.S. Dist. LEXIS 54068 (M.D. Fla. July 24. 2007).........................10

*Briggs v. United States*,
54 Fed. Cl. 205 (2002)...........................................................................................................11

*Cash v. Conn Appliances, Inc.*,
2 F. Supp. 2d 884 (E.D. Tex. 1997) .....................................................................................10

*Cote v. Burroughs Wellcome Co.*,
558 F. Supp. 883 (E.D. Pa. 1982) .............................................................................passim

*D'Este. v. Bayer Corp.*,
No. 07 Civ. 3206, 2007 U.S. Dist. LEXIS 87229 (C.D. Ca. Oct. 9, 2007) ....................passim

*Dalheim v. KDFW-TV*,
918 F.2d 1220 (5th Cir. 1990) .............................................................................................22

*Davis v. Charoen Pokphand*,
303 F. Supp. 2d 1272 (M.D. Ala. 2004).........................................................................10, 12

*Dean v. Priceline*,
2001 U.S. Dist. LEXIS 24982 (D. Conn. 2001) ...........................................................23, 31

*Diaz v. Elecs. Boutique of Am., Inc.*,
No. 04 Civ. 0840, 2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005).........................................31

*Donovan v. Burger King Corp.*,
675 F.2d 516 (2d Cir. 1982) .................................................................................................26

*Dring v. McDonnell Douglas Corp.*,
  58 F.3d 1323 (8th Cir. 1995) ............................................................................ 33

*Evancho v. Sanofi-Aventis U.S. Inc.,*
  No. 07 Civ. 2266, 2007 U.S. Dist. LEXIS 93215 (D.N.J. Dec. 18, 2007) ..................... passim

*Feiler v. Hyatt Corp.*,
  No. 98 Civ. 2863, 1999 U.S. Dist. LEXIS 23407 (S.D. Fla. Dec. 8, 1999) ......................... 25

*Hampshire v. Port Arthur Ind. Sch. Dist.*,
  No. 06 Civ. 235, 2006 U.S. Dist. LEXIS 88874 (E.D. Tex. Dec. 7, 2006) ........................ 10

*Haywood v. North Am. Van Lines*,
  121 F.3d 1066 (7th Cir. 1997) ............................................................................. 26

*Heins v. Potter*,
  271 F. Supp. 2d 545 (S.D.N.Y. 2003) ................................................................... 33

*Hogan v. Allstate Ins. Co.*,
  361 F.3d 621 (11th Cir. 2004) ............................................................................. 26

*In re Allstate Ins. Co.*,
  No. 04 Civ. 0015, 2007 U.S. Dist. LEXIS 58442 (D. Ariz. Aug. 6, 2007) ...................... 26

*Irwin v. Dep't of Veterans Affairs*,
  498 U.S. 89 (1990) ........................................................................................... 33

*Jacobsen v. Stop & Shop Supermarket Co.*,
  No. 02 Civ. 5915, 2004 U.S. Dist. LEXIS, *3 (S.D.N.Y. May 15, 2003) .................... 12, 33

*Jewel Tea co. v. Williams*,
  118 F.2d 202 (10th Cir. 1941) ............................................................................ 15

*Kennedy v. Commonwealth Edison Co.*,
  410 F.3d 365 (7th Cir. 2005) .............................................................................. 26

*King v. W. Corp.*,
  No. 04 Civ. 318, 2006 U.S. Dist. LEXIS 3926 (D. Neb. Jan. 13, 2006) .................. 12, 23, 31

*Mackenzie v. Kindred Hosps. East, L.L.C.*,
  276 F. Supp. 2d 1211 (M.D. Fla. 2003) ................................................................ 10

*Marting v. Crawford & Co.*,
  No. 06 Civ. 7132, 2006 U.S. Dist. LEXIS 10509 (N.D. Ill. Mar. 14, 2006) .................... 26

*McAllister v. Transamerica Occidental Life Ins. Co.*,
  325 F.3d 997 (8th Cir. 2003) .............................................................................. 26

*Medtronic, Inc. v. Benda*,
    689 F.2d 645 (7th Cir. 1982), *cert. denied*, 459 U.S. 1106 (1983) .......................................17

*Medtronic, Inc. v. Gibbons*,
    527 F. Supp. 1085 (D. Minn. 1981), *aff'd*, 684 F.2d 565 (8th Cir., 1982) ...........................17

*Menes v. Roche Labs. Inc.*,
    Case No. 07 Civ. 01444, 2008 U.S. Dist. LEXIS 4230 (C.D. Cal. Jan. 7, 2008) ........... passim

*Mike v. Safeco Ins. Co. of Am.*,
    274 F. Supp. 2d 216 (D. Conn. 2003) ................................................................. 9, 12, 23, 31

*Morisky v. Pub. Serv. Elec. & Gas Co.*,
    111 F. Supp. 2d 493 (D.N.J. 2000) ..................................................................... 9, 12, 23, 31

*Nordquist v. McGraw-Hill Publishing Co.*,
    32 Cal. App. 4th 555 (1995) ............................................................................................14

*O'Neal v. Kilbourne Med. Labs., Inc.*,
    No. 05 Civ. 50, 2007 WL 956428 (E.D. Ky. 2007) ...........................................................32

*Pfohl v. Farmers Ins. Group*,
    No. 03 Civ. 3080, 2004 U.S. Dist. LEXIS 6447 (C.D. Cal. Mar. 1, 2004) .................... passim

*Prizmic v. Armour, Inc.*,
    No. 05 Civ. 2503, 2006 U.S. Dist. LEXIS 42627 (E.D.N.Y. June 12, 2006) ................... 9, 12

*Reich v. Homier Distrib. Co.*,
    362 F. Supp. 2d 1009 (N.D. Ind. 2005) .............................................................................23

*Reich v. John Alden Life Ins. Co.*,
    126 F.3d 1 (1st Cir. 1997) ..................................................................................... 22, 25, 26

*Robinson v. Dolgencorp, Inc.*,
    No. 06 Civ. 122, 2006 U.S. Dist. LEXIS 85471 (M.D. Fla. 2006) ......................................10

*Rodgers v. CVS Pharm., Inc.*,
    No. 05 Civ. 770, 2006 U.S. Dist. LEXIS 23272 (M.D. Fla. Mar. 22, 2006) .........................10

*Saccone v. Aventis Pharmaceuticals, Inc.*,
    Case No. BC327123 (Cal. Super. Ct. Apr. 12, 2006) .........................................................14

*Scholtisek v. Eldre Corp.*,
    229 F.R.D. 381 (W.D.N.Y. 2005) .............................................................................. 12, 31

*Severtson v. Phillips Beverage Co.*,
    137 F.R.D. 264 (D. Minn. 1991) ......................................................................................11

*Shih v. City of New York*,
　No. 03 Civ. 8279 LAP, 2006 WL 2789986 (S.D.N.Y. Sept. 28, 2006)..................................33

*Silverman v. SmithKline Beecham Corp.*,
　No. 06 Civ. 7272, 2007 U.S. Dist. LEXIS 80030 (C.D. Cal. Oct. 15, 2007)............... 3, 10, 31

*Tucker v. Labor Leasing, Inc.*,
　872 F. Supp. 941 (M.D. Fla. 1994) .........................................................................35

*West v. Border Foods, Inc.*,
　No. 05 Civ. 2525, 2006 U.S. Dist. LEXIS 96963 (D. Minn. June 12, 2006) .........................13

*Wilshin v. Allstate Ins. Co.*,
　212 F. Supp. 2d 1360 (M.D. Ga. 2002) .............................................................25

*Wirtz v. First Nat'l Bank & Trust Co.*,
　365 F.2d 641 (10th Cir. 1966) ............................................................................17

*Wirtz v. Jernigan*,
　405 F.2d 155 (5th Cir. 1968) ............................................................................17

*Wombles v. Title Max of Ala., Inc.*,
　No. 03 Civ. 1158, 2005 U.S. Dist. LEXIS 34733 (M.D. Ala. Dec. 7, 2005) ............. 10, 23, 31

## OTHER AUTHORITIES

29 C.F.R. § 503(a).......................................................................................20

29 C.F.R. § 503(c).......................................................................................19

29 C.F.R. § 541.2.......................................................................................23

29 C.F.R. § 541.200-202..............................................................................21

29 C.F.R. § 541.201.....................................................................................22

29 C.F.R. § 541.202(a).................................................................................23

29 C.F.R. § 541.202 (b), (c)..........................................................................23

29 C.F.R. § 541.205(b).................................................................................22

29 C.F.R. § 541.500 ....................................................................................15

29 C.F.R. § 541.601 ....................................................................................32

29 C.F.R. § 541.22141-2...........................................................................22, 25

29 U.S.C. § 203(k) ................................................................................................ 15, 16

29 U.S.C. § 213(a)(1) ............................................................................................ 15, 21

29 U.S.C. § 213(b)(1) ................................................................................................... 32

29 U.S.C. § 216(b) .......................................................................................................... 9

49 U.S.C. § 13102 ......................................................................................................... 32

Cal. Code Regs., tit. 8, § 11040-2(M) ........................................................................ 14

## PRELIMINARY STATEMENT

Plaintiff, a former Pharmaceutical Sales Representative ("Sales Rep") of Defendant Bristol-Myers Squibb Company ("BMS") who claims she was misclassified as exempt from overtime pursuant to the Fair Labor Standards Act ("FLSA"), is not entitled to "conditionally certify" a nationwide class of approximately 4,500 current and former BMS Sales Reps for three independent and dispositive reasons.

First, despite over seven months of publicity and advertising, and after being provided with names and addresses of over 350 current and former Sales Reps, Plaintiff has not introduced any evidence that even a single Sales Rep desires to join this action. Where, as here, a former employee purports to represent a class encompassing thousands of putative members, including over 2,000 current employees, it is imperative that she demonstrate at least a modicum of interest in the case before the court can certify it as a collective action and "stir up" the litigation.

Second, Plaintiff has not met her burden of demonstrating that she is similarly situated to other Sales Reps with respect to a single uniform *unlawful* policy. Plaintiff's argument that the allegedly unlawful BMS policy is the "misclassification" of Sales Reps as exempt from overtime under the FLSA cannot be sustained. Courts have consistently rejected Plaintiff's claim that Sales Reps are misclassified as "outside sales" employees because they do not actually "sell" anything, and similarly situated plaintiffs have fared no better attacking the administrative exemption on the grounds that they do not exercise discretion and independent judgment.

Not surprisingly, the entire pharmaceutical industry has treated Sales Reps as salaried exempt employees for at least the last fifty years, based on the clear language of the FLSA, its regulations, Department of Labor opinion letters, and federal case law. Indeed, no less than three federal courts have ruled – within the past four months – that Sales Reps "clearly" fall within the

1

outside sales exemption because they are in fact "selling" within the clear meaning (and intent) of the law.[1]  Yet another federal court has held that Sales Reps also fall within the administrative exemption.[2]  Not surprisingly, no Court has *ever* ruled that Sales Reps – or indeed, any employees who perform similar work – are entitled to overtime under any interpretation of the FLSA.  Likewise, the Department of Labor has maintained – since 1945 – that medical "detail persons" (i.e., Sales Reps) are exempt administrative employees.[3]

In addition, Plaintiff has not even attempted to attack the lawfulness (and applicability) of the "highly compensated" exemption to the FLSA – for employees who earn at least $100,000 annually – or the "motor carrier" exemption, for employees who transport or distribute property (such as drug samples and promotional materials) in interstate commerce.  These two exemptions, wholly apart from the outside sales and administrative exemptions, also necessarily exempt a large percentage of Sales Reps from overtime.  Finally, a careful reading of the FLSA, its supporting regulations, and the legislative history reflecting its intent and purpose, also demonstrates that Sales Reps have been lawfully classified as exempt.  Given the clarity of the law, the novel nature of Plaintiff's claims, and the fact that Plaintiff is relying not on any legal precedent but rather on her own summary assertions of "fact" to attack an entire industry's lawful practice, Plaintiff plainly cannot meet even the "lenient" standard that she argues applies to her motion to certify.

---

[1]  *Menes v. Roche Labs. Inc.*, Case No. 07 Civ. 01444, 2008 U.S. Dist. LEXIS 4230 (C.D. Cal. Jan. 7, 2008); *Barnick v. Wyeth*, 522 F. Supp. 2d 1257 (C.D. Cal. 2007); *D'Este. v. Bayer Corp.*, No. 07 Civ. 3206, 2007 U.S. Dist. LEXIS 87229 (C.D. Ca. Oct. 9, 2007).

[2]  *Cote v. Burroughs Wellcome Co.*, 558 F. Supp. 883 (E.D. Pa. 1982).

[3]  1943-48 Wages Hours (CCH) P33,093 (May 19, 1945); Labor Department Wage and Hour Opinion, January 1946, Lab.L.Rep. (CCH) Wage and Hour, v.1, ¶25,210.41.  Copies the letters are attached as Exhibit 1 to the Alloy Declaration.

Third, even if this Court concludes that Plaintiff has introduced sufficient evidence to sustain a reasonable conclusion that BMS has unlawfully applied the outside sales, administrative, highly compensated, and/or motor carrier exemptions, Plaintiff's motion must still be denied. The law is well-settled that collective adjudication may be denied where the Plaintiff alleges that she is similarly situated to other putative class members because they were improperly classified as exempt from the FLSA.

In particular, where one of the exemptions at issue is the administrative exemption, as it is here, a close reading of the case law demonstrates that potential collective action members are not similarly situated as to FLSA status – even at the notice stage – where their job duties and responsibilities differ.[4] The same result must also apply where, as here, multiple exemptions are at issue, and not all putative class members qualify for each exemption.

Although Plaintiff has alleged that the "primary duty" of Sales Reps is always the same (i.e., promoting sales), she cannot overcome the undisputed facts that the job duties and responsibilities that Sales Reps perform in order to "promote sales" are incredibly diverse and vary depending on, *inter alia*, the particular Sales Rep's level of experience, competence, style, personality and approach, as well as the business division in which they work, the type of product they sell, and the type of customer to which they sell. Because this Court would necessarily have to conduct an individualized and fact-intensive inquiry into how each Sales Rep carries out his or her duties and responsibilities in order to determine if the administrative exemption applies, collective action certification is particularly inappropriate.

---

[4] Significantly, this court now has the benefit of the District of New Jersey's recent decision in *Evancho v. Sanofi-Aventis U.S. Inc.,* No. 07 Civ. 2266, 2007 U.S. Dist. LEXIS 93215 (D.N.J. Dec. 18, 2007), and the Central District of California's decision in *Silverman v. SmithKline Beecham Corp.*, No. 06 Civ. 7272, 2007 U.S. Dist. LEXIS 80030 (C.D. Cal. Oct. 15, 2007), two more FLSA overtime cases involving Sales Reps (and brought by many of the same attorneys as in this case). In both cases, the Courts concluded on similar facts, and faced with the same arguments that Plaintiff makes here, that conditional collective action was wholly inappropriate.

3

Plaintiff also argues that putative class members are entitled to equitable tolling of the statute of limitations. She is wrong. Equitable tolling is an extraordinary remedy in the Second Circuit that is only appropriate where a defendant has prejudiced the plaintiff or behaved improperly, neither of which have occurred here. Finally, and based on the foregoing, Plaintiff's ancillary claims for discovery of the names and addresses of putative class members, and approval of a class notice, must also be denied.

## FACTUAL BACKGROUND[5]

BMS is a global pharmaceutical company and leading provider of medicines to fight cancer, cardiovascular and infectious diseases, including HIV/AIDS, and serious mental illness. (http://www.bms.com/aboutbms/ceo_message/data). BMS currently employs approximately 2,400 Sales Reps, also known as Territory Business Managers ("TBMs"), to sell and promote its various products to healthcare practitioners, hospitals, clinics, and institutions throughout the United States. (Faucett 198) Consistent with the long-standing practice of the entire pharmaceutical industry, as well as federal law, BMS classifies its Sales Reps as exempt from the FLSA and pays them a generous salary plus incentive compensation.

BMS's U.S. Pharmaceutical Sales operation today is divided into five distinct business units/therapeutic areas: (i) Cardiovascular/Metabolics ("CV/Met"); (ii) Virology; (iii) Oncology; (iv) Immunoscience; and (v) Neuroscience.[6] (Faucett 18-20; Saylor Decl. Exs. 2-4, 27, 30-1, 34) Each business division has its own separate sales force, marketing team, and senior management,

---

[5] The depositions of BMS's 30(b)(6) witnesses Faucett, Bitetti, Segalini, DeSimone and Fee, referred to throughout this Opposition Brief, were attached as Exhibits 51-55 respectively to the Saylor Declaration. The deposition of Plaintiff Beth Amendola is attached as Exhibit 2 to the Alloy Declaration.

[6] CV/Met consists of "Primary Care" Sales Reps (who call primarily on general physicians) and "Specialty Sales" Reps (who call on physicians specializing in particular areas of medicine, as well as Hospitals and Institutions). (Faucett 18-19, 26; Bitetti 52-53) "Specialty reps call on different customers, they have deeper product and disease state knowledge, they have deeper market and industry knowledge, they are usually more experienced." (Faucett 160) The Sales Reps in the other four business divisions are all considered akin to "specialty sales" reps. (*See, e.g.,* Saylor Decl. Exs. 12, 28-9, 32, 35)

as well as their own sets of expectations/objectives, practices, training, strategies, customers, and incentive compensation structures.  (*Id.*; Fee 59; Segalini 86-7; DeSimone 56; Bitetti 23-4)

Each business division is further divided into geographic "Regions," "Districts," and ultimately "Territories."  (Bitetti 21-22, 36; Faucett 43-44; DeSimone 22-23; Segalini 133)  Each Region is overseen by a Regional Business Head ("RBH"), or functional equivalent, each District is overseen by a District Business Manager ("DBM"), and each Territory is assigned one or more Sales Reps.  (Id.; Saylor Decl. Exs. 2-4, 21, 24-5, 28)  DBMs oversee and supervise each of the Sales Reps in their district.  (Faucett 83-4)  Plaintiff was employed by BMS from February 1998 through March 2006 as a Primary Care "Associate TBM" and later as a "TBM"[7] in the Cardiovascular/Metabolics Division in Florida.  (Amendola Decl. ¶ 2)

A Sales Rep's job is to sell and promote the sale of pharmaceutical products specific to their business division to Health Care Practitioners ("HCPs"), hospitals and other institutions in their assigned territory, in order to drive sales and market share of their products in their territory.  (Forrey Decl. ¶ 5; Polit Decl. ¶ 4; Pradhan Decl. ¶ 5; Saeger Decl. ¶ 4-5; Amendola 117; Faucett 51-3; Bitetti 44; DeSimone 26, 122; Fee 9-11; Segalini 82)  Sales Reps call on various physicians, doctor's offices, and hospitals in their territory and "sell by promoting the products, providing information, answering questions, understanding, probing, dialoguing with the physician to understand where the product can be used," and by "closing" the doctor and ultimately asking for a "commitment" from the doctor to prescribe the product if appropriate.  (*Id.*; Amendola 159-62, 219-20; *see generally* Forrey, Polit, Pradhan, Saeger Declarations)

Sales Reps are paid generously.  (Forrey Decl. ¶ 20-1; Polit Decl. ¶ 21-2; Pradhan Decl. ¶ 18-19; Saeger Decl. ¶ 19-20; DeSimone 123-24, 129-130; Fee 113-14, 118-20; Segalini 174-76)

---

[7] There are four different seniority levels for Sales Reps:  (i) Associate TBM; (ii) TBM; (iii) Senior TBM; and (iv) Executive TBM.  (Faucett 70)  There are no Associate TBMs outside of CV/Met.  (Faucett 208)

In Oncology, Virology, Neuroscience, Immunoscience and CV/Met Specialty Sales, Sales Reps receive average base salaries between $75,000 and $105,000, while CV/Met Primary Care Sales Reps typically receive lower base salaries on average. (*Id.*; Amendola 89-90) In addition, Sales Reps are eligible for incentive compensation that is typically targeted at $21,000 - $25,000 annually. (*Id.*) Accordingly, a substantial number of Sales Reps earn over $100,000 each year in total compensation. (*Id.*) Incentive compensation is based on total sales, market share, and growth of sales in each individual's territory, and each business division has its own unique incentive compensation program. (*Id.*; Amendola 111, 214, 241, 251; Bitetti 162-3; Fee 115; Segalini 177-81) In addition, throughout the year, Sales Reps compete in and are eligible for various contests, prizes and trips based on their sales rankings versus other Sales Reps in their division or region. (Amendola 104, 113; Alloy Decl. Ex. 3)

BMS advertises and recruits Sales Reps through job postings that identify the job as a sales position and, as a general matter, BMS looks for applicants who have sales experience – preferably related to pharmaceutical sales – when hiring. (Saylor Decl. Exs. 6-7, 20, 22, 33; Alloy Decl. Ex. 3) Outside of CV/Met, it is rare for a Sales Rep to be hired who does not have at least two years of prior sales experience in the pharmaceutical industry. (*Id.*) Sales Reps do not work out of an office, but rather from their home and spend their day on the road on their own calling health care practitioners and hospitals. (Forrey Decl. ¶ 3-4; Polit Decl. ¶ 3-4; Pradhan Decl. ¶ 4-5; Saeger Decl. ¶ 3, 5)

Once hired, Sales Reps in each division undergo extensive, specialized sales and disease state training during a four to six-week at-home "Track 1" training program and an intensive in-person "Track 2" training program that lasts 1-2 weeks and is held at BMS's main campus in New Jersey. (Amendola 188; Faucett 205-8; Segalini 76-7, 157-8; Fee 91-5; Bitetti 142-5;

DeSimone 104-7)  Sales Reps subsequently continue their sales training at semi-annual national and regional conferences (Plan of Action meetings, or "POAs") and online periodically during the year.  (Fee 95-97; DeSimone 107-8; Bitetti 147-9; Segalini 109-12; Faucett 205-8)

In particular, Sales Reps are trained in how to use the "ENGAGE" Selling skills model, a comprehensive tool for Sales Reps to utilize in order to maximize their success when calling on physicians.  (Saylor Decl. Ex. 15; Amendola 100; Faucett 226; Fee 97-8; DeSimone 109-10; Bitetti 85-6; Segalini 143-5)  ENGAGE is a "roadmap" for Sales Reps, and while they are expected to utilize its theories and guidelines (such as the importance of creating a "dialogue" with physicians, "probing" and asking questions, and moving incrementally towards the "close"), these are broad open-ended theories, and Sales Reps have the discretion to (and do) tailor the model to each sales call as they deem appropriate.  (Saylor Decl. Ex. 15; Polit Decl. ¶ 11, 12, 16, 18; Forrey Decl. ¶ 11, 13, 17; Pradhan Decl. ¶ 10, 12, 15; Saeger Decl. ¶ 11, 15; Segalini 143-5; Fee 11; DeSimone 109-11; Amendola 161-2)

Sales Reps are expected to "manage" their territory – they are responsible for calling on all of the key physicians or hospitals (including hospital staff), deciding on whom to call, how often and when.  (Polit Decl. ¶ 6-10, 14; Forrey Decl. ¶ 6-9; Pradhan Decl. ¶ 6-9; Saeger Decl. ¶ 6-10; Faucett 77, 118-21; Fee 59; DeSimone 121; Segalini 93, 137-8; Bitetti 91-103)  Each business division has its own policy with respect to call expectations for its sales representatives; however, these are not rigid requirements as Plaintiff suggests.  (*Id.*; Amendola 166-7, 264-5)

While most (but not all) Sales Reps are provided with a general list of health care practitioners or hospitals to call on (a "Call Plan"), they are also expected to identify and seek out new doctors and to update their Call Plans accordingly to reflect these new sales opportunities.  (Amendola 166-7, 264-5; Polit Decl. ¶ 7; Forrey Decl. ¶ 8; Pradhan Decl. ¶ 8;

Saeger Decl. ¶ 9; Bitetti 91-94, 98-100; Segalini 136; Fee 82)  In addition, many Sales Reps take an active role in building and modifying their Call Plan each year (or quarter).  (*Id.*)

Not surprisingly, each TBM has his/her own sales technique and style, some more successful than others, because every sales call is unique and different. (Faucett 56, 61, 103-4; Amendola 100, 108-9, 160-1; Alloy Decl. Ex. 3; Polit Decl. ¶ 16-18; Forrey Decl. ¶ 10-16; Pradhan Decl. ¶ 10-13, 15; Saeger Decl. ¶ 10-13, 15)   Sales Reps try to "build relationships" with their customers in order to drive sales.  (Amendola 105-7, 224-5; Polit Decl. ¶ 19; Forrey Decl. ¶ 13; Pradhan Decl. ¶ 16)  Sales Reps plan for each call, and individually determine how long to plan, what their goals are for the call and how they are going to achieve those goals. (Polit Decl. ¶ 17; Forrey Decl. ¶ 11; Pradhan Decl. ¶ 10-11; Saeger Decl. ¶ 10-11; Amendola 160-1, 209; Fee 70; DeSimone 78; Bitetti 90-1; Segalini 94)

Amendola testified that she independently and voluntarily read medical journals, articles and clinical studies to stay up to date in her therapeutic area and to help her on her sales calls. (Amendola 153, 190-1)  Many Sales Reps study the sales, prescription, and patient flow data in their territory to help analyze trends and identify physicians and issues they can focus on during a call.  (Amendola 153; Faucett 80; Fee 68-9; Bitetti 46-47)  During a call, Sales Reps decide what to say (within certain legal limits), when to say it, how to answer or respond to questions, what core message to communicate (if any), whether or not to utilize visual aids or other marketing/promotional materials, and whether to distribute samples.  (Amendola 151-2, 217, 242; Faucett 58-60; Segalini 78, 94- 95; Fee 49; DeSimone 29; Polit Decl. ¶ 15-19; Forrey Decl. ¶ 10-17; Pradhan Decl. ¶ 10-15; Saeger Decl. ¶ 11-15)

Sales Reps try to direct the flow of each call in order to "close" the doctor and move towards the ultimate goal of gaining a commitment to prescribe (and therefore, increased sales),

and they are constantly tailoring each sales call to the particular physician's needs and the

particular situation. (Amendola 117, 159; Bitetti 47, 143-4; DeSimone 77; Polit Decl. ¶ 5, 11-13,

16-18; Forrey Decl. ¶ 6, 11-16; Pradhan Decl. ¶ 5-7, 10-16; Saeger Decl. ¶ 11, 15)

Finally, Sales Reps are free of direct or constant supervision on a day-to-day basis.

(Amendola 171-5, 210-11, 263; Polit Decl. ¶ 20; Forrey Decl. ¶ 19; Pradhan Decl. ¶ 17; Saeger

Decl. ¶ 17-18) Indeed, Amendola testified that she ran errands during the day when necessary.

(Amendola 171-5) While managers occasionally accompany Sales Reps on sales calls ("ride-

alongs"), these typically occur only once per month and are for coaching purposes. (*Id.*)

## ARGUMENT

**I.    CLASS NOTICE IS INAPPROPRIATE BECAUSE PLAINTIFF HAS NOT DEMONSTRATED THAT OTHERS HAVE A SUFFICIENT INTEREST IN THIS ACTION.**

Although the FLSA (29 U.S.C. § 216(b)) does not contemplate the use of class notice

district courts have discretion to authorize the sending of notice to potential class members in a

collective action if they are "similarly situated." *See Anglada v. Linens 'N Things Inc.,* No. 06

Civ. 12901, 2007 WL 1552511, at *4 (S.D.N.Y. May 29, 2007); *Prizmic v. Armour, Inc.*, No. 05

Civ. 2503, 2006 U.S. Dist. LEXIS 42627, at *4 (E.D.N.Y. June 12, 2006); *Mike v. Safeco Ins.

Co. of Am.*, 274 F. Supp. 2d 216, 219 (D. Conn. 2003). The decision to authorize notice to

thousands of current and former employees is not automatic, and the Court has broad discretion

to determine whether or not notice is appropriate. *Evancho*, 2007 U.S. Dist. LEXIS 93215;

*Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 497 (D.N.J. 2000).

In particular, courts have increasingly held that the plaintiff bears the burden of

establishing not only that there exist other "similarly situated" employees, but that there also

exist other employees who actually desire to opt-in to the litigation. *See Davis v. Charoen*

*Pokphand*, 303 F. Supp. 2d 1272, 1276-77 (M.D. Ala. 2004) (citing *Dybach v. Florida Dep't of Corrections*, 942 F.2d 1562, 1567-68 (11th Cir. 1991); *Silverman*, 2007 U.S. Dist. LEXIS 80030, at *5; *Hampshire v. Port Arthur Ind. Sch. Dist.*, No. 06 Civ. 235, 2006 U.S. Dist. LEXIS 88874, at *4-5 (E.D. Tex. Dec. 7, 2006); *Pfohl v. Farmers Ins. Group*, No. 03 Civ. 3080, 2004 U.S. Dist. LEXIS 6447 (C.D. Cal. Mar. 1, 2004); *Mackenzie v. Kindred Hosps. East, L.L.C.*, 276 F. Supp. 2d 1211, 1220 (M.D. Fla. 2003); *Cash v. Conn Appliances, Inc.*, 2 F. Supp. 2d 884, 897 (E.D. Tex. 1997); *see also Barten v. KTK & Assocs.*, No. 06 Civ. 1574, 2007 U.S. Dist. LEXIS 54068, *7-8 (M.D. Fla. July 24. 2007) (denying plaintiff's motion for conditional certification and permission to send out court-supervised notice where plaintiff identified "only one viable opt-in plaintiff" in eleven months); *Robinson v. Dolgencorp, Inc.*, No. 06 Civ. 122, 2006 U.S. Dist. LEXIS 85471, *19-21 (M.D. Fla. 2006) (finding that only three affidavits filed in support of conditional certification of a class of thousands was "insufficient to demonstrate to the Court's satisfaction that there are other similarly situated employees who desire to opt-in to this action"); *Rodgers v. CVS Pharm., Inc.*, No. 05 Civ. 770, 2006 U.S. Dist. LEXIS 23272, 14-15 (M.D. Fla. Mar. 22, 2006) (denying motion to conditionally certify a class and facilitate notice because "[p]laintiff has failed to provide sufficient evidence that there are other employees who desire to opt in to this action, other than the two who have filed consents"); *Wombles v. Title Max of Ala., Inc.*, No. 03 Civ. 1158, 2005 U.S. Dist. LEXIS 34733 (M.D. Ala. Dec. 7, 2005) (denying plaintiff's motion to facilitate class notice where "plaintiffs' unsubstantiated belief about other employees' willingness to join this action and their inability to identify more than two other employees willing to join shows that the plaintiffs have not met their burden").

Here, Plaintiff has failed to proffer any evidence that even a *single* current or former BMS Sales Rep has any interest in joining this litigation.  This lawsuit was filed over seven

months ago amidst a great deal of publicity. (Alloy Decl. ¶ 7-11) Since then, Plaintiff's four law firms have been continuously advertising and promoting this lawsuit (and others) in the media and on the internet, and claim to have received phone calls and e-mails from "hundreds" of interested Sales Reps. (*Id.*) In addition, pursuant to this Court's order, BMS turned over the names and addresses of approximately 350 current and former Sales Reps so that Plaintiff's counsel could contact them, ostensibly to provide witness testimony. (Alloy Decl. ¶ 12-16)

Despite all of this, Plaintiff has submitted only five declarations (including her own) in support of her motion, all from former BMS employees, all but one within the CV-Met business division. None of the declarants have opted-in to this action or even indicated that they intend to opt-in. This is plainly insufficient to justify a nationwide class notice. *See, e.g., Pfohl*, 2004 U.S. Dist. LEXIS 6447, at * 31-32. Accordingly, the Court has a responsibility to deny Plaintiff's motion so as to avoid unnecessarily "stirring up" litigation through unwarranted solicitation. *Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 266-7 (D. Minn. 1991); *see also Briggs v. United States*, 54 Fed. Cl. 205, 207 (2002).

## II.  CLASS NOTICE IS INAPPROPRIATE BECAUSE PLAINTIFF CANNOT DEMONSTRATE THAT SHE IS "SIMILARLY SITUATED" TO OTHER SALES REPS AS TO A UNIFORM UNLAWFUL POLICY.

Plaintiff has also not shown – and indeed, cannot show – that she is "similarly situated" to all other current and former Sales Reps nationwide. First, it is not enough to argue that they all share similar job titles, have the same "primary duty" (i.e., calling on health care practitioners in order to persuade them to prescribe BMS products), are subject to the same Company-wide policies and procedures, and are all classified as exempt from overtime. Rather, to obtain certification and notice, Plaintiff must also demonstrate that her job duties and responsibilities do not differ from the other Sales Reps to be included in the class and that they are all subject to the

11

same FLSA exemptions. *See Evancho v. Sanofi-Aventis*, 2007 U.S. Dist. LEXIS 93215; *Aguirre v. SBC Commc'ns, Inc.*, No. 05 Civ. 3198, 2006 U.S. Dist. LEXIS 22211 (S.D. Tex. Apr. 11, 2006); *King v. W. Corp.*, No. 04 Civ. 318, 2006 U.S. Dist. LEXIS 3926 (D. Neb. Jan. 13, 2006).

Second, Plaintiff must make a "substantial" showing that Sales Reps are "victims of a common policy or plan that *violated the law*." *Scholtisek v. Eldre Corp.*, 229 F.R.D. 381, 387 (W.D.N.Y. 2005) (emphasis added); *see also*, *Jacobsen v. Stop & Shop Supermarket Co.*, No. 02 Civ. 5915, 2004 U.S. Dist. LEXIS, *3 (S.D.N.Y. May 15, 2003) *Mike*, 274 F. Supp. 2d 216 at 220 (quoting *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997)).

Here, Plaintiff argues that the unlawful policy that applies to all Sales Reps is that they have been "misclassified" as exempt from the FLSA as either "outside sales" or "administrative" employees. In conclusory fashion, Plaintiff argues that her mere allegations are sufficient to justify notice and conditional certification. Although the Plaintiff's burden at this first notice stage is not "onerous," it is well-established that conclusory allegations are insufficient.[8] *Prizmic*, 2006 U.S. Dist. LEXIS 42627, at *6; *see also Evancho*, 2007 U.S. Dist. LEXIS 93215 ("[u]nsupported assertions of widespread violations are not sufficient"); *Aguirre*, 2006 U.S. Dist. LEXIS 22211, at *18-19 (denying motion for conditional certification where "plaintiffs' conclusory and unsupported allegations [were] inadequate even for first-stage certification and notice…"); *West v. Border Foods, Inc.*, No. 05 Civ. 2525, 2006 U.S. Dist. LEXIS 96963, *28-29 (D. Minn. June 12, 2006), *adopted by* 2006 U.S. Dist. LEXIS 46506 (D. Minn. July 10, 2006).

---

[8] While Plaintiff characterizes the applicable standard for determining whether notice will be issued as "fairly lenient," (*see* Pl. Mem. p. 16), court-ordered notice requires more, particularly where both parties have engaged in extensive discovery specifically focusing on class certification. (Alloy Decl. ¶ 12-18) In addition, Plaintiff has had the opportunity to contact and speak to a cross-section over four-hundred current and former BMS Sales Reps from each of the five business divisions. (Alloy Decl. ¶ 16) While BMS agrees with Plaintiff that a "second-stage" analysis is not appropriate, certainly a "more searching standard of review" is warranted in this instance. *See Davis* 303 F. Supp. at 1276 (citing *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1313 n.2 (M.D. Ala. 2002)); *Pfohl*, 2004 U.S. Dist. LEXIS 6447, at * 31-2; *Morisky*, 111 F. Supp. 2d at 497-98.

Plaintiff is not claiming that she was subject to a facially illegal policy or practice. Rather, she is challenging the decision to classify Sales Reps as exempt under the outside sales and/or administrative exemption.[9]  Such a challenge inevitably requires an individualized fact-based analysis that is inappropriate for collective adjudication.  Moreover, Plaintiff's counsel are attacking a perfectly *lawful* policy and practice that has been a part of the pharmaceutical industry for over 50 years.  And, when the decision to classify Sales Reps as exempt from overtime has been challenged, the decision has been upheld by every court that has decided the issue, as well as the Department of Labor.  In the face of this mountain of legal precedent all holding that Sales Reps are exempt from the FLSA under either the administrative or the outside sales exemption, the Court should exercise its broad discretion to deny certification.

A.    **Application Of The "Outside Sales" Exemption Establishes That There Is No "Unlawful" Policy.**

Plaintiff's contention that Sales Reps do not qualify for the outside sales exemption because they do not actually exchange drugs for money has now been soundly rejected by three different federal judges within the past four months: (i) *D'Este. v. Bayer Corp.*, No. 07 Civ. 3206, 2007 U.S. Dist. LEXIS 87229 (C.D. Ca. Oct. 9, 2007) ("Bayer"); (ii) *Barnick v. Wyeth*, 522 F. Supp. 2d 1257 (C.D. Cal. 2007) ("Wyeth"); and (iii) *Menes v. Roche Laboratories Inc.*, No. 07 Civ. 01444, 2008 U.S. Dist. LEXIS 4230 (C.D. Cal. Jan. 7, 2008) ("Roche").[10]  Plaintiff provides no legal support for her overly narrow definition of the term "sell" and instead spends

---

[9] As discussed in Section II.C below, Plaintiff ignores both the highly compensated and the motor carrier exemptions.  However, it is undisputed that both of these exemptions are likely to apply to a significant percentage of the purported class who, unlike the Plaintiff, earned at least $100,000 annually and/or regularly worked in interstate commerce.  For this additional reason, Plaintiff's argument that she is "similarly situated" to all Sales Reps with respect to her classification as exempt is plainly incorrect.

[10] Similarly, the California Superior Court held in April 2006 that sales representatives of Aventis – who perform the same work that BMS Sales Reps perform – are properly classified as exempt outside salespersons under the law. *Saccone v. Aventis Pharmaceuticals, Inc.*, Case No. BC327123 (Cal. Super. Ct. Apr. 12, 2006) (a copy of the "Notice of Ruling on Aventis' Motion for Summary Judgment" is attached as Exhibit 4 to the Alloy Decl.).

just two paragraphs summarily dismissing the notion that Sales Reps are "selling" within the meaning of the law.

However, the three recent federal cases all involved Sales Reps, all are directly on point, and each held, unequivocally that sales representatives are exempt outside salespersons within the meaning of California's overtime law because they are in fact "selling." Because California's overtime law – including its outside salesperson exemption – is patterned on the FLSA and looks to federal law for authority, these decisions are controlling.[11]

There can be no dispute that the primary job responsibility of Sales Reps is to "sell" and promote BMS's pharmaceutical products in their territory by calling on health care practitioners and persuading them to administer or prescribe the products for their patients or add the product to their hospital's formulary – always with the end goal of increasing prescriptions and "driving sales" in their territory. (Amendola 117; Alloy Decl. Ex. 3; Polit Decl. ¶ 4-6, 8, 11-12, 22; Forrey Decl. ¶ 5-6, 11, 13, 21; Pradhan Decl. ¶ 5-7, 9, 16, 19; Saeger Decl. ¶ 4-6, 11, 14, 20)

Sales Reps provide information, answer questions, engage in dialogue, probe doctors to understand their concerns, and ultimately "close" the physician and ask for a "commitment" to use or prescribe BMS products where appropriate. (*Id*; Amendola 159-62, 219-20) While it is true that physicians do not purchase pharmaceutical products directly from Sales Reps, they do control a product's ultimate purchase – either by purchasing the products directly themselves, or

---

[11] Section 510 of the California Labor Code exempts "outside salespersons" from overtime and defines "outside salespersons" as "any person, 18 years of age or over, who customarily and regularly works more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services or use of facilities." *Id.* (codified at Cal. Code Regs., tit. 8, § 11040-2(M)). The Labor Code was modeled on the FLSA, and other courts' interpretation of the FLSA has persuasive authority when applying California's exemption. *See Bayer; Wyeth; Roche; Nordquist v. McGraw-Hill Publishing Co.*, 32 Cal. App. 4th 555, 562 (1995). Indeed, California's outside sales exemption is *narrower* than the FLSA's exemption, as it does not have an expansive definition of "sales" or a catch-all "other disposition" category like the FLSA.

by prescribing the products for their patients to purchase from pharmacies.[12]  Not surprisingly, Sales Reps consider the physicians and medical practitioners in their territory to be their "customers" and target them in an attempt to increase prescriptions, and therefore sales.  (*Id*.; Amendola 117, 136)  Indeed, Sales Reps are evaluated and compensated, in large measure, by the sales generated in their territory.  (Amendola 111, 214, 239-41, 251; Polit Decl. ¶ 21; Forrey Decl. ¶ 20; Pradhan Decl. ¶ 18; Saeger Decl. ¶ 19)

Because they work exclusively from the road and out of their homes with little direct supervision and without their hours being tracked, Sales Reps therefore fall under the FLSA's exemption for outside sales, which exempts from the FLSA's overtime requirements "any employee employed…in the capacity of outside salesman."  29 U.S.C. § 213(a)(1); *see also Jewel Tea co. v. Williams*, 118 F.2d 202, 207-08 (10th Cir. 1941) (explaining the spirit and purpose of the exemption).  The Department of Labor's regulations provide that the outside sales exemption applies to employees: (i) whose primary duty is "making sales" or "obtaining orders for contracts or services or for the use of facilities for which a consideration will be paid by the client or customer" and (ii) "[w]ho is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty."  29 C.F.R. § 541.500. A "sale" is defined broadly as "any sale, exchange, contract to sell, consignment for sale, shipment for sale, *or other disposition*."  29 U.S.C. § 203(k) (emphasis added).

Not surprisingly, all three of the recent California decisions rejected Plaintiff's hyper-technical interpretation of "sale."   For example, in *Bayer*, the court recognized the rationale behind the outside salesperson exemption and stated:

> Because patients are unable to obtain Bayer's products directly and must have a
> prescription from a physician, Bayer directs the focus of its sales efforts at the

---

[12] In Immunoscience, for example, Orencia is typically purchased by doctors and hospitals.  (Polit Decl. ¶ 12)

> doctors who are responsible for making the purchasing decision on behalf of the
> patient. . . . In addition to reviewing the transaction at issue, whether or not a
> particular transaction qualifies as a "sale" can also be analyzed based on the
> capacity of the parties to the transaction.  "The buyer . . . must have the capacity
> to purchase or place an order for a product or a service" while "the seller must
> have the capacity to consummate sales, take orders, or obtain commitments from
> the buyer for the purchase of the employer's services."  In this case the "buyer" is
> the doctor who has the capacity to "place an order for Bayer's product by writing
> a prescription for a patient."  Plaintiff . . . was responsible for obtaining
> commitments from the doctors she called on to write additional prescriptions or
> orders for Bayer's products.

*Id.*, at *5 (citation omitted).  Likewise, in *Wyeth*, the court commented that "[w]ith regard to

Plaintiff's first contention that physicians are not the ultimate purchasers of Wyeth's products,

this is clearly a distinction without a difference," explaining that:

> [T]hough it is true physicians never actually buy Wyeth's prescription products, it
> is clearly they who control the product's ultimate purchase.  Because physicians
> determine whether or not a patient will buy a prescription product, it is they who
> are appropriately the target for sales efforts and appropriately considered Wyeth's
> customers.  Plaintiff's contrary analysis would produce the absurd conclusion that
> Wyeth does not engage in any sales activity regarding its prescription products
> merely because its efforts are rationally aimed at those determining the product's
> purchase rather than the directed buyers of the product.

*Id.*, at *13-14.

Indeed, it is clear that the term "sale" is broadly defined in the FLSA, and courts have

routinely considered the realities and practicalities of each situation when determining whether

something constitutes "sales." *See* 29 U.S.C. § 203(k) (definition of "sale" includes a catch-all

"other disposition" category that broadens its scope); "Executive, Administrative, Professional

…Outside Salesman'" Redefined, Wage and Hour Division, U.S. Department of Labor, Report

and Recommendations of the Presiding Officer (Harold Stein) at Hearings Preliminary to

Redefinition (Oct. 10, 1940) (1940 Stein Report) (Alloy Decl. Ex. 5) ("practical" considerations

must be taken into account when determining what constitutes sales); *see also Wirtz v. Jernigan*,

405 F.2d 155, 158 (5th Cir. 1968) ("[i]n the first place the term sale is defined quite capaciously

in the Act"); *Wirtz v. First Nat'l Bank & Trust Co.*, 365 F.2d 641, 645 (10th Cir. 1966) (holding

that the FLSA "does not limit the term 'sale' to transactions in commodities"); *Medtronic, Inc. v.*

*Benda*, 689 F.2d 645 (7th Cir. 1982), *cert. denied*, 459 U.S. 1106 (1983) (focusing on substance

of the transactions and not their form and holding that "physicians are the 'real' purchasers" of

the medical products); *Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085 (D. Minn. 1981), *aff'd*,

684 F.2d 565 (8th Cir., 1982).

Significantly, all three decisions relied on *federal* law interpreting the FLSA's outside

sales exemption, including two seminal decisions that set forth the relevant factors a district

court must analyze to support a determination that an employee should be categorized as an

outside salesperson, namely whether:

> (1) the job was advertised as a sales position and the Plaintiff was recruited based
> on sales experience, (2) the job entailed specialized sales training, (3)
> compensation was based on commissions, (4) the job entailed independently
> soliciting new business, (5) the Plaintiff received little or no direct supervision or
> constant supervision in carrying out daily work task, and (6) the Plaintiff was
> called a salesperson.

*Roche*, at *3 (citing *Hodgson v. Klages Coal & Ice Co.*, 435 F.2d 377, 382-84 (6th Cir. 1970));

*Wyeth*, at *10 (citing *Nielsen v. Devry Inc.*, 302 F. Supp. 2d 747, 756-58 (W.D. Mich. 2003) and

*Hodgson*); *Bayer*, at *5 (citing *Nielsen*).

Applying the above factors, the court in *Roche* held that the plaintiff "[c]learly qualifies

as an exempt outside salesperson" because she: (i) was recruited and trained to sell, including

how to make effective sales presentations; (ii) was compensated based on her sales success to

some extent (i.e., bonuses based on "market share growth"); (iii) identified and solicited new

business from new customers on her own; (iv) received little or no direct supervision; and (v) did

not know the exact number of hours she worked and had no record of her time. *Id.*, at *4; *see*

17

*also Bayer*, at *6 (concluding that plaintiff "easily" met the same factors); *Wyeth*, at *10-11

(finding that the plaintiff "clearly" qualified as an outside salesperson).

Here, it cannot be disputed that BMS sales representatives satisfy the factors federal

courts routinely apply to determine whether or not an employee is "engaged in sales."  Namely:

- Sales Rep positions are advertised as sales positions, and as a general rule, BMS seeks applicants with sales experience (and preferably pharmaceutical sales experience) when hiring.  As the Plaintiff's own resume makes clear, she considers herself to be a "sales" rep first and foremost, and she takes pride in the fact that she has been a top seller and has helped grow the market for certain products.  (Saylor Decl. Exs. 6-7, 20-23, 33; Alloy Decl. Ex. 3; Polit Decl. ¶ 2)

- When hired, Sales Reps receive extensive specialized sales training during their six-week "Track 1" training, and thereafter they continue to receive sales training at POA conferences and on-line throughout the year.  They are trained on the ENGAGE selling skills model, which is a core component of their position.  Indeed, it is impossible to read even two pages of the ENGAGE handbook without concluding that it is meant as a "sales" guide.  (Amendola 100, 188; Faucett 205-8, 226; Segalini 76-7, 109-12, 143-5, 157-8; Fee 91-8; Bitetti 85-6, 142-9; DeSimone 104-10; Saylor Decl. Ex. 15; Forrey Decl. ¶ 18; Pradhan Decl. ¶ 15; Saeger Decl. ¶ 16)

- Sales Reps are responsible for independently identifying, soliciting, generating new business opportunities in their territory, including updating their call list to reflect these new sales opportunities.  (Amendola 166-7, 264-5;  Alloy Decl. Ex. 3; Polit Decl. ¶ 7; Forrey Decl. ¶ 8; Pradhan Decl. ¶ 8; Saeger Decl. ¶ 9; Bitetti 91-94, 98-100; Segalini 136; Fee 82)

- Sales Reps focus on "closing" the physicians (who they call "customers") who they call on in their territory, and the ultimate objective of each sales call is to get a "commitment" from the physician to prescribe (where appropriately indicated) the BMS product that the Sales Rep is selling.  Sales Reps are trained extensively on the importance of the "close" and they take pride "growing" sales and market share in their territories.  (Forrey Decl. ¶ 5-6, 11, 13, 21; Polit Decl. ¶ 4-6, 8, 11-12, 22; Pradhan Decl. ¶ 5-7, 9, 16, 19; Saeger Decl. ¶ 4-6, 11, 14, 20; Amendola 117, 159-62, 219-20; Alloy Decl. Ex. 3; Faucett 51-3; Bitetti 44; DeSimone 26, 122; Fee 9-11; Segalini 82; Saylor Decl. Ex. 15)

- Sales Reps receive incentive compensation (often as much as 30% of their base salary) which is based primarily on prescriptions and sales within their specific territory - i.e. total sales, market share, sales rank, or market growth.  (Amendola 111, 214, 241, 251; Bitetti 162-3; Fee 115; Segalini 177-81; Forrey Decl ¶ 20-1; Polit Decl. ¶ 21-2; Pradhan Decl. ¶ 18-19; Saeger Decl. ¶ 19-20)

- Finally, Sales Reps are generally free of direct day-to-day supervision. They do not report in to an office, and their whereabouts are not tracked. Managers accompany Sales Reps on sales calls ("ride-alongs"), about once per month, and most Sales Reps do not even speak to their managers more than weekly. Amendola even ran errands during the day. (Amendola 171-5, 210-11, 263; Polit Decl. ¶ 20; Forrey Decl. ¶ 19; Pradhan Decl. ¶ 17; Saeger Decl. ¶ 17-18)

In a footnote, Plaintiff attempts to distinguish *Bayer* and *Wyeth* on three grounds, none of which are persuasive. First, Plaintiff argues that those cases involved different facts and different law. However the facts in this case establish that Sales Reps meet all of the factors generally applied to outside salespersons. Likewise, as those two cases (and *Roche*) make clear, the California Labor Code is patterned on the FLSA (and indeed, is *narrower* in scope), and those courts all relied solely on federal law interpreting the FLSA in reaching their decisions.

Next, Plaintiff cites the applicable FLSA regulations and claims that the regulations "are explicit that an employee's promotion work can be exempt only if it furthers that employee's own individual sales." Pl. Brief at 20, n.52. As an initial matter, Plaintiff is correct that to qualify as exempt *outside sales* work, the promotion work must further the employee's own individual sales. Here, however, there can be no question that Sales Reps are focused on promoting and selling products to *particular* health care practitioners in their own territory, and the objective of every sales call is to gain a commitment and generate prescriptions from the particular doctors they call on. *See* 29 C.F.R. § 503(c) (gaining commitments for additional purchases would be outside sales work, not general promotional work). Moreover, even if Sales Reps did not qualify for the outside sales exemption because they do not "sell" as Plaintiff wrongly defines the term, Plaintiff ignores the fact that 29 C.F.R. § 503(a) goes on to state that employees who engage in sales promotion "may still qualify as an exempt employee under other

subparts of this rule" (i.e., the *administrative* exemption, which specifically mentions "promotion" work as an example of exempt administrative work).

Finally, Plaintiff cites a single sentence in *Wyeth*, clearly *dicta*, and taken out of context, to justify ignoring the now-settled law that Sales Reps are exempt outside sales employees – under any standard. When read in its full context, however, and without the bracketed language that Plaintiff has misleadingly added, the *dicta* merely sets out the court's opinion that federal courts interpreting the FLSA are likely to require that, in order to be considered incidental to sales, and therefore exempt outside sales work, promotional efforts must include seeking a *commitment* from individual physicians. The court notes that it does not agree with that (presumed) requirement, and instead, believes that *all* promotion work in the pharmaceutical sales context should be considered exempt sales work, regardless of whether or not the sales rep seeks a commitment, so long as the rep is focused on persuading particular customers. This, of course, only lends further support to the conclusion that Sales Reps are exempt under the FLSA, as it is undisputed that they routinely seek commitments from physicians in the course of a sales call – indeed, this is one of the core principles of BMS's "ENGAGE" selling skills model on which all Sales Reps are trained. And, as shown above, Sales Reps focus their efforts on *particular* health care practitioners in their territory rather than the general public.

Accordingly, because there is overwhelming evidence that Sales Reps are exempt from the FLSA and overtime pursuant to the "outside sales" exemption, Plaintiff should not be permitted to send notice to some 4,500 current and former Sales Reps – disrupting BMS' operations, wasting resources, and raising false expectations – based on an argument that has been consistently rejected by every court that has ever addressed it to date.

**B.**    **Application Of The "Administrative" Exemption Precludes A**
**Finding That Plaintiff Is "Similarly Situated" To All Sales Reps.**

If the Court agrees that the outside sales exemption applies (or is likely to apply) in this

case, then Plaintiff's motion must be denied.  However, if the Court determines that the outside

sales exemption may not apply, the Court also must address whether Sales Reps are

independently exempt from overtime pursuant to the FLSA's administrative exemption (and, as

discussed below in Section C, the highly compensated and/or motor carrier exemptions).

Plaintiff has presented no legal support for her assertion that she is "misclassified" under the

administrative exemption, and indeed, courts routinely hold that employees who market and

promote sales are exempt employees.  Moreover, even if this Court disagrees that Sales Reps fall

within the administrative exemption, any further resolution of the issue will necessarily require

an *individualized* analysis of each Sales Rep's job duties and responsibilities, making this case

particularly inappropriate for adjudication on a class-wide basis.

1.    *Plaintiff Has Not Established That She Was "Unlawfully"*
*Classified As An Exempt Administrative Employee.*

The administrative exemption applies to employees: (i) whose primary duty is "the

performance of work directly related to the management or general business operations of the

employer or the employer's customers;" and (ii) whose primary duties include the exercise of

discretion and independent judgment with respect to matters of significance.  29 U.S.C.

213(a)(1); 29 C.F.R. § 541.200-202.  To meet the first requirement, an employee must perform

work "directly related to assisting with the running or servicing of the business, as distinguished,

for example, from working on a manufacturing production line or selling a product in a retail or

service establishment."  29 C.F.R. § 541.201.  Plaintiff's argument that "[p]lainly all [Sales

Reps] fall on the 'production' side of the dichotomy" because they "are line employees who

21

perform the routine, day-to-day work of BMS's business, *i.e.*, encouraging doctors to prescribe

its pharmaceutical products" is patently absurd.  Pl. Brief at 21.

Plaintiff is asking this Court to ignore the law and rely on her unsupported assertions that

she – and therefore every Sales Rep – is a "production" line employee akin to a factory worker or

machine operator.  As an initial matter, the so-called "administrative/ production" dichotomy has

never been a dispositive test for exemption, but is merely an analytical tool.  *See* April 23, 2004

Preamble to the Department of Labor's Final Rule, 29 C.F.R. Part 541 at 22141-2.  Regardless,

29 C.F.R. § 541.205(b) sets forth examples of work that is clearly administrative," including

"promoting sales."  S*ee also Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230 (5th Cir. 1990) (quoting

the fact that "promoting sales" is administrative and not production work); *Reich v. John Alden*

*Life Ins. Co.*, 126 F.3d 1 (1st Cir. 1997).  Sales Reps are certainly not the ones producing  BMS's

products, and they are not working in factories or operating machines.  Accordingly, there is no

question that Sales Reps meet the first prong of the administrative exemption.

To meet the second requirement of the administrative exemption, an employee must

exercise discretion and independent judgment with respect to matters of significance.  The

exercise of discretion and independent judgment "involves the comparison and the evaluation of

possible courses of conduct, and acting or making a decision after the various possibilities have

been considered."  29 C.F.R. § 541.202(a).  It "implies that the employee has authority to make

an independent choice, free from immediate direction or supervision" but "it does not require

that the decisions made by an employee have a finality that goes with unlimited authority and a

complete absence of review."  29 C.F.R. § 541.202 (b), (c).

To determine whether or not a particular employee exercises sufficient discretion and independent judgment (and is therefore exempt), a court must conduct a fact-specific, individualized inquiry into each employee's duties and responsibilities. *See* 29 C.F.R. § 541.2; *Morisky v. Public Serv. Elec & Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000) ("[t]o determine which employees are entitled to overtime compensation under the FLSA depends on an individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria"); *see also Evancho v. Sanofi-Aventis*, 2007 U.S. Dist. LEXIS 93215, at *8-12; *Aguirre*, 2006 U.S. Dist. LEXIS 22211, No. 05 Civ. 3198, at *7 (S.D. Tex. Apr. 11, 2006); *King*, 2006 U.S. Dist. LEXIS 3926. *Reich v. Homier Distrib. Co.,* 362 F. Supp. 2d 1009, 1013 (N.D. Ind. 2005); *Wombles v. Title Max of Ala., Inc.*, No. 03 Civ. 1158, 2005 U.S. Dist. LEXIS 34733, *16 (M.D. Ala. Dec. 7, 2005); *Pfohl v. Farmers Ins. Group*, No. 03 Civ. 3080, 2004 U.S. Dist. LEXIS 6447, at *28; *Mike v. Safeco Ins. Co. of Amer.*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003); *Dean v. Priceline*, 2001 U.S. Dist. LEXIS 24982 (D. Conn. 2001).

Significantly, one federal court has already explicitly held that Sales Reps are properly classified as exempt under the FLSA's administrative exemption. In *Cote v. Burroughs Wellcome Co.*, 558 F. Supp. 883 (E.D. Pa. 1982), the plaintiff was employed as a "Professional Representative" or "detail person" who was responsible for "call[ing] regularly on physicians, hospitals, and pharmacies and to increase the sale of [Defendant's] products by 'detailing' the recommended indications of these drugs to potential prescribers and retailers." *Id.* at 885. Similar to BMS, the "[Defendant] train[ed] its detail persons for six to eight months and provide[d] them with an extensive set of selling tools including a weekly schedule, preprinted individual Physician and Pharmacy Call Cards, Physician Work Plan Pages identifying who to call during a particular week, and a Selling Plan to identify the drugs to be detailed." *Id.* Much

like BMS Sales Reps, the "detail person" was occasionally accompanied on calls by his District

Sales Manager, who evaluated his performance.  Also, he was required to "record daily sales,

detail and sample distribution" and his job performance was "evaluated based on sales results

and standardized requirements such as calling on a certain number of physicians per day and

presenting each physician with a minimum number of product details."  *Id*.

The court in *Cote* specifically noted that plaintiff had only mechanically to apply

specified procedures in setting up her physician visit schedule and in "detailing" her products,

but nevertheless concluded that there was "ample record evidence to show that the job required

the exercise of independent judgment and discretion in many other areas."  *Cote*, 558 F. Supp. at

887.   The court cited "[c]ircumstantial evidence of [Plaintiff's] exercise of discretion," including

the fact that "plaintiff was commended for her initiative in increasing sales of a certain drug by

cultivating a good working relationship with nurses at a particular clinic and asking for their help

in reminding physicians about the drug."  *Id*.  The court then concluded that "[c]learly, on

entering the physician[']s office (even if plaintiff had very little choice in deciding which

physician to visit or which product to detail) the detail person was expected to use a wide degree

of discretion in deciding how to encourage the use of the product."  *Id*.  The Department of

Labor has also determined that medical "detail persons" (akin to pharmaceutical reps) are

exempt.  *See* 1943-48 Wages Hours (CCH) P33,093 (May 19, 1945); Labor Department Wage

and Hour Opinion, January 1946, Lab.L.Rep. (CCH) Wage and Hour, v.1, ¶25,210.41.  Copies

the letters are attached as Exhibit 1 to the Alloy Declaration.

Outside of the pharmaceutical industry, courts have also routinely held that employees

who market and promote their employer's products in order to increase sales fall within the

administrative exemption.  For example, in *Reich*, 126 F.3d at 10, the First Circuit concluded that

John Alden's marketing representatives were indisputably exempt administrative employees, and specifically noted that they: (i) were the primary contact with John Alden's customers; (ii) were responsible for maintaining an exclusive list of customers who they regularly contacted; (iii) had a set quarterly sales goal; (iv) were responsible for keeping their customers up to date on the company's product line, including new products; (v) discussed with their customers how their products could meet their needs (as well as the needs of their customer's customers); and (vi) educated their customers about their products, including passing along articles and holding small group presentations.[14]

Not surprisingly, the duties identified in *Cote* and *John Alden* are remarkably similar to the duties and responsibilities that Sales Reps routinely perform for BMS. For example:

- Sales Reps are BMS's primary contact with their customers;

- Sales Reps are particularly proud of their ability to form "superior" relationships with important key physicians in their territory, which leads to increased sales;

- Sales Reps maintain, update, and utilize Call Lists of "customers" who they regularly contact. They decide when to contact the customers, how often, and what to speak about during the call, within regulatory guidelines.

- Sales Reps are responsible for educating the doctors in their territory, providing them with pertinent information and clinical studies, and answering questions.

- Sales Reps have quarterly sales goals that they strive to meet, and receive incentive compensation and other prizes when they meet these goals.

- Sales Reps promote and sell their products to their customers by identifying the needs of the physicians, nurses and office staff, as well as their patients.

---

[14] The Department of Labor has specifically adopted the reasoning in *John Alden* and has taken the position that employees who engage in marketing and sales promotion work should be evaluated under the standard set forth by the First Circuit. *See* April 23, 2004 Preamble to the Department of Labor's Final Rule, 29 C.F.R. Part 541 at 22145-6; *see also Wilshin v. Allstate Ins. Co.*, 212 F. Supp. 2d 1360 (M.D. Ga. 2002); *Feiler v. Hyatt Corp.*, No. 98 Civ. 2863, 1999 U.S. Dist. LEXIS 23407 (S.D. Fla. Dec. 8, 1999).

25

- Sales Reps organize, plan and hold speaker programs, dinner programs, lunch n' learns, and other educational presentations. They choose whether to hold a program, when, where, and who to invite.

(Polit, Forrey, Pradhan and Sager Declarations; Alloy Decl. Ex. 3; Amendola 103-7, 111, 114-17, 136, 139, 147-8, 150-2, 166-7, 214, 217-20, 241-2, 251, 259-61, 264-5)

In light of the *Cote* decision and the Department of Labor's opinion letter – both of which apply specifically to Sales Reps and are directly applicable in this case – as well as *Reich v. John Alden*, and given the job duties and responsibilities that Sales Reps indisputably perform, Plaintiff cannot succeed in attacking the administrative exemption. She does not discuss *Cote*, let alone explain why it is not controlling. While she implies that Sales Reps do not exercise discretion or independent judgment because they must follow FDA guidelines, provide physicians with pre-approved materials (that they cannot alter), are expected to convey certain "core" messages, and are subject to various BMS policies, Pl. Brief at 22, she does not explain how or why this is legally significant for the purposes of applying the administrative exemption.[15] Indeed, with the exception of the administrative/production dichotomy, Plaintiff does not even cite a single case in support of her claim that Sales Reps are *unlawfully* classified under the administrative exemption. Because Plaintiff has failed to establish any legal (or, for that matter, factual) basis for this claim, conditional certification and class notice are inappropriate.

---

[15] Not surprisingly, this is because the law is well-settled that employees routinely exercise discretion and independent judgment even where they are required to adhere to standardized policies and procedures, federal regulations, and detailed guidelines. *See, e.g., John Alden*, 126 F.3d at 14; *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365 (7th Cir. 2005); *Hogan v. Allstate Ins. Co.*, 361 F.3d 621 (11th Cir. 2004); *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir. 2003); *Haywood v. North Am. Van Lines*, 121 F.3d 1066, 1069 (7th Cir. 1997); *Donovan v. Burger King Corp.*, 675 F.2d 516, 521-22 (2d Cir. 1982); *In re Allstate Ins. Co.*, No. 04 Civ. 0015, 2007 U.S. Dist. LEXIS 58442, *6, 41 (D. Ariz. Aug. 6, 2007); *Marting v. Crawford & Co.*, No. 06 Civ. 7132, 2006 U.S. Dist. LEXIS 10509, *29, *32 (N.D. Ill. Mar. 14, 2006); *Cote v. Burroughs*, 558 F. Supp. 883 (E.D. Pa. 1982); DOL Opinion Letter FLSA-2006-43 (Nov. 27, 2006).

2.    *The Court Cannot Resolve The Administrative Exemption On A Class-Wide Basis.*

Even if the Court finds that there is a factual dispute as to whether, for the purposes of this motion, Plaintiff has been unlawfully misclassified under the administrative exemption, it is plainly inappropriate to conclude that all Sales Reps nationwide are similarly situated without regard to business division, experience, competence, and most importantly, job duties and responsibilities and how those duties are actually carried out.  As discussed above at pages __ to ___, to make a determination that any particular Sales Rep is properly (or improperly) classified as exempt under the administrative exemption, the Court would necessarily have to undertake an individualized and fact intensive inquiry into that particular Sales Rep's job duties and responsibilities, including how they actually carry out those duties on a day-to-day basis.

Plaintiff's argument that certification is appropriate because all Sales Reps are identical automatons with no discretion and who perform the exact same "routine" tasks day in and day out, is totally undermined by the extensive documentary evidence, witness testimony, and declarations submitted by BMS, as well as by Plaintiff's own testimony, her resume, and her job evaluations (which she in part wrote).  The five declarations submitted by Plaintiff contain only sweeping generalizations and very little detail, pertain *only* to former Sales Reps from the CV/Met and Neuroscience divisions, and are remarkably similar.[16]  Moreover, Plaintiff testified at her deposition that she had *no* personal knowledge of how Sales Reps in other divisions are trained, what their customer base consists of, what the expectations are in those divisions, what their hours are, how much discretion they have with respect to developing their call plan, how much discretion they have with respect to choosing which doctors to call on, how they are

---

[16] The declarations submitted by Plaintiff in support of her motion contain largely identical boilerplate language, are replete with hearsay, and provide little or no foundation for many of their statements.  Accordingly, the Court should disregard any statements which plainly are not based on personal knowledge and/or are unadmissible.

supervised, how they are compensated, and how much authority and flexibility they have to conduct presentations and other programs. (Amendola Dep. 120-1, 129-30, 164-5, 178-82) Indeed, she did not even know how many divisions there were, and instead just "assumed" that they were all the same. (*Id.*)

BMS, by contrast, has submitted declarations from Sales Reps from multiple divisions that *specifically* set forth all of the varying ways that they go about performing their jobs, including all of the different ways in which they exercise discretion and independent judgment, and all of the ways that their work varies as a result of their particular business division, their experience, their selling style, and their selling skills. What is particularly notable about these declarations is how *different* they are, both from each other, and compared to the declarations submitted by Plaintiff. For example:

- They work in different business divisions, which have different disease states, different products, different types of physicians, and different expectations;

- Some Sales Reps call on private physician offices, others call on hospitals. Calling on hospitals involves a "total office call" and is considerably more involved and complicated than calling on just a doctor.

- Those Sales Reps who call on hospitals, in addition to focusing on increasing sales, also must work to get their products on the hospital's formulary.

- Some products (such as in Immunoscience) are infusible and are purchased and stocked by the doctor (or hospital). Sales Reps who sell infusible products have a greater responsibility to meet with, educate and sell the benefits of the product to nurses and other hospital staff.

- Different divisions have different requirements for Call Plans. Some Sales Reps are able to craft their Call Plan at the beginning of each year. Others have the ability to modify their Call Plans by adding or deleting doctors.

- Not all divisions or Sales Reps have set call requirements. Some have target numbers for each doctor, others are simply given a list of doctors in their territory without any guidance as to how many times to call on each individual.

28

- All Sales Reps pick and choose which doctors (from their Call List – if they have one) to call on, and how frequently.

- Some Sales Reps work with a "Pod" partner in their territory, which means they must coordinate their sales goals and objectives. Others are the only Sales Reps in their territory.

- Each Sales Rep believes it is important to develop relationships with the doctors they call on, and each goes about developing those relationships in different ways.

- Some Sales Reps have samples, which they determine when and how to distribute to their customers in order to maximize and drive sales and market share.

- Some Sales Reps like to put on promotional programs, including speaker programs, others do not. However, they all have a great deal of discretion in choosing whether to put on such programs, and who to invite.

- Sales Reps have promotional materials specific to their business division, and they pick and choose which materials to use on each call.

- Each Sales Rep has their own "style" that they have developed on their own and adapt to each physician, and their own strategies and goals. Each Sales Rep "tailors" every sales call to the particular physician and the particular situation.

- Each Sales Rep decides (within legal limits) whether and how to adapt a "core message" or other key selling points into their sales calls, what questions to ask, and how to answer or respond to questions.

- Each Sales Rep prepares for calls in a unique manner, depending on the particular physician, the physician's patient population, and depending what goal or objective they have set for the call.

- Each Sales Rep goes about getting a "commitment" (and indeed, deciding what particularly "commitment" to seek) from doctors in completely different ways, depending on the particular physician, the flow of the sales call, and prior calls.

- Each division has a different incentive compensation plan, and different incentive compensation targets.

- Each Sales Rep has a different manager, who has their own supervisory style. However, none of them are closely supervised, and most have very little contact with their manager in any given week.

(Polit, Forrey, Pradhan and Saeger Declarations)  These declarations are only further supported by the testimony of BMS's five 30(b)(6) witnesses. *See supra,* 4-9.[17]

Clearly, there is an enormous disparity between how Plaintiff (and the five Sales Reps who submitted declarations in her behalf) describe their job and its duties, and how current Sales Reps describe their job.  Whether this is due to the fact that Plaintiff downplayed her job duties and responsibilities, or because Plaintiff and four of the five declarants are former representative who only worked in CV-Met Primary Care, is unclear.  However, this makes it impossible to conclude that Plaintiff is "similarly situated" to all other Sales Reps, particularly Sales Reps from Virology, Oncology, Immunoscience, and Neuroscience.

Indeed, in a case nearly identical to this one, the District of New Jersey recently denied collective action certification and declined to authorize notice to a proposed nationwide class of *Sanofi Aventis* Sales Reps for this precise reason.  *Evancho v. Sanofi-Aventis U.S. Inc,.* No. 07 Civ. 2266, at *9-11 (D.N.J. Dec. 18, 2007).  The plaintiff there made the exact same claims about her job duties and the exact same arguments why all sales reps were the same.  Similarly, Sanofi-Aventis presented affidavits and evidence that other reps disagreed with the Plaintiff's characterization and were performing their day-to-day duties and responsibilities in markedly different ways.  The court explained that "these differences between various [sales representative's] descriptions of their job responsibilities and duties show that status under the FLSA may vary among plaintiffs and potential collective action members" and therefore, "it appears that plaintiffs are not 'similarly situated' to potential collective action members as to

---

[17] Plaintiff's suggestion that it was inappropriate that BMS could not produce one 30(b)(6) witness to testify in-depth about each of the five business divisions is disingenuous.  Each witness was either the highest-ranking or close to the highest-ranking managerial employee in their respective division, with many years of sales experience at BMS.  Each testified repeatedly and unequivocally that they had *no* idea precisely how other divisions operated or how Sales Reps in those divisions performed their duties and responsibilities.  This testimony lends further support to the fact that each division is a separate sales force with different expectations, practices and realities, and Plaintiff has presented no evidence to the contrary.

their status under the FLSA." *Id.* at *10-11; *see also Silverman v. SmithKline Beecham*, No. 06 Civ. 7272, 2007 U.S. Dist. LEXIS 80030 (C.D. Cal. Oct. 15, 2007) (denying certification and notice where, as here, Plaintiff submitted "nearly identical" declarations from former sales reps that were not representative of the company's various discrete business divisions, and which all contained numerous hearsay and other evidentiary problems).

This exact reasoning has been applied repeatedly by courts to deny conditional certification in so-called "misclassification" cases, particularly where, as here, the Plaintiff claims to be similarly situated to a class merely because they were all classified as exempt under the administrative exemption (or a variety of exemptions). *See, e.g., Aguirre v. SBC Communications, Inc.*, 2007 U.S. Dist. LEXIS 17259 (S.D. Tex. Mar. 12, 2007)*; Aguirre*, 2006 U.S. Dist. LEXIS 22211, at *18-19; *Diaz v. Elecs. Boutique of Am., Inc.*, No. 04 Civ. 0840, 2005 WL 2654270, at *4 (W.D.N.Y. Oct. 17, 2005); *Mike*, 274 F. Supp. 2d at 220; *Morisky*, 111 F. Supp. 2d at 498; *King v. West Corp*, 2006 U.S. Dist. LEXIS 3926 (D. Neb. Jan. 13, 2006); *Dean v. Priceline.com, Inc.*, 2001 U.S. Dist. LEXIS 24982; *Pfohl v. Farmers Ins. Group*, 2004 U.S. Dist. LEXIS 6447; *Wombles*, 2005 U.S. Dist. LEXIS 34733; *see also Scholtisek*, 229 F.R.D. 381.

### C.    The Highly Compensated and Motor Carrier Exemptions Preclude A Finding That Plaintiff Is "Similarly Situated" To All Sales Reps.

While it is true, as Plaintiff points out, that the primary FLSA exemptions that pharmaceutical companies have relied upon traditionally have been the "outside sales" and "administrative" exemptions, many BMS Sales Reps are independently exempt under the "highly compensated" exemption, which applies to employees earning at least $100,000 in a year and who regularly perform at least one exempt duty (i.e., promoting sales).[18]  BMS has submitted

---

[18] The "highly compensated" exemption became effective in August 2004.  *See*  29 C.F.R. § 541.601.  Notably, the duties test is an intentionally low standard that virtually *all* white collar (non-manual) employees meet.

substantial undisputed evidence that a large percentage of Sales Reps (particularly those in Oncology, Virology, Neuroscience, and Immunoscience) earn at least $100,000 annually in base salary plus incentive compensation. *See supra* at 5-6. In addition, and because the highly compensated exemption has a significantly lower standard for meeting its "job duties" test (which does not have a "discretion and independent judgment" threshold), there can be little question that Sales Reps qualify for the exemption because they regularly "promote sales" and their duties involve interacting with customers on behalf of BMS and attempting to influence their prescription patterns. Plaintiff has made no attempt to explain why this exemption is not applicable, or how its application by BMS would somehow be unlawful. Accordingly, because this exemption applies to all Sales Reps earning at least $100,000, there is a significant percentage of the putative class that is not "similarly situated" to the Plaintiff (who never earned $100,000) and who would require a completely different legal and factual analysis.

Likewise, prior to August 2005, the "motor carrier exemption" (29 U.S.C. § 213(b)(1) and 49 U.S.C. 13102) exempted from the FLSA employees who transported or distributed property (such as drug samples and promotional materials) and drove vehicles in interstate commerce to further their employer's business. *See e.g.*, *O'Neal v. Kilbourne Med. Labs., Inc.*, No. 05 Civ. 50, 2007 WL 956428 (E.D. Ky. 2007); DOL Wage and Hour Opinion Ltr., 2004 WL 3177909, at *9-13 (Aug. 17, 2004). Because Plaintiff seeks to "certify" a class that extends back to June 2004, the Court would need to conduct yet another factual and legal analysis to determine whether the motor Carrier Exemption would apply to any Sales Reps so as to bar claims between June 2004 and August 2005 (when Congress amended the Motor Carrier Act to impose a vehicle weight requirement of 10,000 pounds, effectively precluding non-commercial motor carriers from qualifying for the exemption after that date).

32

**III.    DISCOVERY OF NAMES OF POTENTIAL CLASS MEMBERS IS NOT WARRANTED AND PLAINTIFF IS NOT ENTITLED TO EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS.**

Plaintiff's motion rehashes her previous request – denied by the Court – for discovery of the names and addresses of all current and former BMS Sales Reps nationwide, and seeks equitable tolling of the statute of limitations. The law on equitable tolling in the Second Circuit places a substantial burden on the plaintiff to prove that the defendant either (i) prejudiced them or (ii) improperly caused or influenced other plaintiffs not to join the suit. *See Jacobsen v. Stop & Shop Supermarket Co.*, No. 02 Civ. 5915, 2004 U.S. Dist. LEXIS 17031, *10 (S.D.N.Y. Aug. 27, 2004) (Cote, J.) (requiring "extraordinary circumstances" to justify equitable tolling); *Shih v. City of New York*, No. 03 Civ. 8279 LAP, 2006 WL 2789986, at *3 (S.D.N.Y. Sept. 28, 2006) (equitable tolling is appropriate where "the defendant has actively misled the plaintiff respecting the cause of action") (quoting *Smith v. American President Lines, Ltd.*, 571 F.2d 102, 109 (2d Cir. 1978); *Heins v. Potter*, 271 F. Supp. 2d 545, 553 (S.D.N.Y. 2003). In addition, "[f]ederal courts have typically extended equitable relief only sparingly." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96, (1990); *see also Dring v. McDonnell Douglas Corp.*, 58 F.3d 1323, 1330 (8th Cir. 1995).

Notwithstanding the high legal standard, Plaintiff argues that she is entitled to equitable tolling because BMS "repeatedly refused" to provide information on class members, refused to voluntarily toll the statute of limitations, is responsible for putative class members not being provided with sufficient knowledge of the lawsuit, and misled employees regarding their "entitlement" to overtime. Plaintiff's arguments are both legally insufficient and misleading.

First, Plaintiff already made an application to the Court for the names and addresses of all BMS Sales Reps. The Court ruled that Plaintiff was not entitled to all 4,500 names and

addresses but required BMS to provide a representative cross-section of the sales force. In accordance with this ruling, and in early-mid October 2007, BMS ultimately provided Plaintiff's counsel with the names and addresses of approximately 350 current and former Sales Representatives. Accordingly, Plaintiff's assertion that equitable tolling is somehow appropriate because BMS "refused" or "delayed" in providing this information is entirely disingenuous.

Second, BMS is under no obligation to *voluntarily* agree to toll the statute of limitations, particularly where, as here, it believes that a collective action is inappropriate and unwarranted as a matter of law. Additionally, Plaintiff cites no law for this novel proposition. Third, Plaintiff provides no evidence that other Sales Reps lack sufficient knowledge about the lawsuit. Indeed, Plaintiff's counsel engaged in seven months of publicity, claimed in the media to be overwhelmed by calls from interested sales reps, advertised heavily on the internet, and have had access to hundreds of names and contacts for current and former Sales Reps.

Third, Plaintiff's suggestion that Sales Reps are "entitled" without a Court order to notice of this lawsuit and their right to opt-in is plainly incorrect. Her suggestion that BMS improperly "delayed" its production of documents is not supported in light of the scope of the requests – which sought, in effect, *all* discovery that will be necessary in this case – and the thousands of pages of documents that BMS has produced, many of which have nothing to do with class notice. Fifth, BMS has not hidden or "misled" its employees regarding the fact that they are not entitled to overtime. Sales Reps have known for fifty years that they are classified as exempt, and that they have not challenged this classification until recently is certainly through no fault of BMS.

Finally, the statute of limitations should not be tolled where, as here, Plaintiff has failed to demonstrate that there are other similarly situated putative class members who wish to join the action or have relied on this action to their detriment. *See Evancho* 2007 U.S. Dist. LEXIS

93215 at *11-*12 (D.N.J. Dec. 18, 2007) (denying motion to equitably toll FLSA claims "[a]s to

unknown prospective claimants because plaintiffs have not shown there are potential collective

action members similarly situated to the plaintiffs for whom equitable tolling may be justified").

## IV.    PLAINTIFF'S PROPOSED NOTICE IS INADEQUATE

Plaintiffs' Proposed Notice is improper and generally misleading on numerous grounds,

including, but not limited to: (i) failing to fully and accurately describe Defendant's respective

position as to the defenses asserted in this action; (ii) improperly defining the class and the class

period; (iii) setting an overly lengthy deadline to opt-in, particularly in light of the six-months of

publicity and solicitation that plaintiff's counsel has already engaged in; and (iv) implying that

individuals can only join the lawsuit by returning the opt-in form to class counsel.  Accordingly,

the Court should order the parties to meet and confer in good faith to draft a mutually agreed-

upon notice that can be jointly submitted to the Court for approval.  *See Tucker v. Labor Leasing,*

*Inc.*, 872 F. Supp. 941, 949 (M.D. Fla. 1994).  In the event that the parties cannot agree, BMS

respectfully requests the opportunity to submit its own proposed notice.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's motion for conditional

certification, notice, discovery, and equitable tolling.

Dated:  New York, New York
        February 6, 2008

                                        PROSKAUER ROSE LLP

                                        By:    */s/ Joshua F. Alloy*
                                               Bettina B. Plevan (BP 7460)
                                               Joshua F. Alloy (JA 4372)
                                        1585 Broadway
                                        New York, NY 10036-8299
                                        (212) 969-3000
                                        Attorneys for Defendant