PROSKAUER ROSE LLP
Bettina B. Plevan (BP 7460)
Joshua F. Alloy (JA 4372)
1585 Broadway
New York, NY 10036-8299
(212) 969-3000
Attorneys for Defendant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
BETH AMENDOLA, on behalf of herself :
and others similarly situated, :
 :
                        Plaintiffs, :        07 CV 6088 (DLC)
 :
          v. :        **(ECF CASE)**
 :
BRISTOL-MYERS SQUIBB COMPANY, :        **DECLARATION OF**
and Does 1 through 20, inclusive, :        **JOSHUA F. ALLOY**
 :
                        Defendant. :
-------------------------------------------------------X

       Joshua F. Alloy, an attorney duly admitted to practice in the United States District Court for the Southern District of New York, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

       1.     I am an attorney at the law firm Proskauer Rose LLP, attorneys for Bristol-Myers Squibb Company ("Defendant" or "BMS"), in the above-captioned matter. I am fully familiar with the facts set forth herein and make this Declaration based on personal knowledge and in support of Defendant's Opposition to Plaintiff's Motion for Conditional Certification, Class Notice, Discovery, and Equitable Tolling ("Opposition Brief").

       2.     Attached hereto as Exhibit 1 are true and correct copies of the Department of Labor opinion letters (1943-48 Wages Hours (CCH) P33,093 (May 19, 1945) and Labor

Department Wage and Hour Opinion, dated January 1946, Lab.L.Rep. (CCH) Wage and Hour, v.1, ¶25,210.41) referenced in the Opposition Brief.

       3.     Attached hereto as Exhibit 2 is a true and correct copy of the deposition of Beth Amendola, dated January 28, 2008.

       4.     Attached hereto as Exhibit 3 is a true and correct copy of Beth Amendola's resume.

       5.     Attached hereto as Exhibit 4 is a true and correct copy of the California Superior Court's "Notice of Ruling on Aventis' Motion for Summary Judgment" referenced in the Opposition Brief.

       6.     Attached hereto as Exhibit 5 is a true and correct copy of the "Executive, Administrative, Professional . . . Outside Salesman" Redefined, Wage and Hour Division, U.S. Department of Labor, Report and Recommendations of the Presiding Officer (Harold Stein) at Hearings Preliminary Redefinition (Oct. 10, 1940) (1940 Stein Report).

       7.     Between June 2007 and the present, I have periodically visited the website http://cafepharma.com which touts itself as the "website for pharmaceutical Sales Professionals." Café Pharma contains various bulletin boards devoted to each pharmaceutical company, where sales reps can read and post messages about their job, their employer, and the industry. At the top of the webpage (both the main page and the "Bristol-Myers Squibb" bulletin board), there are various advertisements ("banner ads").

       8.     It has been my observation and experience that up until approximately December 2007, many of the banner ads on Café Pharma were ads placed by Plaintiff's counsel (and co-counsel) soliciting potential opt-in plaintiffs and referring those individuals to websites maintained by Plaintiff's counsel. True and correct copies of versions of these advertisements,

which were submitted as exhibits in *Evancho v. Sanofi-Aventis*, No. 07 CV 2266 (MLC) (D.N.J.) are attached hereto as Exhibit 6.

9. In the past, when I "clicked" on the various advertisements run by Plaintiff's counsel, I was directed to one of two websites maintained by Plaintiff's counsel (or co-counsel): (i) www.pharmalegal.com; and (ii) www.pharmarepovertime.com. Both websites contained legal advertisements encouraging current and former sales representatives to call Plaintiff's attorneys. Since approximately late December 2007, both of these websites have been removed for "maintenance" and/or shut down and are no longer accessible. True and correct copies of these legal advertisements (printed on September 19, 2007) are attached hereto as Exhibit 7.

10. The website www.pharmarepovertime.com contained a section entitled "Papers Filed in Court" which listed and provided links to all of the complaints from each of the numerous lawsuits Plaintiff's counsel have filed against pharmaceutical companies. It also contained a section entitled "News Coverage" which listed and provided links for all of the press releases and news articles relating to the numerous lawsuits they have filed against pharmaceutical companies. True and correct copies of these sections of the website are attached hereto as Exhibit 8.

11. Three of the articles listed in the "News Coverage" section were specifically about BMS. One of the articles, published by "Business Wire" on June 28, 2007, quotes Plaintiff and Plaintiff's counsel extensively, contains links to their website, two different toll-free numbers, and contact information for the four different firms representing Plaintiff, and encourages sales reps to contact them. The article also states that, according to Plaintiff's attorney Eric Kingsley, "more than 500 pharmaceutical reps have already called the hotline."

True and correct copies of all three articles are attached hereto as Exhibit 9.

**Plaintiff's Demands for Names of All BMS Sales Reps and Discovery**

12. On July 24, 2007, Plaintiff's counsel wrote a letter to my colleague, Bettina Plevan, demanding "the names and contact information of all members of the collective action" or in the alternative, granting them equitable tolling of all claims. (Exhibit 38 to Elizabeth Saylor's Declaration) On July 30, Plaintiff's counsel served their first request for the production of documents. On August 2, 2007, following a phone conversation that I had with Plaintiff's counsel, Ms. Plevan wrote back and informed Plaintiff's counsel that their demands and requests were plainly prohibited by Rule 26 of the Fed. R. Civ. P. and inappropriate given that the parties had not yet even met and conferred or participated in a Rule 16(c) conference as per the Court's rules. A true and correct copy of the August 2, 2007 letter is attached hereto as Exhibit 10.

13. Over the course of the next two weeks, counsel for both parties engaged in discussions regarding the scope and scheduling of discovery, but were unable to reach agreement on several key issues. On August 17, 2007, Plaintiff's counsel "re-served" their demand for the names and contact information of all putative class members, as well as extensive document requests. (Saylor Decl. Exhibit 39)

14. On September 11, 2007, the parties participated in a pretrial conference pursuant to Rule 16, at which time the Court issued a Pretrial Scheduling Order instructing BMS to respond to the discovery requests and answer the August 17, 2007 interrogatories by October 8, 2007. (Saylor Decl. Exhibit 41) The Pretrial Scheduling Order adhered closely to the schedule proposed by Plaintiff's counsel, a draft copy of which is attached hereto as Exhibit 11.

4

15.   Over the next week, I had numerous discussions with Plaintiff's counsel concerning our objections to the broad discovery requests and interrogatories, but we could not come to an agreement. The parties agreed to seek the Court's assistance in resolving the dispute over the interrogatories, and both parties wrote letters to the Court setting forth their position. On September 26, 2007, the parties held a telephone conference with the Court to resolve the issue. The Court rejected Plaintiff's request for *all* (approximately 4,500) names and addresses, but ordered BMS to provide Plaintiff with the names of 2-3 sales reps for each job level, geographic region, and business division (and for the parties to agree on a method of selecting those names randomly and anonymously).

16.   On October 9, 2007 (with the consent of Plaintif's counsel for the extra day), I served Plaintiff's counsel with BMS's Objections and Responses to her First Set of Interrogatories, and provided them with a breakdown of the BMS sales force so that they could anonymously select the 2-3 sales reps from each category. Over the course of the next week, I had numerous discussions with Plaintiff's counsel in order to appropriately select a random and anonymous cross-section of the sales force. I provided Plaintiff's counsel with approximately 100 names and addresses on October 12, 2007, and the remaining 250 names and addresses on October 19, 2007.

17.   Plaintiff, by her own choice, has sought extensive discovery in this case prior to filing her motion for class notice, and to date, BMS has produced over 6,000 documents, in addition to several boxes of documents that have been made available for inspection. The first wave of documents (5,891 in total) were delivered to Plaintiff's counsel by hand on October 9, 2007 (the extra day was by consent).

18.   Plaintiff's 30(b)(6) request, on its face, is not limited to class notice, but

5

instead covers the entire BMS sales and marketing operations, training, compliance, and a multitude of other topics – for each of the five distinct business divisions at BMS – something that no single individual at BMS is capable of testifying to. Plaintiff's counsel was made well-aware of the magnitude of their 30(b)(6) notice, and the impossibility of finding any one witness, and indeed, I had several conversations with Plaintiff's counsel to discuss narrowing the scope of the depositions and/or to try to limit the number of witnesses. Ultimately, BMS agreed to produce five of the highest-ranking vice presidents and managers overseeing each of the five distinct business divisions within BMS's pharmaceutical sales operations. While the parties had initially hoped to complete all of the depositions by the end of November 2007, due to the difficulties of scheduling, the fifth deposition was not completed until December 17, 2007, and therefore the parties jointly sought a brief extension to the briefing schedule.

Dated: New York, New York
       February 6, 2008

_____
Joshua F. Alloy