# Exhibit 2

# Part I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------X

BETH AMENDOLA, on behalf of herself and others similarly situated,

Plaintiffs,

Index No:

-against- 07 CV 6088

BRISTOL-MYERS SQUIBB COMPANY, and Does 1 through 20, inclusive,

Defendants.

-----------------------------------------------X

1585 Broadway
New York, New York

January 28, 2008
8:40 a.m.

VIDEOTAPED DEPOSITION of BETH AMENDOLA, a plaintiff, taken on behalf of the defendants, pursuant to Notice, held before a Notary Public of the State of New York.

A P P E A R A N C E S:

EMERY, CELLI, BRINCKERHOFF & ABADY, LLP
Attorneys for the Plaintiffs
75 Rockefeller Plaza
New York, New York 10019
BY: ILANN M. MAAZEL, ESQ.
ELIZABETH S. SAYLOR, ESQ.
(212) 763-5000

PROSKAUER ROSE, LLP,
Attorneys for the Defendants
One Newark Center
Newark, New Jersey 07102-5211
BY: JEREMY M. BROWN, ESQ.
JOSH ALLOY, ESQ.
(973) 274-3200

Also Present:

Amy Sandgrund-Fisher, Bristol-Myers
Craig Atella, videographer

oOo

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that such deposition may be signed and sworn to before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before a judge.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form, are reserved to the time of trial.

(Whereupon, a Complaint was received and marked Amendola Exhibit 1, for identification, as of this date.)

(Whereupon, Plaintiff's Initial Disclosures were received and marked Amendola Exhibit 2, for identification, as of this date.)

(Whereupon, Plaintiff's Responses to Defendants' First Set of Interrogatories were received and marked Amendola Exhibit 3, for identification, as of this date.)

(Whereupon, Plaintiff's Responses to Defendants' First Request for Production of Documents were received and marked Amendola Exhibit 4, for identification, as of this date.)

(Whereupon, Declaration of Beth Amendola was received and marked Amendola Exhibit 5, for identification, as of this date.)

VIDEOGRAPHER: Good morning. My name is Craig Atella of Veritext. The date today is January 28th of 2008. The time is approximately 8:38. This deposition is being held in the office of Proskauer Rose located at 1585 Broadway, New York, New York.

The caption of this case is Amendola versus Bristol-Myers Squibb in the United States District Court, Southern District of New York, index number 07 CV 6088. The name of the witness is Beth Amendola.

At this time the attorneys will identify themselves and the parties they represent, after which our court reporter will swear in the witness and we can proceed.

MR. BROWN: I'm Jeremy Brown with Proskauer Rose, and I represent the defendant Bristol-Myers Squibb Company.

MR. ALLOY: Josh Alloy also of Proskauer Rose.

MR. MAAZEL: Ilann Maazel of Emery, Celli, Brinckerhoff & Abady for Ms. Amendola.

MS. SAYLOR: Elizabeth Saylor also of Emery, Celli, Brinckerhoff & Abady.

B. Amendola

BETH AMENDOLA, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. BROWN:

Q. State your name for the record.

A. Beth Amendola.

Q. Where do you currently reside?

A. 5165 Northwest 50th Terrace, Coconut Creek, Florida 33073.

Q. Good morning, Ms. Amendola. I'm Jeremy Brown. We spoke earlier. I represent the defendant, Bristol-Myers Squibb Company, in this action. You've been sworn in, and there's a court reporter here, and a videographer here and they're going to be recording your testimony. Do you understand that?

A. Yes.

Q. Notwithstanding that we have a videographer here, we do need all of your responses to be verbal so the court reporter can take them down.

A. Okay.

Q. Also, I know it's a little artificial, but you have to let me ask the whole question and

B. Amendola

then I have to let you answer the whole question so the court reporter can take that down, okay?

A. Yes.

Q. At some point your attorney --

MR. BROWN: Who's defending here? Ilann.

Q. Your attorney may interpose an objection. Unless your attorney directs you not to answer the question or you don't understand the question, we're going to expect that you are going to answer the question fully, okay?

A. Yes.

Q. If you don't understand a question, please tell me, I will try to clarify it, but if you do answer a question, we're going to assume that you understood it fully and that you're responding to it, okay?

A. Yes.

Q. You have been sworn in and your testimony today is just like giving testimony in a court. Do you understand that?

A. Yes.

Q. Is there anything that could interfere with your ability to understand any of the questions?

B. Amendola

A. No.

Q. Anything that could interfere with your recollection of past events?

A. Perhaps.

Q. What's that?

A. The past.

Q. Passage of time?

A. Right, passage of time.

Q. Fair enough. Have you taken any medication, any alcohol or other drugs today?

A. No.

Q. Are you currently taking any prescription or non-prescription medication that could impair your ability to recall facts?

A. No.

Q. Is there any reason that you can't answer my questions completely and truthfully today?

A. No.

Q. Today I'm going to be referring to your former employer Bristol-Myers Squibb Company as BMS or Bristol-Myers; is that fair enough?

A. That's fine.

Q. I assume you will be doing the same. Have you ever given deposition testimony before

B. Amendola

today?

A. Once.

Q. When was that?

A. I would say about 23 years ago.

Q. What was that in connection with?

A. I had a neighbor who was harassing me and I sued them.

Q. Was that a criminal or civil action?

A. Civil.

Q. What was the end result of that?

A. I won the case and they stopped harassing me.

Q. Any other involvement in any lawsuit of any kind?

A. No.

Q. Any other sworn testimony other than in that action you said 23 years ago?

A. No.

Q. Have you ever filed a complaint or administrative charge against any employer other than Bristol-Myers Squibb?

A. No.

Q. Has a close family member of yours ever sued a former employer?

B. Amendola

A. I don't think so, no.

Q. Have you personally contacted any current or former employees or managers of Bristol-Myers Squibb since leaving the company?

A. No.

Q. What about anyone on your behalf, your attorneys or anyone, are you aware of them contacting anyone who worked for presently or formerly worked form Bristol-Myers Squibb?

MR. MAAZEL: Let me object there because the response would require some revelation of a conversation between Ms. Amendola and her counsel.

MR. BROWN: Fair enough.

Q. Has anyone on your behalf contacted anyone at Bristol-Myers Squibb that you're aware of?

MR. MAAZEL: It's the same objection. The only way Ms. Amendola could answer the question is by referring to conversations with counsel.

Q. Without referring to conversations with counsel, are you aware of anyone on your behalf contacting any current or former employee of Bristol-Myers Squibb?

MR. MAAZEL: What that means is put aside any conversation that you ever had with any

B. Amendola

lawyer, such as me. Do you have any knowledge outside of any conversation that we had about someone being contacted?

THE WITNESS: No.

Q. Have you spoken to Nelson Almerico since leaving Bristol-Myers Squibb?

A. Yes.

Q. When?

A. Probably the end of March, maybe after that.

Q. When you say "end of March," do you mean 2006?

A. Yes.

MR. MAAZEL: Could you spell that name.

MR. BROWN: A-L-M-E-R-I-C-O.

Q. Correct?

A. Yes.

Q. At the end of March 2006, was this a phone conversation that you had with him?

A. Yes, and face-to-face.

Q. Where did you meet him face-to-face?

A. At my home.

Q. What did you say? What did he say?

A. We said good-bye.

B. Amendola

Q. Anything else?

A. We said good-bye. He was taking the rest of my things from Bristol-Myers.

Q. Any other discussions other than good-bye and here's your documents?

A. At that time, no.

Q. Any other time?

A. We've spoken.

Q. How often?

A. Infrequently.

Q. Since March of 2006 when he was at your home --

A. Maybe --

Q. Let me finish the question. I know it's awkward, but let me finish the question.

Since him visiting your home at the end of March in 2006, have you seen him face-to-face?

A. No.

Q. Have you spoken to him on the phone?

A. Yes.

Q. About how many times?

A. Three or so.

Q. Did you ever discuss anything relating to the lawsuit?

B. Amendola

A. That's a trick question. That's a tricky question.

Q. Why is it a tricky question?

A. Because Nelson discussed the lawsuit.

Q. What did he discuss about the lawsuit, and what did you say in response?

A. He asked me if his name was mentioned and I said no.

Q. Anything else?

A. Basically that's it.

Q. Do you have any other recollection of any other topics that you discussed?

A. Nelson asked me why I was doing it.

Q. What did you say?

A. I said because I thought it was the right thing to do.

Q. Did he have a response?

A. He said well, you could never come back to Bristol-Myers Squibb, and I said that's not an issue.

Q. Anything else?

A. I had applied for a position with Bristol-Myers Squibb, and I discussed it with Nelson and Nelson recommended me for the position.

B. Amendola

Q. This was during the same conversation?
A. This was approximately a year ago.
Q. So the conversation about the lawsuit was after you had applied for and been rejected for employment at Bristol-Myers or re-employment?
A. Re-employment.
Q. How long after that?
A. It's coming back to me now. The application I believe was January and then after Nelson heard that there was a lawsuit he called me. That's when we had that discussion that I mentioned before.
Q. That subsequent discussion with him after you had made an application to work at Bristol-Myers again, by the time you had that conversation, your application had already been rejected, correct?
A. I don't remember.
Q. Any other conversations with him?
A. Not that I can remember.
Q. Any other times that he referenced or you referenced the lawsuit?
A. No.
Q. Did Mr. Almerico express anything else

B. Amendola

about the lawsuit other than what we've discussed?
A. Not really. He was just concerned about it. He was just concerned.
Q. What do you mean he was concerned?
A. He was concerned whether or not he would have a role in the lawsuit.
Q. What did you tell him?
A. I said no.
Q. Anything else that you recall about any conversations with Nelson that we haven't discussed?
A. We talked about stocks.
Q. Stock in Bristol-Myers Squibb?
A. No, stock in other companies. Nelson and I always talked about stocks.
Q. Anything else?
A. His daughter. We were friends.
Q. Have you communicated with him in any other way other than by phone and that one meeting?
A. No.
Q. No e-mails?
A. Yes, there are e-mails. When I get something funny on the computer, I generally forward it on to Nelson.
Q. Is it mostly those kinds of

B. Amendola

communication?
A. I think so. That's all I can remember.
Q. Have you communicated by e-mail about the lawsuit in any way?
A. I don't think so.
Q. I'm going to have similar questions for a person named Nelson Sastoque.
A. Sastoque.
Q. Sastoque. That's S-A-S-T-O-Q-U-E. Have you spoken with him since leaving Bristol-Myers Squibb?
A. No.
Q. No communications whatsoever?
A. None at all.
Q. Same question for a person named Chris Young.
A. Not since February 28th of 2006.
Q. That was the day that you left Bristol-Myers Squibb?
A. It was the day Chris called me to tell me that I was displaced.
Q. But no communications whatsoever with him since that date?
A. No.

B. Amendola

Q. Same question for Karen Miller.
A. No, none.
Q. No communications whatsoever?
A. None.
Q. Shelly Ager?
A. None.
Q. Alfredo Martir?
A. Yes.
Q. Tell me, what did Alfredo do at Bristol-Myers Squibb?
A. Alfredo was my counterpart. He was my partner.
Q. Was he your pod partner?
A. Yes.
Q. Since leaving Bristol-Myers in February of 2006, have you spoken to him?
A. Yes.
Q. Have you met with him face-to-face?
A. Yes.
Q. Let's talk about the first time you recall either speaking with him or meeting him after leaving Bristol-Myers Squibb.
Do you recall when that was?
A. No.

18

B. Amendola

Q. Was it soon after you left?
A. Yes.
Q. What did you discuss?
A. We discussed what to order for lunch.
Q. After discussing what to order for lunch what did you discuss?
A. Alfredo is my best friend.
Q. Have you discussed the lawsuit with him?
A. Alfredo called me when he heard that there was a lawsuit and that was the basis of our conversation. That was it.
Q. Tell me about that conversation. What do you recall about it?
A. He asked me what it was. I told him. He wished me good luck. He hoped that I did the right thing so that he would benefit from it as well.
Q. Do you understand what he meant when he said do the right thing?
A. Of course I did.
Q. What do you think he meant by that?
A. Be honest and tell it the way it is, and explain to whoever I had to explain to exactly what we did and how we weren't compensated for it.
Q. What did he say in response to that?

19

B. Amendola

A. Well, he said that.
Q. What did you say in response?
A. I said thanks, Freddie. I said I'll do my best.
Q. Where does he work now?
A. He works for Bristol-Myers Squibb.
Q. Any other conversations with him other than the one we just talked here relating to the lawsuit?
A. No.
Q. Have you spoken to him since that conversation when you discussed the lawsuit?
A. I speak to Freddie sometimes five times a week, sometimes once a week.
Q. Does he know that you're being deposed today?
A. He knows I was going to Manhattan.
Q. Does he know you're being deposed to?
A. No, he doesn't know that it's called a deposition. He doesn't know it's deposed. I said I'm going there for the case.
Q. When did you tell him that?
A. Probably a week ago.
Q. So when I said to you or when I say to

20

B. Amendola

you have you discussed anything about the lawsuit with him, I mean by that, just to be clear, anything related to the lawsuit, including coming to New York for anything related to the lawsuit.
A. Then I would have to say yes.
Q. My question to you again is: Could you tell me or relate to me any and all conversations you had with him relating in any way to this lawsuit?
A. Freddie, I have to go to Manhattan on the -- I'm going on the 26th, I'm working on the lawsuit on the 28th. I don't want to go because It's freezing there.
Q. Anything other than that?
A. No.
Q. Anything about compensation issues?
A. No.
Q. Have you communicated with Freddie by e-mail?
MR. MAAZEL: At sometime?
MR. BROWN: Since leaving Bristol-Myers Squibb.
A. He's on the list of the jokes that I send to Nelson Almerico.
Q. Have you communicated with him by e-mail

21

B. Amendola

about anything related to this lawsuit?
A. No.
Q. Has he communicated by e-mail anything related to this lawsuit?
A. No.
Q. Do you know who Jacob Yanwitz is?
A. Would you repeat that?
Q. Sure. Do you know who Jacob Yanwitz is?
A. No.
Q. Y-A-N-W-I-T-Z?
A. No.
Q. You don't know who that is?
A. No.
Q. Do you know who David Corry, C-O-R-R-Y?
A. C-O-R-R-Y. I don't think so.
Q. A TBM and primary care in Delaware.
A. No.
Q. Never heard of him?
A. I may have seen him at a meeting, but the name doesn't ring a bell.
Q. I guess back to Jacob Yanwitz.
A. Same thing.
Q. He's a territory business manager in Florida?

B. Amendola

A. I don't think I know anyone named Jacob.
Q. William Yanwitz?
A. I don't think so.
Q. Jocelyn Martin?
A. I don't think so.
Q. Just to be clear, other than the Bristol-Myers Squibb employees current and former that I mentioned, have you spoken to anyone else, communicated by e-mail, phone or in person or any other way other than those individuals that I mentioned related to this lawsuit?
A. I did get a call on Friday night from a representative from Bristol-Myers Squibb.
Q. Who called you?
A. Sam Smith.
Q. Who is Sam Smith?
A. He's a representative in Tennessee.
Q. What did Sam Smith have to say?
A. He asked me for the names of the attorneys who are representing the lawsuit and I gave him their numbers.
Q. Did he tell you why?
A. He said he would like to join.
Q. Like to join what?

B. Amendola

A. A class action lawsuit.
Q. What did you say to him?
A. I gave him the numbers.
Q. Did you respond in any way other than to give him phone numbers?
A. I said good.
Q. Anything else other than saying good?
A. No.
Q. Did he share anything else with you other than that he would like to join the lawsuit?
A. Not really, no.
Q. Is he currently employed by Bristol-Myers Squibb?
A. He was.
Q. Is he currently employed?
A. I don't know if he's currently employed. He was displaced in October.
Q. Well, my question is: Is he currently employed by Bristol-Myers Squibb?
A. No.
Q. Do you know why he isn't?
A. But --
Q. Do you know why he isn't employed by Bristol-Myers Squibb?

B. Amendola

A. I think he said the division was disbanded.
Q. What division was that?
A. I'm not sure. Immunology perhaps. I'm not sure.
Q. Do you know how he got your phone number?
A. He did a Google search of Bristol-Myers Squibb.
Q. He said that's how he found your phone number?
A. That's how he found my name.
Q. How did he find your phone number?
A. Information.
Q. He called you at home?
A. Yes.
Q. How long was that conversation?
A. Twenty minutes.
Q. What did you discuss in those twenty minutes?
A. His career at Bristol, the last time I saw him, what he's been doing since October.
Q. What did he say about his career at Bristol-Myers Squibb?

B. Amendola

A. He said he just completed ten years and he loved his job.
Q. You said he also discussed the last time you saw him?
A. I had seen him about -- I had seen him at a sales meeting.
Q. Where?
A. I don't remember.
Q. When?
A. I don't remember.
Q. After you left --
A. No, I was with Bristol-Myers.
Q. Anything else you discussed about the last time you saw him?
A. No. I was happy to see him. I had seen him periodically at sales meetings.
Q. What did he say that he's been doing since leaving Bristol-Myers?
A. Looking for a job.
Q. What kind of a job?
A. I don't know.
Q. You didn't ask him?
A. No.
Q. What did he do at Bristol-Myers?

B. Amendola

A. Pharmaceutical rep.

Q. Do you know where he was located?

A. When I knew him, when I originally met him he was in Fort Meyers, Florida, and then he was in Knoxville. I think he said Knoxville, Tennessee, that's where he was living.

Q. Anything else about the discussion?

A. No.

Q. Anything you haven't shared about the conversation?

A. No.

Q. Other than Sam Smith and the other individuals that we've already talked about, have you communicated in any way with any current or former Bristol-Myers Squibb employee?

A. I ran into Melanie Briner.

Q. Can you spell that last name?

A. B-R-I-N-E-R.

Q. Anyone else?

A. I don't think so.

Q. Who is Melanie Briner?

A. Melanie Briner is a hospital rep with Bristol-Myers Squibb.

Q. Where is she located?

B. Amendola

A. Fort Lauderdale.

Q. When was this?

A. Maybe a month ago.

Q. Was it a face-to-face conversation?

A. Yes.

Q. How long was the conversation?

A. Five minutes.

Q. Where was it?

A. Broward General Hospital.

Q. What did you discuss?

A. A man that I was going out with.

Q. Anything else?

A. She asked me, she said "you're in this lawsuit?" I said yes. I said, "I can't discuss it with you."

Q. Did she say anything in response to that?

A. She laughed.

Q. Anything else?

A. She said good luck.

Q. Anything else?

A. Good-bye.

Q. Anything else?

A. I hope your date goes well. It didn't.

B. Amendola

Q. I didn't ask.

A. I anticipated it.

Q. I wasn't going to. When was the first time that you discussed suing Bristol-Myers Squibb with an attorney?

A. It was 2007. I don't know if it was the spring or the early summer. I don't remember.

Q. Without telling me because I don't want to know any conversation that you had with an attorney, I would like to know who you met with.

A. I did not meet with anyone. It was a phone conversation.

Q. Who did you speak to?

A. I think it was Eric Kingsley. I think. I'm not quite sure.

MR. BROWN: We'll note on the record that Amy Sandgrund-Fisher of Bristol-Myers Squibb has just come into the room.

Q. After speaking with Mr. Kingsley, did you speak to any other attorneys?

A. I don't think so. I didn't write down their names. I may have spoken to a female attorney, but I don't remember her name.

Q. Do you know what firm Eric Kingsley is

B. Amendola

with?

A. I think he's with Kingsley & Kingsley.

Q. When you spoke to Mr. Kingsley for the first time, did you call him?

A. No.

Q. He called you?

A. Yes.

Q. How did he hear about you?

A. I had seen his ad for -- I saw Kingsley & Kingsley pharmaceutical representatives. I think it said "do you feel you are entitled to overtime pay" and I clicked on it, it was on the Internet, and I submitted my name.

Q. When you say it was on the Internet, was this on Cafepharma?

A. Yes.

Q. I'm not familiar with Cafepharma, so I will apologize, but is there a specific place in or within the site of Cafepharma that's particular to Bristol-Myers Squibb?

A. Yes.

Q. Is that where you were when you saw Mr. Kingsley's ad?

A. No.

B. Amendola

Q. Where did you see his ad?
A. It was at the home page of Cafepharma.
Q. How soon after you had clicked on his banner or his ad and submitted your name that you received a phone call?
A. I don't know.
Q. Was it within days or weeks?
A. It would probably be weeks. I don't know.
Q. Was he the first person to call you?
A. I think so.
Q. What is Cafepharma if you could tell me?
A. Cafepharma is a site with a list of pharmaceutical companies that -- I guess it's a gossip board, but you can also find jobs there. You can do surveys there. It's just a site for pharmaceutical representatives.
Q. Was there a reason that you were on the Cafepharma website when you saw Mr. Kingsley's advertisement?
A. Just habit, gossip.
Q. Were you aware at the time that you clicked on Mr. Kingsley's advertisement that there were other lawsuits for overtime pay against other

B. Amendola

pharmaceutical companies?
A. I don't know.
Q. You don't recall that?
A. I don't know the time line of that.
Q. Had you read on Cafepharma anything about any other lawsuits at the time that you clicked on Mr. Kingsley's advertisement?
A. No.
Q. How did it occur to you that Mr. Kingsley may help you.
MR. MAAZEL: Form objection, but you can answer.
A. It never entered my mind that he would help me. It just seemed like an answer to a dilemma that I had had for years.
Q. That dilemma was what?
A. That I was working in excess of 40 hours a week and I wasn't being compensated for it.
Q. Have you posted any comments on the Cafepharma website since leaving Bristol-Myers Squibb?
A. No.
Q. Has anyone on your behalf filed or posted any messages on the Cafepharma website?

B. Amendola

A. Yes.
Q. Who?
A. I don't know.
Q. What are you referring to?
A. Well, after the lawsuit came out there were messages on my behalf and also messages that were not on my behalf.
Q. Do you recognize any of the people that posted one way or the other?
A. Everything is anonymous.
Q. You didn't post at all?
A. No.
Q. Why not?
A. I didn't have to. Everyone else was.
Q. You didn't feel like it?
A. If you're involved in a legal action then you don't do that.
Q. Why couldn't you speak to -- is it Ms. Briner?
A. Yes.
Q. You said you can't talk about the lawsuit, why not?
A. Because I was advised not to.
MR. MAAZEL: Move to strike that answer.

B. Amendola

Don't -- try to avoid any conversations you ever had with an attorney.
Q. At some time have you learned in the last year or two that Mr. Kingsley is representing other plaintiffs suing other pharmaceutical companies for the same reason that you're suing?
MR. MAAZEL: I object to that on attorney/client privilege.
MR. BROWN: I accept your objection.
Q. Let me be very clear that I don't want to know about any conversations that you've had with Mr. Kingsley or any other attorney.
My question to you is: Have you learned in the last year or two that Mr. Kingsley represents other employees suing other pharmaceutical companies?
If you can't answer that question because of a conversation you've had with Mr. Kingsley, then you will say so, but if it's based on other information, I want to know.
A. I can't answer that because of conversation with Mr. Kingsley. I believe, I think I will say that, I think that he told me --
MR. MAAZEL: No, no, don't discuss any conversation you had with an attorney.

34

B. Amendola

Q. Have you learned that Mr. Kingsley or your counsel here today represent any employees in other lawsuits against pharmaceutical companies by looking on the Internet?
A. Yes.
Q. What did you learn on the Internet?
A. I learned the different lawsuits that are taking place.
Q. When did you learn about those lawsuits?
A. I don't know.
Q. Was it before you filed your lawsuit?
A. No.
Q. It was after?
A. Yes.
Q. What did you do to prepare for today's deposition, if anything?
A. I reread my declaration.
Q. Did you speak to anybody?
MR. MAAZEL: Form objection. You can answer.
A. Yes.
Q. Who did you speak with?
A. My attorneys.
Q. Was anybody else present other than your

35

B. Amendola

attorneys?
A. No.
Q. Did you speak to anybody else about the deposition other than your attorneys?
A. No.
Q. Are you married?
A. No.
Q. Again, without getting -- trying to get too personal, do you have a significant other or someone you live with?
A. No.
Q. Do you have children?
A. Yes.
Q. How old are they?
A. Twenty-three and 30.
Q. Where does your 23-year old live?
A. Aventura, Florida.
Q. What is that child's name?
A. Alexis.
Q. Does Alexis work?
A. Yes.
Q. Where does she work?
A. Miami Country Day School.
Q. Is she a teacher?

36

B. Amendola

A. Yes.
Q. Your 30-year old, what is his or her name?
A. Melissa.
Q. Where does Melissa live?
A. Coconut Creek, Florida.
Q. Where does Melissa work?
A. AstraZeneca Pharmaceuticals.
Q. What does she do for AstraZeneca?
A. She is a cardiovascular specialist.
Q. What is that job?
A. It's a specialty position.
Q. Is it a specialty sales rep position?
A. Yes.
Q. How long has she been working for AstraZeneca?
A. Approximately seven or eight years.
Q. Have you discussed this lawsuit with your children?
A. No.
Q. Your daughter Melissa doesn't know -- you haven't shared with her anything about this lawsuit?
A. I've told her that I am involved in a

37

B. Amendola

lawsuit for overtime compensation, but that's it.
Q. Has she spoken to you about the lawsuit?
A. She said good luck, mommy.
Q. Anything else?
A. No.
Q. Is your daughter involved in a lawsuit?
A. Definitely not.
Q. Not this lawsuit, but any lawsuit?
A. No.
Q. Do you talk to your daughter about how she's compensated?
A. Yes, I have.
Q. How is your daughter compensated at AstraZeneca?
A. She has a base salary and she has a bonus structure.
Q. She doesn't get overtime, does she?
A. No.
Q. Have you talked to her about her compensation structure?
A. Yes.
Q. What have you told her?
A. I've told her that if I'm successful at this lawsuit, then it will be better for her as well

B. Amendola

as for me.

Q. When did you tell her that?

A. In the very beginning.

Q. What did she say?

A. She said good luck.

Q. What about Alexis, have you talked to her about the lawsuit in any way?

A. Not really, no.

Q. When you say "not really," what do you mean?

A. I said the same thing. If I win the lawsuit -- actually, I said to her if I'm successful at the lawsuit, then I will benefit and we'll all benefit.

Q. Anyone else that you've spoken to about the deposition? Let me strike that.

Did you tell them that you were coming today for this deposition?

A. I just told them that I was -- I didn't mention deposition. I said I'm coming to Manhattan to work on the lawsuit.

Q. Have you told anyone that you're here for a deposition other than your attorneys?

A. No, because they wouldn't know what I

B. Amendola

was talking about.

Q. You said that you reviewed your declaration in preparation for today's deposition, yes?

A. Yes.

Q. Any other documents that you recall looking at?

A. I don't know what they're called. I don't know what they're called.

Q. Maybe you could describe them.

A. The one versus --

Q. The Complaint?

A. The Complaint and the preliminary statement.

Q. Did you look at anything else that you recall?

A. No.

Q. Did you look at any deposition transcripts?

A. No.

Q. Did anyone read to you any testimony?

A. No.

Q. Anybody characterize any testimony that's been given?

B. Amendola

A. No.

Q. Let me go through some very basic -- we'll try to do this as quickly as I can.

What's your full name?

A. Beth Roberta Amendola.

Q. I know you gave your address, but I didn't hear it. What is your current home address?

A. 5165 Northwest 50th Terrace.

Q. Where is that?

A. Coconut Creek, Florida 33073.

Q. How long have you been at that address?

A. Five years and a few months.

Q. Before that?

A. I was at --

Q. In Coral Springs?

A. Right, 5028 --

Q. 5029 Northwest?

A. 5029 Northwest 102nd Drive, Coral Springs, Florida.

Q. How long were you at that address?

A. Thirteen years.

Q. How many years have you lived in Florida?

A. Since 1983.

B. Amendola

Q. Do you own your current home?

A. Yes.

Q. Have you been married before?

A. Yes.

Q. When were you divorced?

A. I was never divorced.

Q. I'm sorry. I was making a wrong assumption. Are you currently married?

A. No.

Q. How did your marriage end?

A. My husband died.

Q. When was that?

A. October 30, 1993.

Q. Was that your first marriage?

A. My only marriage.

Q. I would like to ask you a few questions about your educational background.

Where did you attend high school?

A. Abraham Lincoln High School in --

Q. Where is that?

A. In Brooklyn, New York.

Q. Did you graduate high school?

A. Yes.

Q. Do you recall what year?

B. Amendola

A. 1965.

Q. After that you went to college, Brooklyn College?

A. Brooklyn College.

Q. When did you graduate Brooklyn College?

A. June of 1969.

Q. Did you have a major?

A. English literature.

Q. Did you study business at all?

A. No.

Q. How did you do in school?

A. I did all right.

Q. You got a degree?

A. Yes.

Q. BA?

A. BA.

Q. After graduating from Brooklyn College in 1969, did you attend any other university or college?

A. I went to Brooklyn College.

Q. Well, after Brooklyn College.

A. Well, I went to Brooklyn College for graduate school. I took I think about ten or 12 credits there. I don't remember.

B. Amendola

Q. In what field?

A. English literature.

Q. Did you transfer to another school?

A. I went to Long Island University and I think I took about 18 graduate credits there.

Q. Did you receive a degree from LIU?

A. No.

Q. Did you receive any graduate degree?

A. No.

Q. At some point did you attend Hofstra University?

A. Yes.

Q. When was that?

A. It was in -- I believe it was June of 1977, and I think I took either six or nine credits there.

Q. What were you taking there classes?

A. I took one psychology class. I know I took a phys ed class, but I don't remember if I took a third or I just took those two.

Q. Any business classes?

A. No.

Q. So you have a BA and no other degrees, but a number of courses?

B. Amendola

A. Yes.

Q. Any other education or training other than what we've talked about?

A. Not formal education. I took the Wilton cake decorating class.

Q. Fair enough. When was that? I don't care. Any other kinds of education, formal or informal?

A. A lot of cooking classes. That's about it.

Q. Have you ever been a member of a professional association?

A. No.

Q. Have you ever held a professional license?

A. No.

Q. I'm going to show you what has already been marked as Amendola 1. Take your time and let me know when you're done perusing it.

A. That's what I perused.

Q. Okay. You've seen this document before?

A. Yes.

Q. Is this your Complaint?

A. Yes.

B. Amendola

Q. Did you review this Complaint with your attorneys before it was filed in court?

A. I believe so.

Q. Do you believe that the Complaint is true and accurate?

A. Yes.

Q. Is there anything that you've learned since the filing of this Complaint that's not accurately stated in the Complaint?

A. No.

Q. Are there any other claims or potential claims that you have against Bristol-Myers Squibb that are not reflected in this Complaint?

MR. MAAZEL: I'm going to object to that question.

Q. Other than your claim for overtime, are there any other claims that you have against Bristol-Myers Squibb?

A. No.

MR. MAAZEL: I object to the question.

MR. BROWN: On what grounds?

MR. MAAZEL: You're calling potentially for a legal conclusion.

Q. Any other complaints of any kind against

B. Amendola

Bristol-Myers Squibb other than what's reflected in the Complaint in this action?

MR. MAAZEL: Form objection, but you can answer.

A. No.

Q. Thank you. You can set that aside. I'm going to show you a bunch of documents. I'm showing you what has been pre-marked as Amendola 2, which is entitled Plaintiff's Initial Disclosures Pursuant to Rule 26 (a)(1) of the Federal Rules of Civil Procedure. It is dated -- it is not dated.

Do you recognize this document, Ms. Amendola?

A. No.

Q. Have you ever seen this document before today?

A. No.

Q. You can set that aside. I'm going to show you what has been marked for identification as Amendola 3. This is a document entitled Plaintiff's Responses to Defendants' First Set of Interrogatories to Plaintiff Beth Amendola.

Do you recognize this document?

A. No.

B. Amendola

Q. You've never seen this document before today?

A. No.

MR. BROWN: Ilann, has Ms. Amendola ever verified the interrogatory responses? Has anybody?

MR. MAAZEL: Do you know the answer to that?

MS. SAYLOR: I don't remember.

MR. BROWN: We'll talk off the record about that.

MR. MAAZEL: I'm not sure.

Q. I'm going to show you another document which we've marked for identification as Amendola 4. This is a document entitled Plaintiff's Responses to Defendants' First Request For Production of Documents.

Have you ever seen this document before? Take your time.

A. No.

Q. Have you at any time searched for documents relevant to this lawsuit, documents in your possession?

A. Yes.

Q. Tell me about what you did to search for

B. Amendola

those documents.

A. I went into whatever files I had remaining and piled up the documents, piled up the papers.

Q. Did you produce all of those documents to your counsel?

A. I produced whatever I had.

Q. Did you search in addition to hard copy files anything on your computer?

A. When I was displaced Bristol took my computer.

Q. Let me ask it again. Do you have a computer?

A. I have a personal computer.

Q. Is there anything on that computer that you searched for related to this lawsuit and produced to your counsel?

A. There was nothing on the computer that was related to this lawsuit.

Q. While you were employed at Bristol-Myers Squibb, did you keep a calendar of any kind?

A. I had a day planner.

Q. A hard calendar?

A. A Franklin planner.

B. Amendola

Q. Do you still have that?

A. No.

Q. For any of the years that you worked at Bristol-Myers Squibb?

A. No.

Q. Do you know where they are?

A. In the trash.

Q. When did you throw away your 2006 calendar?

A. December 31st, 2006.

Q. When did you throw away your 2005 calendar?

A. December 31st, 2005.

Q. When did you throw away your 2004 calendar?

A. The same thing.

Q. At the end of the year of 2004?

A. Right, at the end of the year.

Q. Same question for 2003.

A. Same thing.

Q. Did you keep an electronic calendar of any kind?

A. No.

Q. Did you keep electronically or anywhere

else a list of appointments?
A. No.
Q. It was all in your Franklin planner?
A. Either in the planner or in my head.
Q. Do you keep a calendar today?
A. Yes.
Q. Do you have that calendar with you?
A. No.
Q. In searching for documents related to this lawsuit, did you ask for any documents from colleagues, friends, former colleagues?
A. No.
Q. Are you aware of anyone other than Bristol-Myers Squibb, and the documents you've already produced to your attorneys, who would have information relevant to this lawsuit?
MR. MAAZEL: Form objection. You can answer.
A. Not pertinent to the lawsuit, but things that -- but documents that could respond to questions, other reps, reps who are still employed by Bristol-Myers Squibb.
Q. I'm going to show you another document. It's marked Amendola 5. It's entitled Declaration of

Beth Amendola.
Have you seen this document before?
A. Yes.
Q. This is the document you reviewed before coming to this deposition?
A. Yes.
Q. What is this document?
A. Declaration of Beth Amendola.
Q. Is that your signature on the last page?
A. Yes.
Q. Is this declaration accurate?
A. Yes.
Q. Truthful?
A. Yes.
Q. Did you draft this document?
A. Orally.
Q. Anything you would change in this declaration?
MR. MAAZEL: Form objection. You can answer if you understand it.
A. Let me look it over to see if there is anything I would change. No.
Q. While you were employed at Bristol-Myers Squibb and after, were you ever directed to retain

any documents in your possession related to this lawsuit while you worked at Bristol-Myers Squibb and after?
MR. BROWN: Let me withdraw that question.
Q. While you were employed at Bristol-Myers Squibb, were you ever directed by anyone to retain documents related to your employment?
A. Yes.
Q. Who?
A. I don't think I could tell you who. It was a directive that this is what you did, that you would retain certain documents. It was part of policy.
Q. Did you comply with that directive?
A. Yes.
Q. Do you know whether that directive included retaining your calendars?
A. No.
Q. That was poorly phrased.
A. I know.
Q. Did the directive include retaining your calendars?
MR. MAAZEL: Form objection.

A. I don't think so.
Q. After high school, what was your first job? Do you recall?
A. I sold sausages.
Q. Where did you do that?
A. Supermarket.
Q. Next job.
A. Dental assistant.
Q. Was this while you were in college?
A. Yes.
Q. Any other jobs while you were in college?
A. Yes, I worked for Scudder, Stevens, Clark as a coating clerk.
Q. Scudder, S-C-U-D-D-E-R, Stevens?
A. Stevens, Clark as a coating clerk. I worked for Metropolitan Life as an actuarial trainee.
Q. What's an actuarial trainee generally?
A. It's a position where you work on probability and statistics of people dying.
Q. Were you trained in mathematics or accounting?
A. I was trained to use a -- probably the forerunner of a small calculator, a calculator like

B. Amendola

this (indicating) with numbers across, down and in the middle. I worked there for two months. I needed a summer job and that's what I did.

Q. Any other jobs while you were in college?

A. Probably a checker in a supermarket.

Q. Anything else that you recall?

A. No.

Q. After graduating from Brooklyn with your BA, what was your first job?

A. I was a teacher of English.

Q. Where were you a teacher of English?

A. Boody Junior High School in Brooklyn.

Q. In Brooklyn?

A. Yes.

Q. What did you teach?

A. English.

Q. How long were you a teacher?

A. I taught at Boody until 1977.

Q. I apologize, I didn't ask when you started I don't think.

A. I started in 1969 and I taught there until my daughter was born in '77, and then I taught in Queens. I transferred to Queens because it was

B. Amendola

closer to my home, and I taught there for approximately two years.

Q. Did you have any summer jobs while you were a teacher?

A. No.

Q. Where did your husband worked?

A. My husband was -- when? Not when he was a boy?

Q. No, I guess I'm asking you when you were in college.

A. When I was in college he was a butcher.

Q. After college, your college?

A. After college he was a butcher and he was a butcher until we moved to Florida.

Q. What did he do in Florida?

A. He had a furniture manufacturer -- he was a furniture manufacturer. He had a factory.

Q. Did he own the factory?

A. Yes.

Q. What was it called?

A. It was called AA Mica II.

Q. I believe, and you will tell me if I'm wrong, but between 1980 and 1990 you did not have work outside the home, correct?

B. Amendola

A. I did.

Q. Could you tell me what you did?

A. I think it was 1980 I had a hand knit sweater business in Greenwich, Connecticut.

Q. You owned it?

A. Yes.

Q. What was it called?

A. It was called BA.

Q. Sorry?

A. It was BA. It was a one-person business.

Q. Did you do all of the accounts receivable and accounts payable?

A. I did everything.

Q. Let me ask it again. I know this is an awkward kind of experience. We're not having a normal conversation. So let me ask it again.

Did you do the accounts payable and the accounts receivable?

A. Yes.

Q. Did you take care of all of the finances of the business?

A. Yes.

Q. Could you describe that generally for

B. Amendola

me?

A. I will give it to you really briefly. I knitted 102 sweaters in one year. The sweaters sold between three and $600 each. I couldn't knit them fast enough. They cost $21.42 to make. That was my business.

Q. Good business woman.

A. I was exhausted.

Q. Do you think of yourself as a good business woman?

MR. MAAZEL: Form objection. You can answer.

A. I think that I am a very hard worker.

Q. How did you determine the price of those sweaters?

A. I priced them according to what the traffic would bear.

Q. Did you do any marketing for the company you owned?

A. I did everything, including the marketing.

Q. Tell me about your marketing.

A. I went to two of the hottest stores on Greenwich Avenue with my sweaters, and I showed them

B. Amendola

the sweaters, and they took it from there. They said we'll take whatever you can do.

Q. Did you have a business plan?

A. No.

Q. After the BA company in Greenwich, did you have any other employment between 1980 and 1990?

A. I basically helped my husband in his business.

Q. In what way?

A. I deposited the checks.

Q. I apologize, this is which business?

A. This is his furniture company.

Q. Where was that located, the furniture company?

A. The company was in Hialeah, Florida.

Q. When did you move to Florida?

A. 1983.

Q. After the business in Greenwich, any other work or business in the non-Florida area?

A. No.

Q. You moved to Florida, correct, in 1983?

A. Right.

Q. Between 1983 and 1990 you assisted your husband in his business venture?

B. Amendola

A. Right.

Q. Besides from depositing checks, any other role that you played in the business?

A. I filed his invoices. That was it.

Q. Anything else?

A. No.

Q. Were you involved at all with assisting him in marketing?

A. No.

Q. Accounts receivable or payable?

A. No.

Q. In 1990 you began working for a company called Budd Mayer; is that correct?

A. Yes.

Q. What kind of company was Budd Mayer?

A. Budd Mayer was a food broker.

Q. What was your job at Budd Mayer?

A. I marketed foods to chefs and restaurants.

Q. What does that mean you marketed foods to chefs and restaurant? Could you explain that to me?

A. Yes. I brought samples of foods to the restaurant, showed them to the chef, showed the chef

B. Amendola

how to prepare them and hoped that the chef would want to order them for his restaurant.

Q. You tried to convince him too, right?

A. I promoted them to the chef in hopes that the chef would like the food.

Q. If he or she liked the food, what would happen?

A. He could order it from the distributor.

Q. Not from you?

A. No.

Q. Was this a job -- well, let me ask you this: Did you enjoy that job?

A. Yes.

Q. What did you like about it?

A. I liked -- well, I liked cooking and I liked showing chefs -- I liked telling chefs what to do.

Q. Was this a traveling job?

A. It was an outside job.

Q. You had a car?

A. I had my own car.

Q. You would travel from restaurant to restaurant?

A. Restaurant to restaurant, yes.

B. Amendola

Q. How were you paid at Budd Mayer, if you recall?

A. I was paid an hourly wage.

Q. Did that include any overtime?

A. I was paid hourly so I was paid for every hour that I worked.

Q. Did that include overtime?

A. It was a part-time, flex time position.

Q. Were you paid overtime?

A. I never worked 40 hours.

Q. Were you trained in any way for this job at Budd Mayer?

A. Very, very basic training.

Q. What kind of training did it include?

A. These are the foods that we represent. These are the fliers that we use for the foods, go out and do it.

Q. What kind of food did they have?

A. They had very high end products as well as prison bologna.

Q. That's a term of art?

A. No, that is prison bologna. That's whatever is left on the bone or the carcass, it becomes bologna for the prisons.

B. Amendola

Q. I always like to learn something new.

A. Okay. I also had baby scallops that were alive in the shells that I had to wrap in diapers because they couldn't get dry.

Q. You worked there from November of 1990 to January of '92; is that accurate generally?

A. I think so, yes.

Q. Why did you leave there?

A. Well, I had all the food I could eat, but they didn't pay me enough to buy it, and then I got a position that was going to compensate me for what I was worth.

Q. What job was that?

A. I went to work for PDI or Pharmaceutical Detailing Incorporated I believe it was called.

Q. That's out of Ramsey, New Jersey?

A. Yes.

Q. But you worked for them in Florida?

A. Yes.

Q. What was your title?

A. I don't remember.

Q. Were you a pharmaceutical sales representative?

A. I was a flex time representative. It

B. Amendola

was flex time. I didn't sell anything.

Q. I didn't ask you -- what did you say your position was at PDI?

A. Flex time representative.

Q. What does that mean, flex time?

A. It means that you have a required number of calls to make and you can make them any time of the day that you want, any number of days that you want as long as you fulfill your quota.

Q. Was it a weekly quota?

A. I believe so.

Q. Were you given a base salary there?

A. No, you were paid per call.

Q. You didn't have a $500 a week base salary?

A. I don't remember.

Q. Do you recall representing your position at PDI to subsequent employers as a pharmaceutical sales representative?

A. It was pharmaceuticals, yes.

Q. I guess my question is more specific. Do you recall representing to subsequent employers that your job was as a pharmaceutical sales representative?

B. Amendola

A. That was what the jobs were called.

Q. I just want to get a general picture of what it was that you did, let's take an average day, while you worked for PDI.

A. Went to a doctor's office. I don't remember what -- I think I did a drink with them. I did a drink, a cholesterol lowering drink with them. Mixed up the drink, showed it to the doctor, showed him the texture, showed him the efficacy, told him the dose, left some samples, and left, went to my next call.

Q. Did your customers, were those just doctors, or were the customers also anyone else in the physician's office?

A. I believe it was the doctor or maybe a physician's assistant or a nurse practitioner.

Q. Did you receive any training from PDI?

A. Yes.

Q. What kind of training did you receive?

A. I had to go away for training to learn -- to see the promotional materials, to get familiar with the message, to learn how to prepare the product, the competitors, just basic training.

Q. Did you learn how to analyze competitor

B. Amendola

data or sales data?

A. Not really.

Q. Was that part of your training?

A. Part of the training for when you -- when you do any marketing is you have to know your competition and how what you have is an improvement on the competition, features. I imagine it was part of the training.

Q. The benefits of your product was something that you conveyed to these physicians?

A. Yes.

Q. Did these physicians order the product through you?

A. No.

Q. Who did they order it through?

A. I believe it was through a distributor.

Q. Again, you were, as best you recall --

A. Actually, no, I'm mistaken. They would prescribe it for their patients and the patients could purchase it in the pharmacy. That's how it was.

Q. Thank you. The pay that you received at PDI, again, I just want to be clear, your memory is what it is, is your memory that you were paid a

B. Amendola

weekly salary or you were paid hourly?

A. I wasn't paid hourly. I was paid per call.

Q. In addition to that, did you receive any bonuses or incentive compensation?

A. I don't know if I got anything from PDI. I don't think I was there long enough.

Q. You were there about six months; is that right?

A. Yes.

Q. Was there any contest or awards for sales at PDI if you recall?

A. I don't remember.

Q. What was the territory or the area of responsibility that you had at PDI?

A. The territory was from, I believe, Boca Raton through West Palm Beach.

Q. And the kinds of doctors you visited I believe you said were family practitioners; is that accurate?

A. I think so.

Q. Internists?

A. Yes.

Q. Cardiologists?

B. Amendola

A. Yes.

Q. Gastroenterologist, correct?

A. Yes.

Q. And I guess general medicine; is that accurate?

A. Yes.

Q. This was your first experience calling on doctors directly?

A. Yes.

Q. Were you successful at PDI as you believe it?

A. I was semi-successful.

Q. When you say that, can you expand on what you mean by that?

A. Well, I thought I was successful at the time, but then as I progressed in pharmaceuticals I realized what I did there was the start of being successful.

Q. What I guess in general terms was it that you've learned since your experience in the pharmaceutical industry that you weren't doing at PDI that would have made you more successful?

MR. MAAZEL: Form objection.

A. Well, I became more confident and I

B. Amendola

realized that I was performing a valuable service for the physician.

Q. Anything else?

A. I just became more confident.

Q. And more competent; is that also fair to say?

A. Sure.

Q. After working at PDI for approximately six months and ending in June or approximately June of '92, do you recall where you went to work next?

A. I went to work for Scios.

Q. Scios, Inc. S-C-I-O-S, Inc.?

A. Yes.

Q. What kind of company is Scios, Inc.?

A. When I went to work for them it was an R and D company.

Q. You mean research and development?

A. Research and development.

Q. In the pharmaceutical field?

A. Yes.

Q. What was your position at Scios, Inc.?

A. I was a psychiatric specialty representative.

Q. Have you listed your job title at Scios

B. Amendola

for subsequent employers as pharmaceutical sales representative?

A. Probably.

Q. Is that an accurate description of what your title was?

A. It was what my job was called.

Q. I guess a more detailed title was psychiatric specialty representative?

A. Yes.

Q. How long did you work at Scios?

A. I worked for them until February 13, 1998.

Q. So you worked there for approximately six years?

A. Yes.

Q. In those six years you remained the psychiatric specialty representative?

A. Yes.

Q. What was your territory?

A. I went from North Miami Beach through Tequesta, Florida.

Q. What was generally your job responsibilities as a pharmaceutical sales rep for Scios?

B. Amendola

A. I marketed antipsychotics, a 28-day injectable for schizophrenics, antidepressants, and a drug for bipolar illness.

Q. When you say you marketed those pharmaceuticals, can you tell me what you mean by that?

A. I visited psychiatrists, neurologists, mental health clinics, jails, and I tried to convince the physician or the mental health worker that these were the best drugs for their patients.

Q. How did you go about doing that?

A. I told them the features and benefits. I relayed the core message. I told them the patient type that would benefit from the drug. I went over the formulary. I followed Scios training.

Q. When you talk about training, could you tell me generally what kind of training you received at Scios?

A. I worked for Scios for about six months and then I went to a training class, and at the training class we did role play, and we went over the promotional materials, and the competition, and we discussed how to identify the right market for the right drugs.

B. Amendola

Q. Was this sales training?

MR. MAAZEL: Form objection.

Q. Would you call it sales training?

MR. MAAZEL: Same objection. You can answer.

A. I worked for them for seven months prior to going to this training. My training was training that I trained myself.

Q. I'm asking you specifically about the training you received after six months.

A. The training was how to do things the Scios way.

MR. BROWN: We're going to take a quick break.

VIDEOGRAPHER: The time is approximately ten o'clock. This ends tape number one. We're now going off the record.

(Whereupon, a recess was taken.)

VIDEOGRAPHER: The time is approximately 10:08. This begins tape number two. We're now on the record.

MR. BROWN: Could I have the last question and answer.

(The requested portion was read.)

B. Amendola

Q. In doing the things the Scios way, I guess my question to you is: You had identified role playing, what kind of role playing did you do?

A. One person was the doctor, one person was the rep.

Q. So you practiced trying to persuade the doctor to prescribe the Scios medication; is that fair?

A. Right.

Q. How many hours a week did you work for Scios?

A. It was also a flex time position. I was paid $25 per office call. Some weeks I put in -- some weeks I earned $800. Some weeks I would earn a thousand dollars. I had to do less than 40 calls per week, 40 or less.

Q. Were you ever paid overtime at Scios?

A. No.

Q. You received sales bonuses at Scios, right?

A. Yes.

Q. One time it was $5,000?

MR. MAAZEL: Form objection. You can answer.

B. Amendola

A. I received a bonus -- I guess you can call them bonuses.

Q. What would you call them?

A. They were bonuses at the time, but they were different than the bonuses that I received in subsequent years from Bristol-Myers. So I guess it was just an incentive, you know, a reward, a reward.

Q. What was it a reward for?

A. It was a reward for moving market share of a product.

Q. What does that mean?

A. It means that a hospital may have only been prescribing a certain number of vials of Haldol to counterweight in the previous year and now this year they were prescribing more of it. They were using more of that product than the competitors.

Q. Within your territory?

A. Yes.

Q. As a result of that increase prescribing of your dedicated medication, you were rewarded with a bonus or some sort of incentive comp; is that right?

A. Yes.

Q. The job at Scios, again, was that out of

74

B. Amendola

the house or out of the office?
A. Yes, it was outside.
Q. Outside sales?
A. Outside marketing.
Q. Outside marketing, okay. You had your own car?
A. Yes.
Q. You traveled from doctor's office to doctor's office, correct?
A. And prison to prison.
Q. And prison so prison?
A. Yes.
Q. Was anybody with you?
A. I had a manager who would periodically come down.
Q. But on a day-to-day basis were you alone?
A. Yes.
Q. Where did you work after Scios?
A. I took a job with Bristol-Myers Squibb.
Q. Is there a company called MMD that you worked for?
A. When I was working for Scios, because it was a flex time position, I could do my 40 calls as

75

B. Amendola

quickly and when I could, and I had become a widow. There was a job with MMD promoting -- maybe that was -- it was promoting Triaminic cough medicine and that was approximately 12 calls a week.
I explained to my manager at Scios that I needed additional money, and I explained to MMD that Scios was my bread and butter, and MMD hired me to do that as well.
Q. Did you call on doctors for MMD?
A. Yes, I think it was dermatologists. There's no conflict between psychiatry and dermatology.
Q. In addition to calling on dermatologists, you called on pediatricians --
A. Pediatricians.
Q. -- correct?
A. Yes.
Q. You have to let me finish. You called on internal medicine doctors as well?
A. Yes.
Q. Family practitioners?
A. Yes.
Q. Gastroenterologists?
A. Yes.

76

B. Amendola

Q. Cardiologists?
A. Yes.
Q. I'm sorry, what territory was MMD? What was your territory for MMD?
A. I think it was Broward County. It was Broward and Palm Beach County.
Q. In Florida?
A. Yes.
Q. The job for MMD was an outside marketing sales job; is that right?
A. It was marketing.
Q. Outside?
A. Outside.
Q. Outside marketing job?
A. Yes.
Q. You were on your own for the most part for MMD?
A. Unless I rode with the manager.
Q. The next job after Scios/MMD was Bristol-Myers Squibb, right?
A. Yes.
Q. Are you working now?
A. Yes.
Q. Where are you working?

77

B. Amendola

A. I work for Ambient Health Care.
Q. What do you do for Ambient Health Care?
A. I market infusion pharmacy services for patients who leave the hospital with either a feeding tube or an IV.
Q. Is this an outside marketing job?
A. Yes.
Q. Can you describe generally what your duties are for Ambient Health Care?
A. I call on referral nurses, case managers, social workers, and I explain to them what service we perform, what insurance we are in network providers for, and what territories -- what areas of the state we can service their patients.
Q. What's your title?
A. Pharmacy account manager.
Q. Any other title?
A. No.
Q. Any titles that the company uses that's different from pharmacy account manager?
A. Pharmacy account manager.
Q. Is this an outside marketing job?
A. Yes.
Q. I might have asked you that. I

78

B. Amendola

apologize. Is there a minimum expectation of calls to make each week?

A. Yes.

Q. What is it?

A. Thirty.

Q. How are you paid?

A. I have a base salary.

Q. What is your base salary?

A. My base salary is $65,000.

Q. Any other form of compensation?

A. Yes, if I meet my monthly goal it's an additional $1,500, if I exceed the goal it's $2,500, and if I exceed the goal over that it's $0.05 on every dollar of revenue that the case brings into the pharmacy.

Q. When you say "goal," is that the goal of making calls, or is that sales call?

A. It's a revenue goal for the company.

Q. How is that measured?

A. Well, different services bring in different revenue for the company. For example, if a patient needs IV IG it could bring in $6,000 a month, so it's based on that.

Q. Do you have your own car?

79

B. Amendola

A. Yes.

Q. You travel to these customers --

A. Yes.

Q. -- on your own?

A. Yes.

Q. How long have you been working for Ambient Health Care?

A. Since October 15, 2007.

Q. Do you get overtime?

A. There is no overtime.

Q. Do you work more than 40 hours a week?

A. No.

Q. Do you keep track of your time?

A. I send in a time sheet every week.

Q. So you do keep track of your time?

A. Well, I put nine to five.

Q. Do you work nine to five?

A. Yes.

Q. Do you work longer than nine to five?

A. No.

Q. Do you work less than nine to five?

A. No.

Q. You work exactly nine to five every day?

MR. MAAZEL: Form objection.

80

B. Amendola

A. On the average it's nine to five.

Q. I guess I'm confused by that. There are days that you work longer than nine to five and days that you don't, and on average it's nine to five; is that what you're saying?

A. Yes.

Q. Before working at Ambient Health Care in October or beginning October 15, 2007, did you have any other job after leaving Bristol-Myers Squibb?

A. I worked for Barrier Therapeutics.

Q. What was your title there?

A. Specialty -- dermatology specialty representative.

Q. Was it called specialty sales representative?

A. Perhaps.

Q. You don't know?

A. In pharmaceuticals that's the general title.

Q. What is?

A. Whatever you do for them it's sales representative, but you don't sell anything. You're a pharmaceutical representative. That's what representatives call each other.

81

B. Amendola

Q. That's what you called yourself while you worked there?

A. I suppose.

Q. Well, did you or didn't you?

MR. MAAZEL: Form objection.

A. I don't remember. I called myself a pharmaceutical rep. That's what I called myself.

Q. When you worked for Barrier Therapeutics, is it?

A. Yes.

Q. What was your job?

A. I marketed an ointment for diaper dermatitis, and I also marketed a product for solar lentigines, and I also marketed another product for seborrheic dermatitis.

Q. That was an outside marketing job?

A. Yes.

Q. Who were your customers?

A. Dermatologists and pediatricians.

Q. Any other kinds of doctors?

A. I don't think so.

Q. What was your territory?

A. I went from South Miami through Central Broward.

B. Amendola

Q. In Florida?
A. Yes.
Q. Did you have your own car?
A. No.
Q. A company car?
A. Yes.
Q. You traveled from doctor's office to doctor's office?
A. Yes.
Q. You were alone?
A. Yes.
Q. When you say you marketed these products for Barrier, what do you mean by that?
A. Well, I brought samples of what we considered butt paste to the pediatrician's office and showed the pediatrician what it was made of, opened the tube and demonstrated the texture and hoped that he would prescribe it for his patients.
The same thing with Zolagel, which was for solar lentigines, that was marketed to dermatologists. There were no samples. It was just to show him features and benefits, use a detail piece and a clinical study and hoped that he would prescribe it for his patients.

B. Amendola

Q. Did you receive any training at Barrier?
A. Yes.
Q. What kind of training?
A. Two weeks in Princeton.
Q. What kind of training?
A. What the promotional materials were, what the core message was, how to approach the physician, role playing, competitors dosing, lack of managed care support for all of these products, basic training.
Q. How were you compensated at Barrier?
A. Barrier I was paid I think $68,000 base plus a bonus plan.
Q. The $68,000 base, that was paid to you on a weekly salary?
A. Bimonthly.
Q. Bimonthly?
A. Yes.
Q. How many hours a day did you work?
A. Probably nine to five. It was a nine to five job.
Q. Did you ever work longer than nine to five?
A. No, I never did dinner programs.

B. Amendola

Q. Did you ever work longer than nine to five?
MR. MAAZEL: Form objection.
A. No.
Q. Did you ever work less than nine to five?
A. No.
Q. You worked exactly nine to five?
MR. MAAZEL: Form objection.
A. I was out of the house from eight to five because of travel time.
Q. That time was all work time?
A. Predominantly. I would have lunch.
Q. What was the bonus plan at Barrier?
A. The bonus plan was not implemented. It was for the most part -- it was a new company, new products. They had award points. So you would get award points for everything.
Q. What were the award points based on?
A. Number of calls that you did, if you got an additional script from the doctor.
Q. From the doctor in your territory?
A. Yes, success story.
Q. Script means prescription?

B. Amendola

A. Yes.
Q. Thank you. You were employed by BMS as a pharmaceutical representative from February 1st, 1998 to March 2nd, 2006; is that accurate?
A. February 13, 2006 -- 19 --
Q. Let's start again. Let me show you -- I'm going to show you what we're going to mark as Amendola 6, an employment offer letter dated January 27, 1998.
(Whereupon, a January 27, 1998 employment offer letter was received and marked Amendola Exhibit 6, for identification, as of this date.)
Q. Ms. Amendola, looking at what's been marked as Amendola 6; do you recognize this document?
A. Yes.
Q. Is this your employment offer letter from Bristol-Myers Squibb?
A. Yes.
Q. On the second page, is that your signature?
A. Yes.
Q. It's dated February 1st, 1998, your signature?

B. Amendola

A. Yes.
Q. Is it accurate that you were hired in January of 1998 to work for Bristol-Myers Squibb?
A. I was offered the position in January 1998. I accepted it on 2/1.
Q. Your job was as an associate territory business manager; is that correct?
A. Yes.
Q. You were paid an annual salary of $44,000 to start?
A. Yes.
Q. You participated in an incentive bonus program; is that correct?
A. Yes.
Q. Who made the offer to you at Bristol-Myers Squibb?
A. June Crockett.
Q. What was June's position at Bristol-Myers Squibb?
A. She was my manager.
Q. Is that district business manager?
A. Yes.
Q. Where was she located?
A. She lived in Palm Beach County.

B. Amendola

Q. Did she work out of her home?
A. Yes.
Q. What was your understanding of the type of work that you would be doing at Bristol-Myers Squibb as an associate territory business manager?
A. I would be doing what I did for Scios with a different portfolio of products.
Q. Could you explain to me what it was you were going to be doing at Bristol-Myers Squibb?
A. I would be calling on psychiatrists, neurologists, primary care physicians, pediatricians, internal medicine, family practice promoting Cefzil, Serzone and Buspar.
Q. At that time?
A. Yes.
Q. In '98, correct?
A. Right, and my territory was located where I lived.
Q. Where is that?
A. I had lived in Coral Springs at the time, so I would be working within my territory.
Q. Was this called the Hollywood territory?
A. No, this was the Coral Springs territory.

B. Amendola

Q. Ultimately the job that you got as the associate territory business manager, that was the job that you applied for, right?
A. Yes.
Q. It was the type of job you had applied for?
A. Yes.
Q. You were paid on a salary basis; is that accurate?
A. Yes.
Q. It was an outside marketing job?
A. Yes.
Q. You did not receive overtime, correct?
A. Right.
Q. Did you ever receive a promotion out of the associate TBM position? When I say TBM, I mean territory business manager.
A. That's difficult for me to answer because titles changed.
Q. Did you get promoted to TBM?
A. I believe so.
Q. Do you know when that occurred?
A. No.
Q. Is it your understanding that there's a

B. Amendola

difference between an associate territory business manager, an ATBM, and a territory business manager, TBM?
A. It's a different title. That's the only difference.
Q. Is there a difference in pay?
A. There could be.
Q. Do you know?
A. There could be. I mean my understanding was that an ATBM was a new hire, an entry level rep versus a more seasoned rep. A more seasoned rep theoretically earned more money.
Q. Did you earn more money as a TBM rather an ATBM?
A. Salaries were never discussed between reps.
Q. Did you receive more money as a TBM rather than as an ATBM?
A. In my career with Bristol-Myers Squibb my salary did go up.
Q. Did you receive more money as a TBM rather than an ATBM?
MR. MAAZEL: Form objection.
A. All I could tell you is I started with a

B. Amendola

base of 44 and I left with a base of 62.
Q. You don't recall being promoted to TBM?
A. No, but I remember that my business card said TBM. It didn't say associate territory business manager.
Q. Were you familiar generally with what the criteria for promotion was at BMS?
A. It changed over the years.
Q. So generally you were familiar with it?
A. I became familiar with the Advance system.
Q. Are you familiar with the Excel system?
A. Excel, yes.
Q. One of the criteria in the Excel system for being promoted was having a history of good sales performance; is that true?
MR. MAAZEL: Form objection.
MR. BROWN: What's the form objection?
MR. MAAZEL: Are you asking a question or are you --
MR. BROWN: I'm asking a question.
MR. MAAZEL: -- making a statement?
Q. The question is: Is it true that one of the criterion for being promoted at Bristol-Myers

B. Amendola

Squibb was having a history of good sales performance?
A. I don't know. I don't have it in front of me.
Q. I will put it in front of you.
MR. BROWN: Let me mark as Exhibit 7 the Excel Sales Career Progression Program Primary Care Representative Guidebook.
(Whereupon, Excel Sales Career Progression Program Primary Care Representative Guidebook was received and marked Amendola Exhibit 7 for identification, as of this date.)
MR. MAAZEL: Just take a minute to look through that document.
A. Okay.
Q. Are you familiar with this document generally?
A. I am familiar with it, but I don't remember if I had a hard copy or if it was just online.
Q. As a preliminary matter, you worked for Bristol-Myers Squibb as a primary care pharmaceutical representative; is that accurate?
A. Yes.

B. Amendola

Q. This guidebook, the Excel Sales Career Progression Program, applied to you, correct?
A. Yes.
Q. Could you tell me generally what it is you recall about what this program was, the Excel Sales Career Progression Program?
A. This was given to us as an improvement over the failure of the Advance Care Progression Program. This was supposed to simplify and delineate our responsibilities, and if we followed this, we could be promoted to another level, and if we followed this when we went on a call, then we would be doing things properly. If a manager was with us, he would rate us on how well we adhered to this booklet.
Q. So is it fair to say that the Excel Sales Career Progression Program set out objectives for what a primary care pharmaceutical rep would need to do to get promoted?
A. Would need to do to succeed at Bristol-Myers.
Q. In succeeding, that would also include, I guess, career progression, right?
A. Well, not everybody wanted career

B. Amendola

progression. Some people were very content being primary care representatives.
Q. If you would turn to BMS -- it's in the lower right corner -- 2033. It says at the top of that page Overview of Excel. Do you see that?
A. Yes.
Q. Under 2.1, Requirements For Sales Career Progression it states the following and I quote, the three components that are the foundation of sales career progression at Bristol-Myers Squibb are: sales results, core BMS behaviors, and sales competencies. Do you see that?
A. Yes.
Q. Was it your understanding that these were the three core components for a sales career progression at Bristol-Myers Squibb?
MR. MAAZEL: Form objection. You can answer.
A. These are the --
Q. What it your understanding --
MR. MAAZEL: Let her answer. Please don't interrupt.
Q. You're not answering.
A. I am answering it.

94

B. Amendola

MR. MAAZEL: All she's said is "these are" and you interrupted her. Please do not interrupt.

MR. BROWN: Let me ask the question.

MR. MAAZEL: She was in the middle of an answer. You can't interrupt her.

MR. BROWN: I can because she's not answering the question.

A. Yes, I was.

MR. MAAZEL: Can you read back the record. I'm sorry, that's not appropriate. Just read back the record. Let's see where the interruption was. That's not the way to handle it.

(The requested portion was read.)

A. These are the components that Bristol-Myers outlined for having success at Bristol-Myers Squibb.

Q. Those three components included sales results, core BMS behaviors and sales competencies, correct?

MR. MAAZEL: Form objection.

Q. Correct?

MR. MAAZEL: Form objection. You can answer.

95

B. Amendola

A. I think that we have to get one thing straight. In pharmaceuticals, sales, and marketing, and promotion means the same thing. I was not a sales rep. I sold nothing, but if I did these three competencies, then I would be successful at Bristol-Myers Squibb.

Q. Those three competencies included sales results, core BMS behaviors, and sales competencies, correct?

MR. MAAZEL: Form objection.

Q. You can call -- why don't you answer my question.

A. I'll say yes. I'll say yes so we can move on.

MR. MAAZEL: Don't say --

Q. I want you to answer truthfully.

A. I'll say yes, but I would rephrase it as results, core BMS behaviors, and competencies.

Q. What results are you talking about?

A. Results, increasing market shares, decreasing market share of the competition.

Q. Anything else that you understand "results" to mean?

A. That was results.

96

B. Amendola

Q. If you turn the page to BMS 2034 it provides a little more explanation about what Bristol-Myers meant by "sales results."

Do you see that?

A. Yes.

Q. It says and I quote, Sales Results: Before sales representatives and managers can move forward in their careers, they will be expected to demonstrate a positive track record of sales results in their current band. Do you see that?

A. Yes.

Q. Was this in conformance to your understanding of what it took to get promoted?

MR. MAAZEL: Form objection, but you can answer.

A. A positive track record certainly.

Q. That track record was what, a track record of what?

A. Of increasing the prescriptions -- of contributing to the increase of prescriptions in the defined territory.

Q. Another factor was core BMS behaviors, correct?

A. Yes.

97

B. Amendola

Q. The third factor, if you turn to BMS 2036, talks about sales competencies.

Do you see that?

A. Yes.

Q. It says, and I quote, Sales Competencies: Sales competencies represent critical knowledge, skills and abilities required to successfully perform the job, and it then references on the next page a number of selling skills and competencies. Do you see that?

A. Yes.

Q. Was it your understanding that this was one of the criterion that a sales representative or a pharmaceutical representative in primary care had to meet in order to get promoted?

MR. MAAZEL: Form objection.

A. These one, two, three, four, five, six competencies here are derived from the intense training that's given whenever a new quarter was established, therefore, competency in them means that you took away with you from whatever POA meeting you attended everything that was imparted to you, and you went in the field and you repeated it on every call.

Q. You repeated it verbatim?