# Exhibit 2

# Part II

98

B. Amendola
1
2    A.    You repeated it as close to verbatim as
3  you could.
4    Q.    We'll get back to that.  Did you ever
5  refer to yourself as a sales representative?
6    A.    Yes.
7    Q.    When did you do that?  When did you
8  represent yourself as a sales representative?
9    A.    After Bristol-Myers labeled me a sales
10  representative.
11    Q.    When you applied for a position at
12  Barrier, did you represent yourself as having
13  extensive sales experience?
14    A.    Yes.
15    Q.    Is it accurate?
16        MR. MAAZEL:  Form objection.
17    A.    It's a term that is used in
18  pharmaceutical business when there is no such thing
19  as a sale.
20    Q.    Did you refer to yourself as a sales
21  representative?
22    A.    Yes.
23    Q.    Was that accurate?  Were you being
24  accurate?
25        MR. MAAZEL:  Form objection.

99

B. Amendola
1
2    A.    I was accurate because I wanted another
3  pharmaceutical company to know that I could do their
4  marketing job as well.
5    Q.    Those other companies called those
6  marketing jobs sales jobs?
7    A.    That's right.
8    Q.    In fact, the job that you applied for at
9  Bristol-Myers Squibb was a sales job, correct?
10        MR. MAAZEL:  Form objection.
11    Q.    You wrote that, didn't you?  Do you
12  recall writing that you were seeking a pharmaceutical
13  sales representative job?
14    A.    If I had put that I was seeking a
15  marketing position, then I wouldn't have been hired
16  even though that's the job --
17    Q.    This is --
18        MR. MAAZEL:  No.
19        MR. BROWN:  This is non-responsive and
20  we have limited time today.
21        MR. MAAZEL:  Yes, you are not allowed --
22        MR. BROWN:  We have limited time because
23  of your client.  If I get a direct answer, we'll move
24  along real quick.
25        MR. MAAZEL:  I'm sorry, you can't

100

B. Amendola
1
2  interrupt the witness when you don't like the answer.
3  You spent two hours on irrelevancies today, so if you
4  run out of time that's your problem.  You cannot
5  interrupt the witness when she's responding to your
6  question.  It's totally improper.
7        MR. BROWN:  I would like my last
8  question read back, please.
9        (The requested portion was read.)
10    Q.    Can you answer that question?
11    A.    Yes.
12    Q.    In your resume did you write that you
13  were experienced -- an experienced and award winning
14  sales representative?
15    A.    Yes.
16    Q.    Did you write that you were known for
17  creativity in sales?
18    A.    Yes.
19    Q.    Did you write that you were known for
20  creativity in marketing?
21    A.    Yes.
22    Q.    Did you write that you were known for
23  and have strength in relationship/rapport building?
24    A.    Yes.
25    Q.    In your resume --

101

B. Amendola
1
2        MR. BROWN:  I will mark this as Amendola
3  8.
4        (Whereupon, Beth Amendola's resume was
5  received and marked Amendola Exhibit 8, for
6  identification, as of this date.)
7    Q.    I'm going to give you a moment to read
8  that.  Just tell me when you're finished.
9    A.    Yes.
10    Q.    Is this your resume?
11    A.    Yes.
12    Q.    You created this?
13    A.    Bristol-Myers had a company that created
14  it for me when I was displaced by Bristol-Myers
15  Squibb.
16    Q.    Does this resume reflect Barrier
17  Therapeutics?
18    A.    Yes.
19    Q.    That was after you left Bristol-Myers
20  Squibb?
21    A.    I put that in.
22    Q.    Is this your resume?
23    A.    Yes.
24    Q.    Is everything truthful and accurate in
25  your resume?

26 (Pages 98 to 101)

102

```
 1              B. Amendola
 2      A.    Yes.
 3      Q.    Is it true that you were ranked at the
 4  top of the primary care sales force at Bristol-Myers
 5  each year?
 6      A.    I was either at the very top or in the
 7  top 25 percent or 30 percent.  I was not at the
 8  bottom.
 9      Q.    Is it accurate that you were a
10  Pinnacle -- capital P -- winner in 2004?
11      A.    I tied for Pinnacle in 2004.
12      Q.    You tied to win?
13      A.    I tied to win, but I had the same record
14  as the person who was offered the trip, but I won.
15      Q.    You were the winner of the Pinnacle
16  award in 2004?
17      A.    Right.
18      Q.    What was the Pinnacle award?  What was
19  it for?  What was the award for?
20      A.    The Pinnacle award was for the
21  representatives who moved market share the most,
22  either the first, second and third, or at one time it
23  was the top ten percent.  It varied.
24      Q.    So in 2004 you were recognized for
25  moving market share the most in your territory or in
```

103

```
 1              B. Amendola
 2  your division?
 3      A.    In my region.
 4      Q.    In your region?
 5      A.    Right.
 6      Q.    This was an honor?
 7      A.    Yes.
 8      Q.    For moving market share?
 9      A.    Yes.
10      Q.    The next thing that you put on your own
11  resume about your experience, your work experience
12  with Bristol-Myers Squibb was that you launched
13  Tequin; is that how it's pronounced?
14      A.    Yes.
15      Q.    And moved market share from zero to
16  15 percent to be number one in the nation in 2004.
17      A.    Yes, I have a plaque that was given to
18  me.
19      Q.    That plaque and the recognition that you
20  received was for moving market share?
21      A.    Right.
22      Q.    In 2000 you were also recognized as a
23  Pinnacle winner?
24      A.    Yes.
25      Q.    That was for moving market share as
```

104

```
 1              B. Amendola
 2  well?
 3      A.    Yes.
 4      Q.    Same question for '99 and '98?
 5      A.    Yes.
 6      Q.    You were also team mentor and coach for
 7  new representatives?
 8      A.    For new representative.
 9      Q.    For a new representative?
10      A.    That's what that was in reference to.
11      Q.    It says you were the June Jump Contest
12  winner.  What's that?
13      A.    Whoever did the most calls for the month
14  of June, and I did, and I won $2,500.
15      Q.    When you were at Bristol-Myers Squibb,
16  were the calls called sales calls?
17      A.    Yes.
18      Q.    Whether you believe it or not, was it
19  called sales calls?
20      A.    Yes.
21      Q.    What's a PDE?
22      A.    What's that?
23      Q.    It's under the June Jump Contest winner.
24  It says "achieved the most PDE's in the Southeast
25  region."
```

105

```
 1              B. Amendola
 2      A.    Primary details, I believe.
 3      Q.    What's that?
 4      A.    It's -- you have a number of products
 5  and some are in the first position, which is the
 6  primary detail, and then the others are secondary.  I
 7  think that's what that means.
 8      Q.    You wrote strong team player within
 9  CV/Met specialists?
10      A.    Yes.
11      Q.    And CV/Met stands for cardiovascular
12  metabolics division?
13      A.    Yes.
14      Q.    That was your division?
15      A.    Yes.
16      Q.    You were primary care within CV/Met?
17      A.    Right.
18      Q.    What does it mean that you were a strong
19  team player?
20      A.    I collaborated with Bill Aguayo, who was
21  the cardiovascular specialist, with Lourdes, she was
22  the specialist, I believe, in Hollywood, and I also
23  worked with the hospital rep.
24      Q.    What did you work with them on?
25      A.    Concentrating on certain doctors who
```

27 (Pages 102 to 105)

106

1          B. Amendola
2   needed more attention.
3       Q.    What does that mean, "the doctors who
4   needed more attention"?
5       A.    There might have been a specialist who
6   did not have a good relationship with the doctor and
7   I did, so we would meet and they would encourage me
8   to go there and try to move the product in there
9   because they were unable to.
10      Q.    When you say "move the product in
11  there," do you mean --
12      A.    Convince the doctor.
13      Q.    Persuade the doctor, right?
14      A.    Convince the doctor it was the right
15  product for his patients. The hospital rep did not
16  have an abundance of Tequin samples and I had a lot
17  of Tequin samples because I was making it work in my
18  territory, so I would collaborate with him and see
19  the doctors that he thought would benefit from the
20  samples. We would work together.
21      Q.    This collaboration, you were brought in
22  because it was felt that you could develop these
23  relationships better than the existing rep?
24      A.    Right, or that I had the relationship to
25  begin with.

107

1          B. Amendola
2       Q.    You had been working with doctors in
3   this part of Florida for many, many years?
4       A.    Exactly.
5       Q.    And you had developed good relationships
6   with many of them?
7       A.    Yes.
8       Q.    In fact, you wrote on your resume you
9   developed strong relationships with high volume
10  prescribers, as well as hospitals, clinics and
11  pharmacies; is that true?
12      A.    That's true.
13      Q.    Could you tell me how you developed
14  those strong relationships?
15      A.    Using the materials that Bristol-Myers
16  provided to me in the most efficacious manner
17  possible, allocating my samples to the doctors that
18  would be able to use them and not abuse them,
19  spending my budget where I thought that I would get a
20  return on my investment, and also frequency of calls
21  to these offices.
22      Q.    You testified a little earlier that part
23  of the training that you received through POA and
24  other sort of training, I don't want to
25  mischaracterize them, you will tell me if I'm wrong,

108

1          B. Amendola
2   I know that, is that you would go then out into the
3   field with that information, and I think you said
4   something to the effect that you would repeat this
5   information or as close to it as you could; is that
6   accurate?
7       A.    Yes.
8       Q.    I guess my question to you is this:
9   You're talking about how you developed strong
10  relationships with these prescribers, right, and that
11  you were a strong team player within CV/Met
12  specialists, correct?
13      A.    Yes.
14      Q.    What was it that the sales rep,
15  pharmaceutical rep was not doing that you were doing
16  that made you more successful, if you know?
17          MR. MAAZEL: Are you referring to a
18  particular rep? You can answer if you understand.
19      Q.    I'm referring to your work with CV/Met
20  specialty.
21      A.    I understand. Some doctors would
22  respond better to a woman than a man. Some would
23  respond better to a man than a woman.
24          I could take a clinical study and
25  pinpoint a section of it that would be especially

109

1          B. Amendola
2   advantageous to the doctor and his practice, whereas
3   someone else might not be able to.
4          I was successful because I didn't waste
5   the doctor's time. I was also successful because I
6   was able to get in to see the doctor and I was
7   extremely consistent. On a certain time, on a
8   certain day I would be there.
9       Q.    Was one of the successful things that
10  you did tailoring the message to a specific doctor
11  and his or her needs?
12      A.    You can't tailor the message, but you
13  can take the same message and you can apply it to the
14  doctor. You can look at the doctor's waiting room
15  and make it a personal thing for the doctor based on
16  his patient population, but the core message is the
17  core message is the core message.
18          I was a widow. I needed this job. I
19  had to do what Bristol-Myers told me.
20      Q.    It says here after -- it says you
21  developed strong relationships with high volume
22  prescribers. Do you see that?
23      A.    Yes.
24      Q.    Was it important to develop
25  relationships with high volume prescribers?

28 (Pages 106 to 109)

110

B. Amendola

1
2    A.    Yes.
3    Q.    Why?
4    A.    Because all the drugs work so why would
5    they prescribe a Bristol-Myers drug as opposed to a
6    Novartis drug that did the same thing.
7    Q.    Why was it important for you?
8    A.    Because it was important for the
9    company, because if the doctor didn't like me, then
10   the doctor was not going to prescribe the drug.
11   Q.    The doctor liked you not only because
12   you're very personable, but also you had lots of
13   information to give the doctor; is that accurate?
14   A.    I had good products, good information,
15   and myself.
16   Q.    It says next on your resume that you
17   sold Cefzil to pediatricians and you were
18   instrumental in winning three Pinnacles.
19   I assume that's Pinnacle awards?
20   A.    Yes.
21   Q.    Is that accurate?
22   A.    Yes, I sold Cefzil the first year and
23   the second year and won two awards.  I think it was
24   in 2004 I got it back and I tied for first place for
25   the Pinnacle award.

111

B. Amendola

1
2    Q.    Then it says next "successfully sold
3    Vaniqa to dermatologists to increase incentive
4    compensation."
5    A.    Yes.
6    Q.    Could you explain that to me, what you
7    meant by that?
8    A.    Well, we only had Vaniqa for a short
9    period of time, and we marketed it to dermatologists,
10   and sometimes you would have a product that was
11   weighted very low in your portfolio as far as getting
12   incentive compensation for you, but that little low
13   weighted product could be the difference in being
14   first place or second place, and I knew that, so I
15   pushed Vaniqa.
16   Q.    As a result of your pushing Vaniqa you
17   increased your own incentive compensation?
18   A.    Yes.
19   Q.    As a result of your work you moved the
20   market share?
21   A.    Yes.
22        MR. MAAZEL:  Form objection.  You can
23   answer.
24   A.    Yes.
25        MR. BROWN:  Can I ask what the problem

112

B. Amendola

1
2    was?  I don't want garbage in garbage out.  Was there
3    a specific problem with the form of that question?
4        MR. MAAZEL:  Can you read back the
5    question.
6        (The requested portion was read.)
7        MR. MAAZEL:  My objection is that she
8    testified that there were lots of things that affect
9    market share.
10       MR. BROWN:  Okay.  That's fair enough I
11   suppose.
12   Q.    Do you understand that the work that you
13   did resulted in moving the market share?
14       MR. MAAZEL:  Form objection.  You can
15   answer.
16   A.    I wasn't the only one doing it, but I
17   contributed to the rise in market share of Vaniqa.
18   Q.    To be more particular, you wrote that
19   you successfully sold Vaniqa to dermatologists to
20   increase incentive compensation, correct?  Is that
21   correct, that you wrote that?
22   A.    Yes.
23   Q.    Are you attributing the work that you
24   did at Bristol-Myers Squibb in selling Vaniqa to
25   dermatologists as resulting in an increase in

113

B. Amendola

1
2    Bristol-Myers market share?
3        MR. MAAZEL:  Form objection, but answer.
4    A.    I know that I marketed Vaniqa
5    successfully and my incentive compensation went up.
6    Q.    It says here in your resume that you won
7    Wave 1 of the Plavix High Definition Contest?
8    A.    Yes.
9    Q.    Could you tell me what that is?
10   A.    That was also increasing market share of
11   Plavix, but you had to win Waves two and three as
12   well, I think.
13   Q.    Did you win Waves two and three as well?
14   A.    No, that's why I didn't put them in
15   there.
16   Q.    But you won Wave 1?
17   A.    Yes.
18   Q.    How do you win Wave 1?
19   A.    You get recognition.  I don't think that
20   there was monetary compensation unless you moved it
21   considerably more.  This is a resume.
22   Q.    What does that mean?
23   A.    It means that everything in here is
24   true, but not everything is in here.
25   Q.    I understand that.  I'm just asking a

29 (Pages 110 to 113)

114

B. Amendola
1
2  specific question about the resume.
3     A.   I'm being specific.
4     Q.   Let's just talk about Wave 1.
5     A.   Okay.
6     Q.   How did you win Wave 1?
7     A.   Successfully marketing Plavix to
8  cardiologists and primary care physicians.
9     Q.   Which resulted in moving market share?
10    A.   Right.
11    Q.   The next thing you have in your resume
12 is you successfully sold Plavix to cardiologists,
13 vascular specialists, and primary care. Do you see
14 that?
15    A.   Yes.
16    Q.   Again, did that result in moving market
17 share?
18         MR. MAAZEL: Form objection, but you can
19 answer.
20    A.   I would say so.
21    Q.   Then you wrote in your resume next that
22 you increased market share significantly by selling
23 Glucophage, Glucophage XR, and Glucovance to
24 endocrinologists and primary care. Do you see that?
25    A.   Yes.

115

B. Amendola
1
2     Q.   Is that accurate?
3     A.   Market share was increased, yes, that is
4  accurate.
5     Q.   Market share was increased, you believe,
6  through your marketing efforts?
7     A.   Through my market efforts.
8     Q.   And sales calls you made?
9     A.   And the calls that I made.
10    Q.   It says you marketed Serzone and Buspar
11 to psychiatrists, neurologists, and primary care
12 physicians.
13    A.   Yes.
14    Q.   Is that accurate?
15    A.   Accurate.
16    Q.   When you say "marketed," that includes
17 the sales calls, correct?
18         MR. MAAZEL: Form objection.
19    Q.   You called them sales calls, right?
20         MR. MAAZEL: No, form objection.
21    A.   Bristol called them sales call. The
22 interchangeability of marketed and sold here is
23 because sold means marketed.
24    Q.   Can we agree that when I say "sell" or
25 "market" or "promote," that what we mean is moving

116

B. Amendola
1
2  market share or promoting sales with the goal of
3  getting a commitment to prescribe where appropriate
4  is that a fair definition?
5         MR. MAAZEL: Form objection.
6     A.   I would say that marketing and promotion
7  is to move market share. I agree with you on that
8  most certainly. And moving market share means that
9  Bristol-Myers' revenue increased, but I had nothing
10 to do with sales. I sold nothing.
11    Q.   When we're talking about sales and
12 marketing and promotion, we are meaning -- let's be
13 clear about it -- that we're promoting sales with the
14 goal of getting a commitment from a doctor, from a
15 prescriber, to prescribe more; is that accurate?
16         MR. MAAZEL: Form objection. You can
17 answer.
18    Q.   Do we agree on that?
19    A.   We're getting the doctor to -- we're
20 convincing the doctor that the product is best for
21 his patient. A commitment from a doctor has no -- it
22 has no substance. Doctors will agree to something
23 all the time, but it doesn't necessarily mean that
24 what they've agreed to they're going to do.
25    Q.   Okay. That's fine. Let's be clear

117

B. Amendola
1
2  about this. When we're saying "sell" or "market" or
3  "promote," that we're meaning that you were promoting
4  the sales of a product with the goal of getting a
5  commitment from that doctor to prescribe your product
6  where appropriate; is that fair?
7         MR. MAAZEL: Form objection. Put it in
8  your own words. You don't have to take the words he
9  keeps trying to make you say.
10    A.   I was promoting or marketing a product
11 to a doctor in order to convince the doctor that this
12 was the most appropriate product for his patient and
13 he should prescribe it when the right patient came in
14 for that product.
15    Q.   I will accept that as perfectly put by
16 you.
17    A.   That's it.
18    Q.   Just as an addendum to it though, that
19 the ultimate goal though, your ultimate goal as a
20 pharmaceutical rep in primary care was to move market
21 share?
22    A.   Yes, most definitely.
23    Q.   It says here at the end of this
24 Bristol-Myers section on your resume that you sold
25 Pravachol to cardiologists and primary care meeting

30 (Pages 114 to 117)

118

1            B. Amendola
2  and exceeding targets?
3       A.   Yes.
4       Q.   Could you explain to me what you mean by
5  "meeting and exceeding targets"?
6       A.   There was a goal, to the best of my
7  recollection, because Pravachol I did in the early
8  2000s that I had to increase market share for
9  Pravachol, and I called on cardiologists and primary
10 care physicians to encourage them to write Pravachol
11 for their patients who needed it, and market share
12 went up.
13      Q.   When you say write Pravachol?
14      A.   Prescribe.
15      Q.   Thank you.  I just want the record to be
16 clear about that.  I'm going to show you what we're
17 going to mark as Amendola 9, application for
18 employment.
19           (Whereupon, an application for
20 employment was received and marked Amendola Exhibit
21 9, for identification, as of this date.)
22      Q.   Ms. Amendola, I'm just showing you a
23 document that we've marked as Amendola 9.  It's
24 entitled Bristol-Myers Squibb Company Pharmaceutical
25 Group Application For Employment.  It is dated

119

1            B. Amendola
2  January 16, 1998.  Have you reviewed this document?
3       A.   Yes.
4       Q.   Is this your employment application to
5  work at Bristol-Myers Squibb Company?
6       A.   Yes.
7       Q.   Is this your handwriting on this
8  document?
9       A.   Yes.
10      Q.   On the last page, which is BMS 1662, is
11 that your signature?
12      A.   Yes.
13      Q.   You can put that aside.  When you worked
14 at Bristol-Myers Squibb, again, you were in the
15 CV/Met division?
16      A.   I didn't start in CV/Met.
17      Q.   Where did you start?
18      A.   I started in -- I don't know the name of
19 it, but I was promoting antidepressants and
20 antiinfectives.  I don't know the name of the
21 division.
22      Q.   Do you know how long you worked in that
23 division?
24      A.   Two years, three years.  I don't know.
25      Q.   When did you --

120

1            B. Amendola
2       A.   Products always changed.
3       Q.   When did you move to CV/Met?
4       A.   Even that I don't know.
5       Q.   Approximately?
6       A.   CV/Met was a new title that came up.  I
7  don't know.  2003.  I don't know.  First I did
8  antidepressants, antiinfectives, then I don't
9  remember.
10      Q.   Is it fair to say that as of 2003 you
11 were working in CV/Met?
12      A.   It's possible.  It's possible because
13 Pravachol was metabolic diseases, so was Glucophage
14      Q.   Tequin, was that in CV/Met?
15      A.   I don't know if it was.  That was an
16 antibiotic so I don't know.
17      Q.   Do you know how many different
18 pharmaceutical divisions there are at Bristol-Myers
19 Squibb?
20      A.   No.
21      Q.   Can you name any other divisions other
22 than CV/Met?
23      A.   Virology, oncology, probably neurology.
24      Q.   I don't want you to guess.  If these are
25 what you recall, that's fine.

121

1            B. Amendola
2       A.   Yes.
3       Q.   Anything else?
4       A.   No.
5       Q.   How was the CV/Metabolics division
6  divided up in terms of management structure?
7       A.   There's a regional vice president, and
8  then there are district business managers, and then
9  there are field representatives, and field
10 representatives could be specialty representatives,
11 hospital representatives.  That's it.
12      Q.   Do you know how many regions there were
13 within CV/Met when you worked at Bristol-Myers
14 Squibb?
15      A.   No.
16      Q.   You applied for work at Bristol-Myers
17 Squibb in Florida, right?
18      A.   Yes.
19      Q.   The regional vice president, is that
20 called an RBH?
21      A.   Yes.
22      Q.   That's regional business head?
23      A.   Yes.
24      Q.   Below the regional business heads are
25 DBMs?

31 (Pages 118 to 121)

122

B. Amendola

2    A.    Yes.
3    Q.    And that stands for district business
4  manager?
5    A.    Yes.
6    Q.    Below district business manager are?
7    A.    The territory business managers.
8    Q.    You had a territory?
9    A.    Yes.
10    Q.    I'm talking about CV/Met which
11  encompassed approximately the last three years of
12  your employment?
13    A.    Yes.
14    Q.    What territory were you assigned to?
15    A.    The Hollywood territory.
16    Q.    Do you know how many territories were
17  within your region? Let me strike that. How many
18  territories were within your district?
19    A.    Either five or six.
20    Q.    Were all those territories in Florida?
21    A.    Yes.
22    Q.    Were there other territories that were
23  in Florida that were not covered by the district?
24    A.    My district, yes.
25    Q.    Was there a name for your district?

123

B. Amendola

2    A.    I think it was called the Fort
3  Lauderdale district. I think. These things changed
4  very, very frequently.
5    Q.    Well, your work as a pharmaceutical
6  representative in CV/Metabolics for the last three
7  years of your employment at Bristol-Myers, were you
8  in the Hollywood territory?
9    A.    Yes.
10    Q.    That whole time?
11    A.    Yes.
12    Q.    Were there any other pharmaceutical
13  representatives for CV/Metabolics in your territory?
14    A.    Yes.
15    Q.    Who was that? I'm talking about your
16  entire time at CV/Met only.
17    A.    Initially it was just Alfredo Martir.
18    Q.    That's Freddie?
19    A.    Freddie.
20    Q.    He had the same position as you?
21    A.    Yes.
22    Q.    He was a TBM?
23    A.    Yes.
24    Q.    Not an ATBM?
25    A.    No.

124

B. Amendola

2    Q.    Not a senior TBM?
3    A.    No.
4    Q.    He had the Hollywood territory as well?
5    A.    Yes.
6    Q.    Anybody else?
7    A.    We got a new partner, Lali Bahlawan,
8  L-A-L-I, B-A-H-L-A-W-A-N.
9    Q.    Is that a man or a woman?
10    A.    It's a woman.
11    Q.    Did this woman -- what position did this
12  woman hold?
13    A.    TBM, territory business manager.
14    Q.    When did she come on board?
15    A.    I think in 2004.
16    Q.    Were the three of you marketing, and
17  promoting, and selling the same product?
18    A.    Yes.
19    Q.    Did you call on the same doctors?
20    A.    For the most part.
21    Q.    For the most part, yes?
22    A.    For the most part, yes.
23    Q.    How did that work? How did you divide
24  up or agree on who would be visiting whom?
25    A.    We didn't agree on anything. We were

125

B. Amendola

2  given a doctor list and the doctor list spelled out
3  which doctors we individually were responsible for.
4  Some of those doctors overlapped between the three of
5  us, others we called on them independently. The
6  number of times we called on each one of those
7  doctors in some cases was the same, in some cases was
8  different. The order of the product detailing for
9  each doctor was different.
10    Q.    I want to ask you about that. Was there
11  a list that assigned you of what pharmaceutical
12  product you should be advocating for?
13    A.    For that doctor?
14    Q.    Correct.
15    A.    Yes.
16    Q.    Was there a list in degree of
17  pharmaceutical products that you should be advocating
18  more strongly for for a particular doctor?
19    A.    Yes.
20    Q.    Was there a formal name for this?
21    A.    The call list.
22    Q.    Let's take doctor X, and doctor X when
23  you were making a call to doctor X, was there an
24  order of primacy for the pharmaceutical products that
25  you were to market to him?

32 (Pages 122 to 125)

---

126

B. Amendola

1
2  A.   Yes.
3  Q.   Did that vary with each doctor?
4  A.   It could.
5  Q.   But for you as a pharmaceutical rep in
6  CV/Metabolic primary care, what was your number one
7  product?
8  A.   That changed too with every quarter. My
9  last two years or three at Bristol-Myers I marketed
10  Plavix, Avapro, and Avalide. Some doctors I had to
11  promote Plavix in the first position with either
12  Avapro or Avalide in the second position. I was told
13  that Avalide was more important for my incentive
14  compensation than Avapro so I concentrated on Plavix
15  and Avapro.
16      With Plavix some of the reps were
17  marketing Plavix for cardiovascular syndrome, I think
18  that's what it was called, and I was marketing Plavix
19  for peripheral arterial disease. So I marketed it
20  differently. I focused differently. Its position
21  was different and some doctors were primary care and
22  didn't write much Plavix, so I would focus on Avalide
23  with them. Everything was spelled out on this paper.
24  Q.   The other pharmaceutical reps in your
25  territory, that was called a pod POD?

---

127

B. Amendola

1
2  A.   Yes.
3  Q.   Did they have a different order of
4  pharmaceutical products that they were incentivized
5  to market more heavily?
6  A.   Yes. Sometimes things would overlap,
7  but their concentration was different than mine.
8  Q.   Within the CV/Metabolics division, was
9  there a distinction between primary care and
10  specialty sales?
11  A.   Yes.
12  Q.   What was the difference?
13  A.   Specialty sales called on specialists
14  and only very high volume primary care physicians.
15  Primary care, on the other hand, called mainly on
16  primary care physicians and certain high volume
17  specialists in order to put more emphasis -- to give
18  them more attention.
19  Q.   Did the primary -- strike that. Did the
20  specialty representatives, were they more experienced
21  than the primary care representatives on a whole?
22  A.   Some were with the company longer, some
23  were not with the company longer, some were
24  specialists because there was no one within the
25  company who wanted the position, and yes, some might

---

128

B. Amendola

1
2  have had better work records with Bristol-Myers and,
3  therefore, it was a promotion. It was considered a
4  promotion to be a specialty rep.
5  Q.   Do you know whether specialty reps were
6  paid more in general than primary care reps?
7  A.   In the industry specialty reps earn a
8  higher base salary than primary care represents.
9  Q.   Was that true at Bristol-Myers?
10  A.   As far as I know, but we didn't discuss
11  salaries.
12  Q.   I'm just asking what your understanding
13  was.
14  A.   I mean sergeants earn more than enlisted
15  men.
16  Q.   You would characterize the specialty
17  reps as having a higher rank than primary care reps?
18  A.   Yes.
19  Q.   Are there associate territory business
20  managers who are in the specialty rep position in
21  CV/Metabolics?
22  A.   There might be.
23  Q.   Do you know?
24  A.   I don't know.
25  Q.   Do you know whether specialty

---

129

B. Amendola

1
2  representatives within CV/Metabolics receive
3  different or more specialized training than primary
4  care representatives?
5  A.   They receive the same training, but they
6  receive additional clinical studies so that they can
7  explore the benefits, the features and benefits.
8  They can go into greater detail, but all the
9  materials that even the specialty reps use have to be
10  approved by Bristol-Myers Squibb.
11  Q.   That's because not the approval, but the
12  additional knowledge that the specialty reps have, is
13  that because they're calling on specialists?
14  A.   Exactly.
15  Q.   Presumably they're calling on people
16  with a deeper knowledge?
17  A.   With a deeper -- with more training and
18  more ego.
19  Q.   Do you know what pharmaceutical products
20  virology sells?
21  A.   No.
22  Q.   What about oncology?
23  A.   This time, no.
24  Q.   Any other division?
25      MR. MAAZEL: You mean now or when she

33 (Pages 126 to 129)

130

| | |
|---|---|
| | B. Amendola |
| 2 | was at the company? |
| 3 | MR. BROWN:  Fair enough. |
| 4 | Q.    While you were at the company. |
| 5 | A.    I heard of Taxol. |
| 6 | Q.    What division sold that? |
| 7 | A.    I believe it was oncology. |
| 8 | Q.    Any other pharmaceutical products |
| 9 | outside of CV/Met that you're aware of that |
| 10 | Bristol-Myers sold while you were employed there? |
| 11 | A.    No. |
| 12 | Q.    Do you recall when your last day of work |
| 13 | at Bristol-Myers Squibb was? |
| 14 | A.    February 28, 2006. |
| 15 | Q.    Were you told the reason for your |
| 16 | separation from Bristol-Myers Squibb? |
| 17 | A.    I was told that there was a company wide |
| 18 | layoff. |
| 19 | Q.    It had nothing to do with your |
| 20 | individual performance, correct? |
| 21 | A.    No. |
| 22 | Q.    You weren't disciplined? |
| 23 | A.    No, never. |
| 24 | Q.    In fact, you were one of the top |
| 25 | salespeople? |

131

| | |
|---|---|
| | B. Amendola |
| 2 | MR. MAAZEL:  Objection. |
| 3 | MR. BROWN:  Let me withdraw that. |
| 4 | Q.    You were one of the top sales reps in |
| 5 | your territory, correct? |
| 6 | MR. MAAZEL:  Form objection. |
| 7 | A.    I would like to think so. |
| 8 | Q.    You applied for re-employment with |
| 9 | Bristol-Myers Squibb, correct? |
| 10 | A.    Yes. |
| 11 | Q.    In what area? |
| 12 | A.    As a neuroscience specialty |
| 13 | representative. |
| 14 | Q.    In what area of the country? |
| 15 | A.    Fort Lauderdale. |
| 16 | Q.    It would have been around the same |
| 17 | territory that you had as a primary care rep? |
| 18 | A.    I think so.  I think so. |
| 19 | Q.    Were you hired by Bristol-Myers Squibb? |
| 20 | A.    No. |
| 21 | Q.    Have you applied again? |
| 22 | A.    No. |
| 23 | Q.    Just that one time? |
| 24 | A.    Yes. |
| 25 | MR. BROWN:  We're going to take a few |

132

| | |
|---|---|
| | B. Amendola |
| 2 | minute break.  Thank you. |
| 3 | VIDEOGRAPHER:  The time is approximately |
| 4 | 11:24.  This ends tape number two.  We're now going |
| 5 | off the record. |
| 6 | (Whereupon, a recess was taken.) |
| 7 | VIDEOGRAPHER:  The time is approximately |
| 8 | 11:36.  This begins tape number three.  We are now on |
| 9 | the record. |
| 10 | Q.    Ms. Amendola, I understand from your |
| 11 | counsel there's some answer you wish to supplement? |
| 12 | A.    Yes.  After I was displaced by |
| 13 | Bristol-Myers Squibb, I believe it was a week later |
| 14 | they offered me a new position in Hialeah, Florida, |
| 15 | which I subsequently declined and then applied for a |
| 16 | position with them. |
| 17 | Q.    Thank you. |
| 18 | A.    You're welcome. |
| 19 | Q.    What was the position that they offered |
| 20 | you? |
| 21 | A.    Territory business manager in Hialeah. |
| 22 | Q.    Can you tell me, were you live in Coral |
| 23 | Springs at this time? |
| 24 | A.    I was living in Coconut Creek. |
| 25 | Q.    What is the difference -- as a New |

133

| | |
|---|---|
| | B. Amendola |
| 2 | Jersian, can you explain to me what, in relative |
| 3 | geography, the difference between the two locations? |
| 4 | A.    Well, Hialeah is in I believe it's West |
| 5 | Miami and Coconut Creek is in North Broward.  So it's |
| 6 | a commuting distance of approximately 65 miles each |
| 7 | way. |
| 8 | Q.    Why did you turn down the position? |
| 9 | A.    It's also -- it's not a bilingual |
| 10 | community.  It's predominantly Cuban Spanish, and |
| 11 | while there are people there who speak English, the |
| 12 | general language of Hialeah is Spanish, and I felt |
| 13 | that I could not adequately detail the doctors in |
| 14 | Hialeah in English. |
| 15 | Q.    Do you know Spanish? |
| 16 | A.    I studied Spanish.  I can somewhat speak |
| 17 | Spanish, but I can't do a clinical study in Spanish. |
| 18 | Q.    Was this in CM/Metabolics? |
| 19 | A.    Yes. |
| 20 | Q.    Was it in primary care? |
| 21 | A.    Yes. |
| 22 | Q.    Was it for the same base salary and |
| 23 | bonus structure as you were receiving before your |
| 24 | layoff? |
| 25 | A.    It would have been as if I had never |

34 (Pages 130 to 133)

134

B. Amendola

1
2  been displaced.
3      Q.    Who offered you that job?
4      A.    A person at human resources.
5      Q.    Were any of the marketing materials that
6  Bristol-Myers Squibb used, to your knowledge, in
7  Spanish?
8      A.    Occasional pieces. More patient
9  information pieces were in Spanish, not the detail
10 pieces.
11     Q.    Do you know who the TBM was in Hialeah?
12     A.    The TBM or the DBM?
13     Q.    The TBM that you would --
14     A.    Work with?
15     Q.    Yes.
16     A.    Sylvia Rodriguez.
17     Q.    Would this be replacing somebody or
18 adding somebody?
19     A.    No, there was a vacancy.
20     Q.    Did anybody explain to you why they
21 wanted you to take that position?
22     A.    Because it was available and it was the
23 legal thing to do.
24     Q.    What do you mean by that?
25     A.    When there's a displacement I think the

135

B. Amendola

1
2  company -- I think until you sign the severance
3  agreement, if there's a vacancy, then the company has
4  the legal obligation to offer it to the displaced
5  reps. I think. I'm not quite sure.
6      Q.    Did Bristol-Myers or anyone at
7  Bristol-Myers convey to you that they believed you
8  were qualified for that job?
9      A.    No.
10     Q.    But they offered that job to you?
11     A.    Yes.
12     Q.    Can you go over with me in some detail
13 what your job duties were as a TBM at Bristol-Myers
14 in CV/Metabolics? I know it's a big question. I'm
15 going to write down what you say and maybe we can go
16 over some of it in detail.
17     A.    My job duties were to adhere to my call
18 plan, promote the products in my portfolio in the
19 order in which -- the right number of calls to the
20 right number of physicians the right number of times,
21 to convey the core message, to spend my budget wisely
22 in order to get, and I will quote, more bang for the
23 buck, more return on investment, and to ultimately
24 move market share.
25     Q.    Anything else you want to add to that?

136

B. Amendola

1
2  We'll go over some of it now.
3      A.    Those were my duties and everyone else's
4  duties at Bristol-Myers Squibb.
5      Q.    In CV/Metabolics?
6      A.    In every market or every promoter, that
7  was our job.
8      Q.    In all the divisions?
9      A.    As far as I know.
10     Q.    How do you know?
11     A.    I would see some of them. Some of them
12 were promoted from the ranks of primary care, you
13 know, they went to another division. My very first
14 year with Bristol-Myers Squibb a girl went to
15 oncology, and she learned different products but the
16 same goals, the same way to move market share.
17     Q.    As part of your job as a pharmaceutical
18 rep in CV/Metabolics primary care, did you call on
19 doctors?
20     A.    Yes.
21     Q.    Did you refer to your doctors or to the
22 doctors in your territory that you called on as
23 customers?
24     A.    Yes.
25     Q.    Was there anyone else other than an M.D.

137

B. Amendola

1
2  who was a customer or who you considered a customer?
3      A.    A nurse practitioner, a physician's
4  assistant.
5      Q.    Anyone else?
6      A.    No, I don't think so.
7      Q.    When you called on a physician or a
8  physician's office, I should be clear about that, did
9  you meet with their nurses on occasion?
10     A.    Not really.
11     Q.    What about their office managers?
12     A.    Sometimes to find out what managed care
13 plans were important in the office.
14     Q.    I guess that relates to my next
15 question. Did you ever meet with any of the doctors'
16 administrators or those who communicated directly
17 with insurance companies?
18     A.    Maybe without knowing. It wasn't a
19 function of my job.
20     Q.    What I'm saying is when you worked at
21 Bristol-Myers Squibb, I'm really referring to the
22 last three years of employment while you were in the
23 CV/Metabolics division. You worked out of your home;
24 is that correct?
25     A.    Yes.

35 (Pages 134 to 137)

138

B. Amendola

1
2    Q.    That was true for your entire employment
3 at Bristol-Myers?
4    A.    Yes.
5    Q.    You didn't have a physical brick and
6 mortar office outside your home?
7    A.    No.
8    Q.    Did your DBM have a physical brick and
9 mortar office outside her home?
10    A.    No.
11    Q.    You were provided with a car by
12 Bristol-Myers Squibb?
13    A.    Yes.
14    Q.    Bristol-Myers paid your car insurance?
15    A.    Yes.
16    Q.    You were reimbursed for your gas and
17 wear and tear?
18    A.    We were given an American Express card
19 that took care of it.
20    Q.    Took care of gas?
21    A.    Gas and wear and tear.
22    Q.    Where did you keep your car?
23    A.    In my garage.
24    Q.    When you left from your home in the
25 morning to go on your calls, you returned to your

139

B. Amendola

1
2 home in the evening after your calls; is that
3 accurate?
4    A.    Yes.
5    Q.    Was there a regional office?
6    A.    No. Well, yes.
7    Q.    Where was that?
8    A.    In Tampa.
9    Q.    As part of your calling on and promoting
10 pharmaceutical products in the primary care group,
11 did you distribute samples to your physicians?
12    A.    Yes.
13    Q.    How did you receive those samples?
14    A.    The samples came by either Fed Ex, or a
15 transporting company, or UPS.
16    Q.    To your home?
17    A.    Yes.
18    Q.    Did you ever have to go somewhere to
19 pick them up?
20    A.    I believe I used to sometimes have them
21 shipped right to the UPS office and then I would pick
22 them up there this way I could be out in the field
23 and not home when the samples would arrive. I think
24 I did that initially.
25    Q.    But the last three years?

140

B. Amendola

1
2    A.    They came to my home. At one point they
3 went to a storage unit that I had.
4    Q.    But for the last three or four -- let me
5 just ask this --
6    A.    I think it was my home in the last three
7 years. I think so.
8    Q.    Where did you store those samples?
9    A.    I stored them in my office. I had a
10 closet in there.
11    Q.    Your office in your home?
12    A.    Yes.
13    Q.    Did you bring these samples with you
14 when you were making calls?
15    A.    Yes.
16    Q.    On occasion you also provided your
17 doctors with promotional material, correct?
18    A.    Yes.
19    Q.    I want to call it the right thing. What
20 did you call it?
21    A.    They were promotional materials.
22    Q.    Marketing materials?
23    A.    Sometimes we called it junk, but we had
24 promotional materials.
25    Q.    Why did you call it junk?

141

B. Amendola

1
2    A.    Because it was piles and piles of things
3 to give out, that we were required to give out for no
4 educational benefit.
5    Q.    The promotional materials, did those
6 include handouts?
7    A.    Yes.
8    Q.    Charts?
9    A.    Only if they were prescription approved.
10    Q.    Did they include charts?
11    A.    They could have occasionally.
12    Q.    Did they include articles?
13    A.    They could have.
14    Q.    Visual aids?
15    A.    Yes.
16    Q.    Nicknacks?
17    A.    Yes.
18    Q.    And all of those products, materials
19 were sent to your home; is that accurate?
20    A.    Yes.
21    Q.    How did you determine what doctor you
22 were going to call on first thing in the morning?
23    A.    Check the doctor's schedule, see when
24 the doctor was willing to see reps. Sometimes based
25 on the call plan, how many times I had to see that

36 (Pages 138 to 141)

142

B. Amendola

1 doctor. So it would be advantageous if I didn't know
2 the doctor's schedule to go there first thing in the
3 morning in case I couldn't go in, get back there
4 later on in the day in order to fulfill the
5 requirement.
6     Q.   How many doctors were on your call list
7 generally?
8     A.   Over 100.
9     Q.   Did you know most of them personally?
10     A.   I knew most of them professionally.
11     Q.   Did you over the years develop a
12 professional and personal relationship with the
13 doctors on your call list?
14     A.   With some of them.
15     Q.   I suppose over the years you learned
16 what a particular doctor's office hours were?
17     A.   Yes.
18     Q.   And what that doctor's availability was?
19     A.   Yes.
20     Q.   And whether that doctor would see you as
21 the rep?
22     A.   Yes.
23     Q.   Is it also true that the doctors on your
24 call list had individualized needs and concerns and I

*Note: lines above — line numbering 1-25.*

---

143

B. Amendola

1 guess differences between them, their practice
2 groups?
3     MR. MAAZEL: Form objection. You can
4 answer.
5     MR. BROWN: I will rephrase that.
6     Q.   Is it true that your doctors that you
7 called on had different experience?
8     A.   Yes.
9     Q.   Different prescription histories?
10     A.   Yes.
11     Q.   Different concerns about pharmaceutical
12 products?
13     A.   Yes.
14     Q.   Different clientele, or I don't know
15 what word you would use, different patient
16 population?
17     A.   Yes.
18     Q.   Some doctors that you called on, did
19 they have a preference as to what kind of material
20 you would give them?
21     A.   Yes.
22     Q.   Could you give me an example that you
23 recall specifically of a doctor or group of doctors
24 who preferred some kind of material over other kinds

---

144

B. Amendola

1 of material?
2     A.   Well, some doctors genuinely appreciated
3 and took the time to read clinical studies. Other
4 doctors said I have no time for that, just tell me
5 what it says.
6     Q.   And would you do that?
7     A.   Yes.
8     Q.   That's because that was, I guess,
9 fulfilling the need of the doctor? I don't want to
10 put words in your mouth. Why don't you tell me why
11 you would do that.
12     A.   It was a way to move market share, yet
13 at the same time not alienate the doctor by doing
14 something the doctor didn't want and yet imparting
15 the knowledge and what the doctor needed to
16 appropriately treat his patients and have a dialogue
17 with the doctor.
18     Q.   Were you good at doing that, at reading
19 the doctor and his or her needs for information or
20 the type of materials that would move market share?
21     A.   My record says that I was, but I worked
22 with other people who also were able to compensate
23 for my shortcomings. It was a collaborative effort.
24     Q.   I guess, just to understand what you

---

145

B. Amendola

1 were saying, sometimes the information that you would
2 present to a doctor, pre-approved, would be
3 communicated verbally and in writing or verbally or
4 in writing?
5     A.   It was stressed by Bristol-Myers Squibb
6 to use the written word.
7     Q.   But I'm asking you specifically what you
8 did.
9     A.   I used the promotional materials.
10     Q.   I understand that. I guess my question
11 is more direct. I think you had just described for
12 me that some doctors had a preference for looking at
13 certain literature, others doctors said I don't have
14 time for this, why don't you tell me; is that
15 accurate?
16     A.   Yes.
17     Q.   My question really to you is: In some
18 instances you communicated this information by
19 distributing the pre-approved literature?
20     A.   Right.
21     Q.   And at other times you would communicate
22 this same information verbally; is that fair?
23     A.   Somewhat. It was the one who didn't --
24 you wouldn't leave it with them to continue reading

37 (Pages 142 to 145)

146

B. Amendola

1
2  it. A clinical study could be quite a few pages.
3  The other one you would verbally communicate it and
4  then leave the study with them so they could do the
5  whole study on their own.
6      Q.   Did you engage the doctors and other
7  customers that you called on in conversation?
8      A.   Yes.
9      Q.   Can you give me an example of one of
10 your either techniques or things that you would do to
11 try to engage a doctor or other customer in
12 conversation?
13     A.    Well, we were taught a certain technique
14 and it came in handy when you couldn't think of a way
15 to approach the subject. You would go into the
16 doctor's office, you would sit in the waiting room,
17 you observed the patients in the waiting room and
18 then you would go in and see the doctor and you would
19 say to the doctor, I was waiting in that waiting room
20 for quite sometime and I noticed that you have any
21 number of elderly patients in there, or if it was a
22 primary care and you were selling an antibiotic, you
23 had so many people in there who were coughing, and
24 sneezing, and blowing their noses, and then you would
25 go in. Bristol-Myers taught us to do that.

147

B. Amendola

1
2      Q.   That was part of your training?
3      A.   Yes.
4      Q.   You found that technique to be
5  effective?
6      A.    When I couldn't think of something on my
7  own. It was approved. It was acceptable.
8      Q.   Let me ask you something, when you
9  walked into the doctor's, did you say good morning or
10 good afternoon?
11     A.   Most of the time.
12     Q.   Did you ever engage your --
13     A.    I would say to the doctor I love that
14 tie and they would laugh because I would say it even
15 if they weren't wearing a tie.
16     Q.   Was that your way of engaging these
17 doctors?
18     A.   If I was in the mood to do that.
19     Q.   Any other kinds of -- I'm not talking
20 about the pre-approved message. I'm talking about
21 your developing a professional relationship with
22 these doctors, any other techniques that you would
23 use?
24         MR. MAAZEL:  Form objection.
25     A.    Every Monday morning I was at a certain

148

B. Amendola

1
2  doctor's office at five after eight, every single
3  Monday, and the office -- I was a regular. So that
4  was a technique. They expected me. If I wasn't
5  there they would wonder where's Beth.
6      Q.   Was this a particular doctor?
7      A.   Yes, a very high prescriber.
8      Q.   What was his or her name?
9      A.   David Berndt.
10     Q.   Where was he located?
11     A.   Davie, Florida.
12     Q.   Can you explain to me what you mean by
13 high prescriber?
14     A.    He had a very high patient population.
15 He was in practice many years. He was always busy.
16 He kept himself well abreast of any information that
17 he could get about drugs.
18     Q.   What kind of a doctor was he?
19     A.   A DO.
20     Q.   What does that mean?
21     A.    Doctor of -- it's not an M.D. it's a
22 DO. My mind is a blank.
23     Q.   He was a high volume prescriber?
24     A.   Very high volume.
25     Q.   When I ask you that, does that mean that

149

B. Amendola

1
2  he was a high volume prescriber for Bristol-Myers
3  product?
4      A.    High volume in everything, everything
5  because he had so many patients.
6      Q.   Was that a doctor of osteopathy?
7      A.   Osteopathy.
8      Q.   Thank you.
9      A.    All the reps use him as their doctor
10 because he's wonderful.
11     Q.   Is he your doctor?
12     A.   I don't go to the doctor.
13     Q.    When you would, I guess, on occasion
14 tell a doctor he or she was wearing a nice tie, why
15 did you do that?
16     A.    Because a doctor's day is very strenuous
17 and stress filled, and it's all about sickness, and
18 it brought the doctor a little joy.
19     Q.    You learn anything about the doctors or
20 your other customer's family life over the years?
21     A.    Yes, but we were encouraged not to go in
22 and say to the doctor how is your wife, how are the
23 children, not because we didn't want to have a
24 relationship with them, but the doctor's time was
25 precious, and the point of the call was to get as

38 (Pages 146 to 149)

150

B. Amendola
1    much of the message to the doctor as we could in the
2    time that the doctor was going to allot us.
3        Q.    Were there doctors on your call list
4    that you called on, did they have differences in the
5    amount of time that they would give you generally?
6        A.    Yes.
7        Q.    What was the range?
8        A.    Some would give you 30 seconds. Some
9    would give you one second and say they're just
10   signing and that's it. Some would give you
11   15 minutes, ten minutes. It varied.
12       Q.    Was one of the things that you did in
13   making a call for certain doctors to make sure that
14   that doctor had a sufficient supply of samples?
15       A.    Yes.
16       Q.    How would you determine whether that
17   doctor had a sufficient supply of samples?
18       A.    Well, you would analyze the doctor,
19   first of all, to see was it a high volume prescriber,
20   a low volume -- Bristol-Myers would give us this
21   information -- low volume.
22           You would call on the doctor and you
23   could tell if an office was busy or not. You could
24   sort of note the patient population. We were taught

151

B. Amendola
1    skills to identify these things. You would go into
2    the sample closet to see if there were any samples.
3    You would also look to see if there were a lot of the
4    competitor's samples there and would it be worthwhile
5    to buck the competition by putting the samples.
6    There are lots of variables.
7        Q.    Those variables, you participated in
8    analyzing those for your particular doctors?
9        A.    Yes. We were also told you could give
10   so many samples to this doctor. Not a lot of this
11   was left to chance.
12           MR. MAAZEL: Can I just for a moment of
13   clarity, when you keep saying we were told, we were
14   trained, by whom?
15           THE WITNESS: Managers at sales training
16   sessions, at POA meetings.
17       A.    I did it for so many years you would
18   know that the important thing was allocate the right
19   amount of samples to the right people. Don't throw
20   them away.
21       Q.    How would you throw it away?
22       A.    You would throw them away by giving them
23   to a doctor who a, didn't give out samples, or a
24   doctor who didn't use that product. There are all

152

B. Amendola
1    different classes of drugs. Or a doctor who would
2    give them to his wife. You had to be careful.
3        Q.    So you wanted to optimize where you
4    placed your samples?
5        A.    Exactly.
6        Q.    To I guess drive --
7        A.    Uh-huh.
8        Q.    Well, let me finish. To drive the --
9        A.    To drive the business.
10       Q.    Thank you. One of the techniques, as I
11   understand it, that you and the other TBM's were
12   trained on was to ask probing questions of doctors;
13   is that accurate?
14       A.    Yes.
15       Q.    What was your understanding of probing,
16   what it meant to probe a doctor on a call?
17       A.    The probe was to find out what the
18   doctor's needs were for his patients. The point of
19   the probe was also so that we would not go in there
20   and just read the promotional materials. We wanted
21   to engage the doctor's attention. We wanted to ask
22   the doctor something so that if the doctor said I can
23   only sign, you would ask the probing question, get
24   his attention and have additional time with the

153

B. Amendola
1    doctor.
2        Q.    Could you give me an example, if you
3    recall one?
4        A.    I really don't recall. It's been a
5    while since I did probing. It really has been.
6        Q.    Were you effective at probing? Do you
7    believe you were effective at probing?
8        A.    There's no way to gauge if I was
9    effective. My territory was effective.
10       Q.    You were one of two or three TBM's?
11       A.    Also specialists and hospital reps
12   there.
13       Q.    You say that Bristol-Myers provided you
14   with analytical data of the doctors within your
15   territory, correct?
16       A.    Right.
17       Q.    Did you evaluate, analyze, review that
18   material?
19       A.    Yes, I did.
20       Q.    Based on that material, did you then
21   focus your energies, your efforts, your budget, your
22   samples on particular doctors?
23       A.    As long as I was meeting the call plan
24   and that's why I did more than 8.5 calls a day.

39 (Pages 150 to 153)

154

B. Amendola
1
2       MR. BROWN:  Can you read back the last
3   question and answer.
4       (The requested portion was read.)
5       Q.   Do you believe that you were good at
6   establishing a rapport with the doctors on your call
7   list?
8       A.   Yes.
9       Q.   Can you tell me whether that was
10  something that was important to you?
11      A.   Yes.
12      Q.   Why?
13      A.   Because I was there.  I was there.  I
14  traveled through the territory.  I went from office
15  to office.  On a personal level it was nice to be
16  welcomed into the various offices that I went to.
17      Q.   Do you believe by establishing this good
18  rapport with your doctors it would be driving your
19  business?
20      MR. MAAZEL:  Form objection.
21      A.   By establishing the rapport with the
22  offices it enabled me to get in to see the doctors
23  and for the doctors to not dread my being there.
24      Q.   Were you given, at any time while you
25  were a pharmaceutical rep at Bristol-Myers Squibb, a

155

B. Amendola
1
2   script to read to any of your customers on any of
3   your calls?  When I say script, I want to be very
4   particular, a verbatim, you must read this word for
5   word.
6       A.   I wasn't given it to take on the sales
7   calls with me, but at the POA meetings we were given
8   scripts to practice what to say.
9       Q.   The practice that you performed, was
10  that in order to, I guess, practice what to say if a
11  doctor had a particular concern or question?
12      A.   We were advised how to respond to
13  objections.  We certainly did role playing with
14  various objections and how to handle them.
15      Q.   Could you tell me what you mean by
16  respond to objections?
17      A.   Well, you could go into a doctor's
18  office and the doctor could say oh, I hate that
19  product.  I will never use that.  I don't use ARB's.
20  I only use diuretics.
21      We would practice how to turn an
22  objection into -- how to turn a negative into a
23  positive.  Doctor, I could understand that very much,
24  but and continue that way.  We had anti-objections
25  for everything.

156

B. Amendola
1
2       Q.   These were marketing techniques; is that
3   fair to say?
4       A.   Yes.
5       Q.   As an experienced sales rep, had you
6   developed your own marketing techniques that you felt
7   were effective?
8       A.   I had to follow what I was given and I
9   was given so many to choose from that I had them at
10  my disposal.  I didn't have to make up my own.
11      Q.   The doctors and other customers that you
12  called on, they didn't purchase any pharmaceutical
13  products directly from you, correct?
14      A.   It's against the law to sell samples.
15      Q.   That's a no?
16      A.   Of course it's a no.
17      Q.   The only way that a patient of one of
18  the doctors that were on your call list could obtain
19  pharmaceutical product from Bristol-Myers Squibb was
20  through a prescription?
21      A.   Either a sample or going to the pharmacy
22  and buying one.
23      Q.   With a prescription?
24      A.   Right.
25      Q.   Why did you call on doctors?

157

B. Amendola
1
2       A.   It was my job.
3       Q.   What was the goal?
4       A.   The goal was to influence the doctor's
5   prescribing habits.
6       Q.   When a doctor increases his or her
7   prescribing habits, it necessary follows, I suppose,
8   that they're increasing the sales of that product in
9   your territory; is that right?
10      A.   Only if the patient goes to the pharmacy
11  and fills the prescription.
12      Q.   It is my understanding that one of the
13  goals of a sales rep was to obtain something called a
14  commitment from a doctor; is that accurate?
15      MR. MAAZEL:  Form objection.  You can
16  answer.
17      MR. BROWN:  Let me withdraw the
18  question.
19      Q.   When I say the word "commitment," in
20  terms of being a sales rep at Bristol-Myers Squibb,
21  do you have any understanding of what that term
22  means?  Is it a term of art?
23      A.   A term of art?
24      Q.   Could you explain to me, if you know,
25  what the term "commitment" meant in terms of a sales

40 (Pages 154 to 157)

158

B. Amendola

1   rep at Bristol-Myers Squibb?
2   A.   I could tell you how Bristol-Myers
3   explained it.
4   Q.   Okay.
5   A.   It's not like a marriage commitment that
6   can be -- you're the lawyer.  It's not like that.
7   Bristol said that if you close the call by getting
8   the doctor to say I will prescribe it, then the
9   doctor at least has made some kind of commitment to
10  you.  Whether the doctor fulfills the commitment or
11  not, no one knows.
12  Q.   In your experience -- strike that.  Did
13  you, when making calls to doctors, seek to obtain a
14  commitment as Bristol-Myers described it?
15        MR. MAAZEL: Form objection.  You can
16  answer.
17  A.   It was one of my job responsibilities to
18  get the commitment from the doctor, to get the verbal
19  commitment from the doctor.
20  Q.   Did you do that?
21  A.   Yes, I was told to do it.
22  Q.   My question to you is:  Did you notice
23  in analyzing the data of the doctors in your
24  territory that you called on, that those doctors that

159

B. Amendola

1   gave you a commitment, in fact, prescribed more of
2   your product?
3   A.   Not necessarily.
4   Q.   You never made that correlation?
5   A.   Can I give you an example?
6   Q.   Well, why don't you answer my question
7   and then I will ask --
8   A.   This will answer your question.
9   Q.   All right.
10  A.   I got a commitment and the doctor not
11  only gave me a commitment, but said he wrote it all
12  the time.  When I got the data he wrote one script.
13  Q.   Did you --
14        MR. MAAZEL: Let her finish the answer,
15  please.
16  A.   There was not necessarily a correlation,
17  but I was doing my job.  It was my job responsibility
18  to ask for the commitment before I left.
19  Q.   You're saying that you did ask for a
20  commitment and you did receive commitments?
21  A.   Yes.
22        MR. MAAZEL: Form objection.
23  Q.   But that you didn't see a correlation in
24  the data between the doctors who committed to you and

160

B. Amendola

1   their increase in prescriptions of your product?
2        MR. MAAZEL: Asked and answered.
3   Q.   Is that accurate?
4   A.   I don't know if it was his commitment to
5   me or if it was his commitment to, say, the specialty
6   rep.  I don't know.
7   Q.   I guess I'm not understanding that
8   answer because you don't know whether the increase in
9   prescriptions for BMS product was attributed to you
10  or another rep; is that what you're saying?
11  A.   I don't know why there was an increase.
12  Q.   But there was an increase?
13  A.   In some cases.
14  Q.   There was an increase in some cases for
15  doctors who provided you with a commitment?
16  A.   There also might have been increases or
17  decreases in doctors who provided commitments.  There
18  was no -- it's an intangible thing.  There's no way
19  to know.  You can only hope that that's why market
20  share went up.  After all, the marketers analyze the
21  best ways to market the product.
22  Q.   Did you feel it was an effective way for
23  you to market the product and promote the product to
24  your doctors by obtaining a commitment?

161

B. Amendola

1   A.   It made me feel that it was one other
2   way to possibly move the business.
3   Q.   What were the other ways?
4   A.   The other ways, allocation of samples,
5   bringing in a quality lunch, being cordial to the
6   entire office, marketing the entire office, not just
7   the physician.  There were any number of ways you --
8   Q.   Knowing your product?
9   A.   Of course knowing your product.
10  Q.   Knowing --
11  A.   Knowing the competitors, knowing the
12  right product for the right patient.  We were given
13  tools all the time.
14  Q.   Are you familiar with the term "closing
15  a doctor"?
16  A.   Yes.
17  Q.   Could you tell me what you understand
18  that term to mean?
19        MR. MAAZEL: Form objection.  You can
20  answer.
21  A.   Closing the doctor is asking the doctor
22  for the commitment.
23  Q.   Closing was one of the things that
24  Bristol-Myers trained you on; is that correct?

41 (Pages 158 to 161)

162

1           B. Amendola
2      A.    Yes.
3      Q.    In early 2005, did you conduct a
4  training workshop on closing skills?
5      A.    Probably for a few reps.
6      Q.    Can you tell me what you recall about
7  that training?
8      A.    Just asking for the business.
9      Q.    Who attended that training?
10     A.    I don't remember.
11     Q.    I think you said it was a couple of
12 reps; is that accurate?
13     A.    It was probably at a pod meeting.  I
14 don't remember.
15         MR. MAAZEL:  Is this a meeting you
16 remember or no?
17         THE WITNESS:  Not really.
18     Q.    Do you recall giving a workshop on
19 closing skills?
20     A.    I don't recall giving a workshop, but I
21 might have done closing skills with a bunch of reps.
22     Q.    Can you me what you mean by that?
23     A.    Teaching them how to close a sale.
24     Q.    Could you tell me how you taught them or
25 what you taught them how to close a sale?

163

1           B. Amendola
2         MR. MAAZEL:  Form objection.
3      A.    I could tell you what I did.
4      Q.    I would appreciate that.
5      A.    Telling them that -- initially when you
6  want to close the doctor, you don't ask for all the
7  doctor's business, you ask for a piece of the
8  doctor's business, and you ask the doctor -- after
9  you've given him reason to do it, you ask the doctor
10 would you be willing to try such and such on the next
11 five patients who come in with the appropriate
12 illness.  Many reps don't do that.
13     Q.    What else?  Any other skills?
14     A.    I don't remember.
15     Q.    Any other skills that you recall
16 training reps on?
17     A.    No.
18     Q.    Do you know what the ENGAGE model is?
19     A.    I vaguely remember the ENGAGE model.
20     Q.    What do you recall about it?
21     A.    Not that much.  How to move a sales call
22 along.
23     Q.    Was there an expectation while you were
24 a rep in CV/Met as to the hours that you would be
25 making calls on your customers?

164

1           B. Amendola
2      A.    Yes.
3      Q.    What was that expectation?
4      A.    We were told that we had to be in the
5  field from eight to five.
6      Q.    Do you remember who told you that or how
7  it was conveyed to you?
8      A.    It was conveyed, I believe, by my
9  district business manager.
10     Q.    Who was your district business manager?
11     A.    Nelson Almerico.
12     Q.    Was this Monday through Friday?
13     A.    Yes.
14     Q.    Generally what were the office hours of
15 the doctors on your call list?
16     A.    Some were eight o'clock until five
17 o'clock.  Some were eight until six o'clock.
18     Q.    Any earlier than eight?
19     A.    Perhaps.  I don't remember.
20     Q.    By the way, do you know whether
21 pharmaceutical reps in other divisions also had call
22 plans?
23     A.    It's my understanding that everyone had
24 a call plan, everyone who was out in the field had a
25 call plan.

165

1           B. Amendola
2      Q.    How do you know that?
3      A.    Going to the meetings, talking to other
4  people.  It was just understood.  My friend was a
5  hospital rep.  He would go in at 6:30, seven o'clock
6  in the morning in order to participate in grand
7  rounds with the doctors.
8      Q.    Was that in CV/Met?
9      A.    I think so, yes.
10     Q.    I would like to ask you outside of
11 CV/Met, do you know whether reps in other divisions
12 also had a call plan?
13     A.    I would say yes.
14     Q.    How do you know that?
15     A.    Just hearing it, knowing that company
16 policy is company policy.
17     Q.    Do you have any personal knowledge that
18 reps in other divisions also had call plans?
19     A.    I know neurology reps and they had call
20 plans, and they had to be in the field from eight to
21 five.
22     Q.    Any other divisions, any other reps in
23 other division?
24     A.    I knew an oncology rep.  That's it.  We
25 usually didn't identify ourselves as CV/Met, hi, I'm

42 (Pages 162 to 165)

166

B. Amendola
1   from virology, but we'd talk at meetings, and people
2   that you knew were not in your region could have been
3   in any division and they talked about call plans as
4   much as we did.
5       Q.   Do you know how call plans were
6   developed in other divisions?
7       A.   No.
8       Q.   How were the call plans in your
9   division, for you specifically, how were those
10  created?  Do you know?
11      A.   They were created based on the potential
12  of the doctor, the history of the doctor, the
13  specialty of the doctor, what competitive choices the
14  doctor used, and I imagine marketing developed the
15  call plans in order to either -- well, in every case
16  to increase market share, and in some cases to keep
17  market share as high as it was, and certainly not to
18  downgrade it.
19      Q.   Sure.  In terms of your call plan, were
20  there doctors that you identified in your territory
21  who were not on the call plan that you wanted to call
22  on?
23      A.   They may not have been on my call plan.
24  They may have been on one of my partner's call plan,

167

B. Amendola
1   but we were told that if you could call on 8.5
2   doctors a day, then you could pick your customers.
3   As long as you fulfilled your requirement, then you
4   could add to your call list.
5       Q.   Did you do that?
6       A.   Yes.
7       Q.   Can you explain to me how you did that?
8       A.   Well, some I felt -- you never picked a
9   doctor to call on who wouldn't see you.  You would
10  sit down and analyze the data that you had and see
11  the doctor's history with either your product or the
12  competition and you decide, well, this is a good
13  target.
14      I sold antibiotics and I was calling on
15  ENT's, allergists, IM's, FP's.  I said, you know,
16  there's an indication for the stroke for urologists,
17  let me pick ten urologists and start calling on them,
18  and I did, and that's how Tequin became a number one
19  product for me.  I didn't decide that on my own.
20  Other reps were doing that too.
21      Q.   But not all reps?
22      A.   No.  I wanted to earn more money.
23      Q.   The time that you were in the field, was
24  it always eight to five?

168

B. Amendola
1       A.   No, on Fridays, on many Fridays we had
2   teleconferences or web casts that would start at
3   seven or 7:30, so I would leave my home a little
4   later.
5       I also did some breakfasts where I had
6   to get the food and then bring it to the office and
7   set up, so I was there earlier.  There were times
8   when I did dinner programs and I didn't get home
9   until late at night.
10      Q.   Were there times that you finished for
11  the day before 5:00 p.m.?
12      A.   I had to be in the field between eight
13  and five.
14      Q.   But my question to you is --
15      A.   Finished?  I was not finished until I
16  was done at five o'clock.
17      Q.   Let me ask my question.  Were there days
18  that you finished making calls on doctors before five
19  p.m.?
20      A.   There were days when I finished doing my
21  required 8.5 calls before five p.m., but there was
22  always something to do that was job related until
23  five o'clock.
24      Q.   You always did that?

169

B. Amendola
1       A.   I did my job.
2       Q.   I guess my question to you is:  If you
3   had a doctor call scheduled for four o'clock and that
4   call lasted five minutes, what happened next?
5       A.   You can go to another doctor.  You could
6   pick up printing paper from Office Depot if you were
7   in the field.
8       Q.   Did you ever just go home?
9       A.   No.
10      Q.   Did you ever stop working at any time
11  before five p.m.?
12      A.   I may have stopped working as far as
13  calling on doctors was concerned, but I was doing
14  something job related.
15      Q.   What if you started your day at seven
16  a.m. with one of these teleconferences or web casts,
17  did you ever knock off earlier than five p.m.?
18      A.   Not without a manager's permission,
19  never arbitrarily.
20      Q.   You got written permission?
21      A.   No.
22      Q.   Verbal permission?
23      A.   Yes.
24      Q.   Who did you get that verbal permission

43 (Pages 166 to 169)

170

B. Amendola

1
2 from?
3    A.    I don't know which manager I asked for
4 permission if I had something to do, but if I had
5 something that had to be done between eight and five,
6 at the end of the day, and I couldn't stay in the
7 field, then I would let my manager know.
8    Q.    Let me ask you this: For the last three
9 years that you were at Bristol-Myers Squibb, who was
10 your manager?
11    A.    Nelson Almerico, and I think Henry Fonts
12 prior to Nelson.
13    Q.    Did you ever call Henry or Nelson and
14 tell them that you were finished for the day and it
15 was, I don't know, five to five and you were not
16 going to do anymore work?
17    A.    Not at five to five.
18    Q.    At other times?
19    A.    Not that I remember.
20    Q.    During the day, during the period of
21 time I guess I'm referring to between eight and five,
22 you ate lunch I assume?
23    A.    Most of the time.
24    Q.    Did you eat lunch in your car?
25    A.    Yes.

171

B. Amendola

1
2    Q.    Did you eat lunch at a cafe?
3    A.    Sometimes.
4    Q.    Anywhere else?
5    A.    At a doctor's office.
6    Q.    Did you ever run any errands during the
7 day? When I say "the day," I want to be clear,
8 between eight and five.
9    A.    Usually during lunch.
10    Q.    How long would you take for lunch
11 typically?
12    A.    Typically an hour.
13    Q.    Ever run any errands outside that hour
14 that you typically took for lunch?
15    A.    No.
16    Q.    During the working day between eight and
17 five, did you ever go clothes shopping?
18        MR. MAAZEL:    Form objection to the
19 phrase "working day."
20        MR. BROWN:    Sure.  Let me rephrase that.
21        MR. MAAZEL:    You're referring to time in
22 the field?
23    Q.    Between the hours of eight a.m. to five
24 p.m., Monday through Friday, did you ever go
25 shopping?

172

B. Amendola

1
2    A.    Occasionally.
3    Q.    What kind of shopping?
4    A.    It varied.  If I needed something I
5 would get it.  Sometimes a territory would close down
6 between twelve and two.
7    Q.    What do you mean by that?
8    A.    Certain doctor's offices would be closed
9 between twelve and two for lunch.  Others would be
10 closed between one and two, or you would get to an
11 office and they would be closed for whatever reason.
12 You just filled the time until you could get in to
13 see them.
14    Q.    I'm really just asking about, I guess,
15 that fill-in time for now.  I think you said
16 occasionally you would go shopping.
17        Did you ever get a haircut during that
18 time?
19    A.    No.
20        MR. MAAZEL:    Are you talking about lunch
21 time?
22        MR. BROWN:    No, I'm talking about the
23 time that your client said that she was filling in
24 while doctor's offices were closed.
25    A.    No.

173

B. Amendola

1
2    Q.    What about getting your nails done?
3    A.    Nope.
4    Q.    Ever have another doctor's visit during
5 the day?
6    A.    No.
7    Q.    Dentist?
8    A.    Maybe towards the end of the day or at
9 the beginning of the day.
10    Q.    When you say "day," you mean between
11 eight a.m. and five p.m.?
12    A.    Right, I mean let's say eight and 8:30
13 and then 4:30 to five.
14    Q.    Did you go to the gym?
15    A.    No.
16    Q.    Get a cup of coffee?
17    A.    Yes.
18    Q.    At like a Starbucks or something?
19    A.    Yes.
20    Q.    Read the newspaper?
21    A.    No.
22    Q.    Did you have a laptop?
23    A.    I had a tablet.
24    Q.    Does that have Internet capability?
25    A.    It didn't when I had it.

44 (Pages 170 to 173)

174

B. Amendola

1    Q.    Did you have a computer with you while
2  you were making your calls that had Internet access?
3    A.    No, I had the tablet.
4    Q.    Did you ever do anything else -- I guess
5  that I haven't touched on everything in the
6  universe -- during the eight a.m. to five p.m. time
7  period when you weren't calling on doctors?
8    A.    I'm sure I did a lot of things. I went
9  to Office Depot. I went to the Sprint store. I had
10  a pod meeting with my partner. I ordered lunch for a
11  doctor if I had a good enough budget. I could have
12  gone to Barnes & Noble. I had to be out in the
13  field. I had to find a way to fill up that time.
14    Q.    I guess what do you mean by "out in the
15  field"? Does that mean out of your home?
16    A.    Yes.
17    Q.    And in your territory?
18    A.    In my territory, and I didn't live in
19  the territory so I couldn't be in my home and in my
20  territory.
21    Q.    But it doesn't necessarily mean that
22  you're calling on doctors that whole time, correct?
23    A.    It means I'm fulfilling my obligation to
24  call on the doctors Bristol told me to call on and

175

B. Amendola

1  then some.
2    Q.    Did you keep a log or track all of your
3  activities that you did every day while you worked at
4  Bristol-Myers?
5    A.    My Bristol-Myers activities?
6    Q.    Yes.
7    A.    They were all in the call max.
8    Q.    Let me ask you this: On a day that you
9  had a dentist visit from -- appointment from eight
10  a.m. to 8:30 a.m., was that logged in anywhere?
11    A.    No.
12    Q.    When you took lunch, did you log that in
13  anywhere?
14    A.    There was no place to log it.
15    Q.    When you went to Home Depot, or went to
16  Starbucks, or Barnes & Noble, did you log that in?
17    A.    No.
18    Q.    Did you keep track of the hours that you
19  worked while you worked at Bristol-Myers Squibb?
20    A.    As long as I was in my territory, which
21  was about 40 miles from my house, and I was calling
22  on the first doctor of the day between eight and nine
23  o'clock, and the last doctor of the day between four
24  and five o'clock, then I was working eight hours a

176

B. Amendola

1  day. I wasn't required to keep track of it.
2    Q.    Right. My question is: Did you?
3    A.    I wasn't required to.
4    Q.    So the answer is no?
5    A.    Because I wasn't required to.
6    Q.    The answer is no?
7    A.    Okay, the answer is no.
8    Q.    Thank you. You were never disciplined
9  or counseled in any way for performance issues at
10  Bristol-Myers?
11    A.    No.
12    Q.    That includes not being counseled or
13  disciplined in any way for being outside your
14  territory during a working day, correct?
15    A.    No, never.
16    Q.    You were never counseled or disciplined
17  in any way for not working hard enough?
18    A.    No.
19    Q.    Do you know whether reps in other
20  divisions outside CV/Met kept track of their hours?
21    A.    I know that they had computers that were
22  time sensitive so their hours were tracked for them
23  the same as mine was. I don't know if they were
24  given a directive you must put down every place you

177

B. Amendola

1  go between the hours of nine to five even if it's to
2  the bathroom.
3    VIDEOGRAPHER:  The time is approximately
4  12:37. This ends tape number three. We are now
5  going off the record.
6    (Whereupon, a recess was taken.)
7    (Time noted: 12:40 p.m.)
8  *******************************************
9    A F T E R N O O N   S E S S I O N
10  *******************************************
11    (Time noted: 1:15 p.m.)
12  CONTINUED EXAMINATION
13  BY MR. BROWN:
14    VIDEOGRAPHER:  The time is approximately
15  1:14. This begins tape number four. We are now on
16  the record.
17    MR. BROWN:  Could you read the last
18  question and answer back, please.
19    (The requested portion was read.)
20    Q.    You stated in your previous testimony
21  just then that it was your understanding that in
22  other divisions -- strike that.
23    What is your understanding in other
24  divisions outside of CV/Met as to whether there were

45 (Pages 174 to 177)

178

B. Amendola
1  expectations of hours in the field?
2
3      A.    It is my understanding that all of the
4  divisions had to be in the field between eight and
5  five every day.
6      Q.    What is that understanding based on?
7      A.    It's based on talk between reps,
8  experience that Bristol-Myers made company policy
9  that in many cases was company policy across the
10 board.
11     Q.    You said talk between reps. What reps
12 are you referring to?
13     A.    Reps that we talked to at different
14 sales meetings.
15     Q.    Reps who talked to?
16     A.    I talked to, reps who were talking to
17 colleagues of mine that I came across their
18 conversation and overheard what they were saying.
19     Q.    Do you recall who you were talking to?
20     A.    No.
21     Q.    Do you recall what meetings these were?
22     A.    No, they would be national meetings.
23     Q.    Do you recall when these meetings
24 occurred?
25     A.    There was one national meeting I believe

179

B. Amendola
1  in December of 2005.
2
3      Q.    What divisions were at that national
4  meeting?
5      A.    I don't know.
6      Q.    Was it limited to CV/Met?
7      A.    I don't know.
8      Q.    Any other meetings?
9      A.    We had a lot of meetings. Whenever
10 there was a product launch, that could be sold across
11 the board, so I don't know.
12     Q.    What could be sold across the board?
13     A.    An antibiotic could be marketed by
14 hospital reps, it could be marketed by -- things just
15 changed so much over the years.
16     Q.    Are you referring to reps within the
17 CV/Met family, or are you referring to reps outside
18 in other divisions?
19     A.    I'm referring to national meetings could
20 very often have reps from other divisions, not only
21 CV/Met.
22     Q.    I'm asking you other than the national
23 meeting that you think took place in December of
24 2005, do you recall any other meetings where reps
25 outside of CV/Met attended?

180

B. Amendola
1
2      A.    They might have. I can't recall.
3      Q.    I guess I have the same question as to
4  call plans. What is the basis for your understanding
5  or do you have an understanding that reps,
6  pharmaceutical reps, in divisions other than CV/Met
7  had call plans?
8      A.    If reps in CV/Met had call plans because
9  the powers that be felt that they knew what was best
10 to move market share and gave us call plans, then I
11 would say the other divisions got call plans as well.
12     Q.    Are you speculating?
13     A.    No, I'm making an educated guess.
14     Q.    But you don't know for certain?
15     A.    I know the neurology reps had call
16 plans.
17     Q.    How do you know that?
18     A.    Because I know neurology reps.
19     Q.    Who?
20     A.    I know Jeannie -- I can't think of her
21 last name.
22     Q.    What's her territory?
23     A.    Her territory I believe it's North
24 Miami. No, it's Fort Lauderdale.
25     Q.    Anybody else that you know in neurology?

181

B. Amendola
1
2      A.    Kevin Britt. Courtney McLaughlin.
3      Q.    Anybody else?
4      A.    I knew a hospital rep. He was a
5  hospitalist but with CV/Met.
6      Q.    Let's limit -- I want to talk about
7  neurology.
8      A.    All right, neurology, they have call
9  plans.
10     Q.    How do you know that?
11     A.    I've heard them say it.
12     Q.    Who?
13     A.    I can't tell you which one, but I know
14 that reps at Bristol-Myers Squibb have call plans.
15 Nothing is left to chance.
16     Q.    But the basis for your knowledge is your
17 experience in CV/Met and apparently things you
18 overheard from these reps in neurology?
19     A.    And my experience at Bristol-Myers
20 Squibb.
21     Q.    What do you mean by your experience at
22 Bristol-Myers Squibb?
23     A.    At Bristol-Myers Squibb nothing was left
24 to the discretion of the reps. Everything was
25 organized by people who felt that they knew more than

46 (Pages 178 to 181)

182

B. Amendola

1  the reps.  They were people trained in making sure
2  that, a, the reps used all the materials that were at
3  their disposal, b, how they would use the materials,
4  how many times they would call on a doctor, what
5  products they would detail to the doctor first.
6         Nothing was left to chance.  Every
7  single rep that I knew and everything that I heard,
8  reps were programmed to act, market, and promote
9  exactly the BMS way and no other way.
10     Q.   Do you know whether reps in virology had
11  call plans?
12     A.   I never spoke to a virology rep and
13  asked the virology rep do you have a call plan.
14     Q.   Do you know whether reps in immunology
15  had call plans?
16     A.   I never spoke to an immunology rep and
17  asked do you have a call plan.
18     Q.   I will take that as a no; is that fair?
19  If you don't know, you don't know.  I'm not here to
20  ask you to speculate or guess.
21     A.   I'm saying I never spoke to them so I
22  don't know what they had, but I will tell you,
23  nothing at BMS was left to the rep's discretion, and
24  if I had to have a call plan, I would venture a guess

*(line numbers 1–24 above; last line is 25)*

183

B. Amendola

1  that they did too.
2     Q.   That's what it is, it's a guess?
3     A.   No, that's what it was at BMS.
4     Q.   But you don't know other than CV/Met,
5  right?
6     A.   I know what I had and I know BMS's
7  policy.
8     Q.   What was BMS's policy that applied
9  outside of CV/Met for call plans for other divisions?
10     A.   I can't tell you that. I can't tell you
11  that.
12     Q.   What is the call max system?
13     A.   The call max system is a list of all the
14  doctors within your universe, meaning within your
15  territory, and it's all the data on the doctor,
16  whether it's their address, their phone number, in
17  some cases their dates of birth, their wives' names.
18         It's a list of every single doctor, the
19  specialty, and then there are sections of the call
20  max that you can go into to find out additional
21  information about the doctor, and it's also a place
22  where you record your call on the doctor, and if the
23  doctor received samples, the doctor signs for the
24  samples, and it also keeps track of your samples.

184

B. Amendola

1     Q.   Did you populate any of the data in the
2  call max system as it relates to who a doctor is,
3  what his family's name was, all of those data points?
4     A.   Occasionally.
5     Q.   You said that you would record a call in
6  the system, correct?
7     A.   Yes.
8     Q.   What do you mean by that?
9     A.   Go into the doctor's office and if the
10  doctor wanted samples, if he wanted ten samples of
11  this and five of that, you would write it down and
12  then the doctor would sign for the samples.
13         You would also record the order of the
14  product detail because there was generally a section
15  for that.  If the doctor got the samples, the doctor
16  would sign and then you would close out the entry.
17     Q.   Did you record, I guess, the details of
18  the call, is that accurate, at the end of each day?
19     A.   If you wanted to write something in
20  there, then you would do it at night.  There was no
21  time to do it during the day.
22     Q.   All I asked you was did you record the
23  call details at the end of the day?
24     A.   And I answered you.

185

B. Amendola

1     Q.   What's your answer?
2     A.   I said I would do it at night.
3     Q.   Did you ever do it during the day?
4     A.   If it was just a check mark, I would do
5  it during the day.
6     Q.   What you do you mean "just a check
7  mark"?
8     A.   You know, first I had a Newton, then I
9  had a Fujitsu, that I had a laptop, then I had an HP,
10  so I'm not quite -- I don't quite remember what each
11  one had.
12     Q.   When you said "check mark," what do you
13  mean by that?
14     A.   Sometimes there was a choice, what did
15  you talk to the doctor about and there were a bunch
16  of choices.  I think that's what we had on the HP.
17  If that was it, then I would check the most important
18  one for the doctor.
19     Q.   Did you do that during the day?
20     A.   If I had time I did.  If I didn't have
21  time I did it in the evening.  A call was not
22  complete unless you did every part of it in the
23  computer.  You had to make sure all your calls were
24  complete so they were recorded properly and you would

Doerner & Goldberg New York * A Veritext Company
1350 Broadway * New York, NY 10018 * 212-564-8808

186

B. Amendola

1  get credit for them.  You also went back at the end
2  of the night to make sure that you put your details
3  in the proper order.
4      Q.    What do you mean details?
5      A.    Well, if you had a Plavix that was in
6  the first position and you inadvertently put Avapro
7  in the first position and Plavix in the second
8  position, then that was not counted as call
9  attainment and you could be penalized if you did too
10  many wrong like that.
11      Q.    Were you ever penalized for doing
12  anything wrong with regard to call max?
13      A.    No.
14      Q.    In fact, you recorded your calls
15  diligently; did you not?
16      A.    Yes, I did, but I also went back to make
17  sure that I did them properly because one call could
18  put you below 80 percent and you wouldn't get paid.
19  The only way I could concentrate was in the evening.
20      Q.    You were never below 80 percent?
21      A.    Never.
22      Q.    Did you always meet 100 percent of your
23  call plan?
24      A.    When it became a requirement for IC

187

B. Amendola

1  compensation I did.
2      Q.    For what compensation?
3      A.    For your incentive compensation then I
4  did.
5      Q.    That was the last three years of your
6  employment?
7      A.    Yes, I did.
8      Q.    So just to be clear and, again, so the
9  record is clear, the last three years of your
10  employment as a pharmaceutical rep in CV/Met you
11  attained at a minimum 100 percent of your call plan?
12      A.    Yes, I did.
13      Q.    In order to receive incentive
14  compensation? I'm talking about you.
15      A.    Okay.
16      Q.    You didn't have to achieve 100 percent
17  of your call plan, correct?
18      A.    Correct.
19      Q.    If you didn't call on the number of
20  physicians on your call list or at least 100 percent
21  of them, you could still get some incentive comp,
22  right?
23      A.    You had to achieve 80 percent.
24      Q.    When you were hired by Bristol-Myers

188

B. Amendola

1  Squibb, did you receive any training?
2      A.    Yes.
3      Q.    Tell me what kind of training you
4  received.
5      A.    I initially had home study and then from
6  home study -- and don't forget, this is over ten
7  years ago, so I'm not quite sure -- but after home
8  study I believe I spent a week in North Carolina or
9  South Carolina for training, and then from there I
10  did over three weeks, I believe, in Princeton. I'm
11  pretty sure it was over three weeks. It seemed like
12  it was over three weeks.
13      Q.    What generally do you recall, what areas
14  were you trained on?
15      A.    I was trained on everything.
16      Q.    Tell me what you recall.
17      A.    I was trained on the products. I was
18  trained on doing a call, opening, closing,
19  summarizing. I was trained on how to read a clinical
20  study. I was trained on the specific clinical
21  studies. I was trained on using a Newton.
22      Q.    That's the computer?
23      A.    That was the computer. I was trained on
24  how to hook the Newton up to the laptop and how to

189

B. Amendola

1  transmit, how to do voice mail. I was trained on
2  absolutely everything. I was admonished about
3  samples. I was trained on sample accountability. I
4  was told to count your samples before you leave in
5  the morning and count your samples again at night.
6      Q.    Do you know why that was?
7      A.    Because I was responsible for
8  pharmaceuticals, for controlled substances, whatever.
9  It was called samples accountability. If something
10  went wrong I could lose my job. I was told don't
11  ever make homemade bread. These are the approved
12  materials. You must only use these materials. It
13  was drummed into my head over and over again.
14      Q.    Is that because it's all FDA regulated?
15      A.    Because everything has to be BMS, FDA
16  approved. There is the fear in the industry that
17  people will, a, lie on their own materials, color the
18  facts, omit the side effects, do any number of
19  things, so we were told use this or else.
20      Q.    Who told you that?
21      A.    The trainers, the managers, everyone.
22      Q.    Let's talk about your home study. That
23  was in Florida you did your home study?
24      A.    In my house.

48 (Pages 186 to 189)

190

B. Amendola

1
2   Q.   Do you recall what areas you were
3   studying?
4   A.   Well, the first drugs that I did were
5   Cefzil, so that was an antibiotic, and then Serzone,
6   which is an antidepressant, and Buspar, which was an
7   anxiolytic.
8   Q.   The last few years you were at
9   Bristol-Myers, the last three years, you were selling
10  other pharmaceutical products which included -- what
11  did they include?
12  A.   Plavix, Avapro, and Avalide.
13  Q.   Did you ever receive any disease state
14  indication training on those three medications?
15  A.   Sure, we did disease state on
16  everything, on everything.
17  Q.   You, as part of your job, were to keep
18  yourself updated on the latest information on these
19  products?
20  A.   As my job required that I keep updated
21  on the information that Bristol-Myers Squibb gave me
22  about the product. Anything else was work that I did
23  on my own.
24  Q.   Did you do work on your own to learn
25  about disease state and indications and other things

191

B. Amendola

1
2   about the products you were selling?
3   A.   My computer was not wireless. When I
4   went to Barnes & Noble during the day I could
5   conceivably get a magazine article that I saw about a
6   drug.
7   Q.   Did you do that?
8   A.   If I was in Barnes & Noble I did. If I
9   found something online and printed it up for myself
10  because I could not use it in the field, I would
11  study it.
12  Q.   Why did you do that?
13  A.   I felt it was my responsibility. I also
14  wanted to read the package inserts of other drugs.
15  Bristol-Myers encouraged us to read the package
16  inserts.
17  Q.   Why?
18  A.   Because if there was a clinical reprint
19  that we were using that compared the drug that we
20  were using to another drug, very often the study that
21  showed the comparison was not only in our clinical
22  reprint, it came from the competitor's package
23  insert.
24  Q.   Do you know whether all other reps in
25  CV/Met took those extra steps that you did?

192

B. Amendola

1
2   A.   I know that all the CV/Met reps that I
3   knew were taking extra steps so that we could be the
4   best.
5   Q.   Did you find that reading about disease
6   state and this extra reading made you the best?
7   A.   I have no way of judging that. Maybe
8   the commercials that Bristol-Myers Squibb had on
9   television were making me the best. Maybe it wasn't
10  me. Maybe it was that.
11  Q.   Did you feel that you had more knowledge
12  after doing this additional homework?
13  A.   I'm a reader. I read anything.
14  Q.   Is that a yes?
15  A.   Of course it's a yes.
16  Q.   You passed all of the training?
17  A.   Yes.
18  Q.   Were you a mentor to any reps while you
19  were employed at Bristol-Myers?
20  A.   I was a mentor for Lali Bahlawan.
21  Q.   What were your responsibilities as a
22  mentor to her?
23  A.   She came to my territory. I had been in
24  the Hollywood territory for any number of years. I
25  introduced her to all the doctors. I also made sure

193

B. Amendola

1
2   that she became not the newcomer, but an integral
3   part of the Hollywood pod because two's a company,
4   three's a crowd and now we had a third player in the
5   pod. Alfredo and I wanted Lali to be one-third of
6   the pod.
7       I tried to explain to her different
8   foibles of the different doctors, just tried to make
9   the transition for her easier so she could be up and
10  running.
11  Q.   Did you do that?
12  A.   Yes.
13  Q.   Do you believe it was effective the way
14  that you mentored her?
15  A.   I think it was very effective. She is
16  with Novartis now.
17  Q.   Did she become an effective third of
18  your pod?
19  A.   She did.
20  Q.   The training that you received, your
21  home study and other training that you received, that
22  was for CV/Met products; is that accurate?
23      MR. MAAZEL:  Form objection.
24  A.   I got home study training for every
25  different product that I sold when I got it. I also

49 (Pages 190 to 193)