# Exhibit 2

# Part III

194

B. Amendola

1    had to do home study for products that Bristol
2    anticipated getting approved that were not approved.
3        Q.    Can you explain to me what a plan of
4    action meeting is?
5        A.    A plan of action meeting is a coming
6    together of a region, depending on the company's
7    finances sometimes every quarter, sometimes three
8    times a year, sometimes four times a year, or twice a
9    year.
10
11            It's a coming together to go over new
12   promotional materials, to teach the reps how to use
13   the new promotional materials, how to have the reps
14   role play and get certified to see if they're using
15   them properly in the way they have just been taught
16   to use them. There are also some team building
17   activities. It's three days or four days. It's
18   training if a product gets a new indication. So it's
19   training to make sure that you're doing it the right
20   way.
21       Q.    Did you ever do any of the training at
22   these POA meetings?
23       A.    No.
24       Q.    Did you ever lead any of the role
25   playing exercises?

195

B. Amendola

1
2        A.    Yes, I did.
3        Q.    Could you tell me about that?
4        A.    They would ask for a volunteer, someone
5    to get up and do it. There was generally a small
6    gift if you got up and you did it, a Starbucks card
7    or something, and I always wanted to bring something
8    home for my youngest daughter. I would always
9    volunteer to get it over with, go up, do the role
10   play, get the gift and I would be done.
11       Q.    Who attended these meetings?
12       A.    The reps.
13       Q.    Reps within CV/Met?
14       A.    Reps within CV/Met whether they were
15   specialists, or hospital reps, or primary care reps.
16       Q.    You also received online training,
17   correct?
18       A.    Received a lot of online training.
19       Q.    On what topics? Do you recall?
20       A.    I believe that I did approximately -- I
21   did over 20 online modules. Samples accountability,
22   driving skills, new indications for the product. If
23   we -- HIPAA rules and regulations, the pharmacode.
24   If we got a new product then we would do testing
25   online. We would read the modules. I did all this

196

B. Amendola

1    at night. We would read the modules. We would study
2    the modules. We would do the modules online and then
3    we would be tested on them.
4        Q.    Did you always do it at night?
5        A.    I couldn't do it in the field because my
6    computer was not wireless.
7        Q.    You never did it during the weekday?
8        A.    The weekday?
9        Q.    Yes.
10       A.    I was working during the weekday.
11       Q.    Is that a no?
12       A.    It's a no because I was working during
13   the day without a wireless computer.
14       Q.    Did you ever see your learning history
15   at Bristol-Myers Squibb?
16       A.    Yes.
17       Q.    Is it accurate?
18           MR. MAAZEL: Form objection.
19       Q.    Do you believe it's accurate?
20           MR. MAAZEL: What are we talking about,
21   a document?
22           MR. BROWN: I asked her if she seen the
23   learning history. She said yes.
24       Q.    I'm asking if what you saw you believe

197

B. Amendola

1
2    was accurate?
3        A.    The last time I saw it I thought it was
4    accurate. It's a secure site. I can't go to the
5    site. I haven't been able to since March.
6        Q.    Is it your testimony that you didn't
7    complete training during the workday?
8            MR. MAAZEL: Form objection.
9        Q.    That's your testimony?
10           MR. MAAZEL: Form objection.
11       A.    If we were given an administrative day,
12   then I did the module during the workday.
13       Q.    Were you given administrative days?
14       A.    Occasionally.
15       Q.    How many?
16       A.    I have no idea.
17       Q.    Once a month.
18       A.    It was not on a regular basis.
19       Q.    On average how many a year?
20       A.    I have no idea. I have no idea. It was
21   arbitrary.
22       Q.    Were you given time to complete these
23   trainings? I mean over the course of a week or two
24   weeks.
25       A.    Yes.

50 (Pages 194 to 197)

198

B. Amendola

1
2    Q.   Do you know whether other reps -- strike
3    that.  You said that you didn't I guess the last
4    three years of your employment have the wireless
5    connection for your laptop in your car?
6    A.   I didn't have a wireless connection in
7    my computer.
8    Q.   Do you know whether other reps did?
9    A.   Some did.  Some had a wireless card in
10   their tablets.
11   Q.   Do you know whether those other reps who
12   had the wireless card in their tablets completed
13   training during the workday?
14   A.   I have no idea.
15   Q.   Did you ever do any training at the
16   regional meetings?  When I say do training, I mean
17   did you ever lead the training or present a journal
18   or paper?
19   A.   No.
20   Q.   Did you ever lead training at all?
21   MR. MAAZEL:  Form objection.
22   Q.   At a regional meeting?
23   MR. MAAZEL:  Objection.
24   A.   You want me to answer it?
25   Q.   Please.

199

B. Amendola

1
2    A.   If there was a clinical study and they
3    asked for someone to analyze the study I would
4    volunteer to do it, but I didn't prepare prior to the
5    meeting to analyze a clinical study.  I would just
6    volunteer and do it.
7    Q.   Had you already analyzed it at the time
8    you had presented?
9    A.   I did right prior to presenting it.
10   Q.   Are you familiar with the ENGAGE
11   learning system?
12   A.   I think so.  I don't know how familiar.
13   Q.   We're going to find out.
14   MR. BROWN:  We're going to mark as
15   Exhibit 10 the ENGAGE learning system.  This is Bates
16   BMS 2143 through 2372.
17   (Whereupon, ENGAGE learning system was
18   received and marked Amendola Exhibit 10, for
19   identification, as of this date.)
20   MR. MAAZEL:  Take a minute to look
21   through it.
22   Q.   Before you is what's been marked as
23   Amendola 10.  Are you generally familiar with this
24   document?
25   A.   I don't think so.  It's just not ringing

200

B. Amendola

1
2    a bell.  I know ENGAGE, but I don't remember reading
3    any of this.
4    Q.   If you would turn to the very last page,
5    Bates 2372, at the very bottom you will see it has a
6    2004 copyright on it.
7    A.   Okay.
8    Q.   You were employed by Bristol-Myers in
9    2004?
10   A.   Yes, I was.
11   Q.   I guess I'm just asking you then, are
12   you familiar with this document?
13   A.   I'm looking at these examples in here
14   and I don't remember any of these examples.
15   Q.   Why don't you take a moment and look
16   through this document and tell me if you're generally
17   familiar with the concepts or the techniques that are
18   referenced in here.
19   A.   The concept, yes.  The concepts,
20   definitely, yes.  I believe that we did this at a
21   training.
22   Q.   You believe you did what at a training?
23   A.   At a sales training we did, for example,
24   there's the appendix, the Excedrin, I remember doing
25   an exercise with Excedrin and Comtrex.  I remember

201

B. Amendola

1
2    that from a training session and I do know the terms
3    in here.
4    MR. MAAZEL:  Are you saying there's some
5    other ENGAGE booklet that you know other than this
6    one?
7    THE WITNESS:  I'm not saying that
8    either.
9    Q.   This is not a quiz on whether you know
10   every aspect of it, but is it fair to say that you're
11   generally familiar with the ENGAGE learning system,
12   correct?
13   A.   Yes, I know that there is a series of
14   steps.  That I know.
15   Q.   A series of steps that are reflected in
16   the ENGAGE learning system?
17   A.   Right.
18   MR. BROWN:  We're going to mark this as
19   Exhibit 11, which is another document related to
20   ENGAGE.  It's entitled ENGAGE Selling Skills Model
21   Pre-Work.
22   (Whereupon, ENGAGE Selling Skills Model
23   Pre-Work was received and marked Amendola Exhibit 11,
24   for identification, as of this date.)
25   Q.   Can you take a look at what's been

51 (Pages 198 to 201)

202

```
 1              B. Amendola
 2   marked as Amendola 11 and tell me if you're familiar
 3   with this document.
 4       A.   I'm more familiar with this document.
 5       Q.   Let's go over this document that's
 6   Amendola 11.  What was the ENGAGE Selling Skills
 7   Model that we've marked as Amendola 11?
 8       A.   It was a series of steps to call on your
 9   customer, figure out the customer's needs, engage the
10   customer in a conversation, focus on the customer in
11   order to get the customer to prescribe more of the
12   product.
13       Q.   As part of the ENGAGE model, you learned
14   through various methods like workshops and role
15   playing and reading; is that accurate?
16       A.   Workshops, role playing, right, and
17   reading, and also we were given different scenarios
18   and told to figure out what's the global A to B
19   shift, what will you do on your next call.  It was,
20   again, leaving nothing to chance.
21       Q.   When you say A to B shift, what do you
22   mean by that?
23       A.   I vaguely remember -- I mean I haven't
24   done this in two years or more -- the global A to B
25   shift had to move the doctor from thinking one thing
```

203

```
 1              B. Amendola
 2   to thinking what you wanted the doctor to think.
 3       I believe it's, for example,
 4   antihypertensives are very good for patients, and
 5   there's also a focus, what are you going to focus on.
 6   Antihypertensives are an excellent pharmaceutical for
 7   patients who have high blood pressure.  You want to
 8   shift the doctor from thinking that into Avapro is
 9   the best antihypertensive for your patients with high
10   blood pressure because it can do this, this, and
11   this.  So it's taking -- here global A to B shifts
12   (indicating).
13       Q.   What page are you on?
14       A.   It's the big picture.
15       Q.   What page are you on?
16       A.   I'm on page 2389.  You want to shift the
17   doctor's way of thinking from use antihypertensives
18   for your hypertensive patients to lower their blood
19   pressure to prescribe Avapro for your hypertensive
20   patients because Avapro will lower their hypertension
21   in a safe, effective way.
22       Q.   Is it fair to say that these were skills
23   that you were being trained on?
24       A.   These are techniques formulated by
25   marketers who generally do not call on doctors, but
```

204

```
 1              B. Amendola
 2   assume that this will work and wanted it adapted by
 3   every single rep in the field because they say that
 4   this will work.
 5       Q.   The components of ENGAGE were opening,
 6   probing, positioning and closing; is that accurate?
 7       A.   But this global A to B shift I remember
 8   was very important.
 9       Q.   Okay.
10       A.   We were encouraged to write notes about
11   the global A to B shift every evening.
12       Q.   Including the A to B shift?
13       A.   Right.
14       Q.   ENGAGE included opening, probing,
15   positioning and closing, correct?
16       A.   Right.  If you go --
17            MR. MAAZEL:  Wait for a question.
18       Q.   Is there a page you would like to direct
19   me to?
20       A.   Yes, I would like to go to page 2393, to
21   the third paragraph.
22       Q.   Okay.
23       A.   "You must plan your incremental A to B
24   shifts carefully."
25       Q.   Could you read the rest of the
```

205

```
 1              B. Amendola
 2   paragraph?
 3       A.   "If you make them too small you will
 4   increase the number of calls you have to make with
 5   the customer to achieve your overall goal.  If the
 6   incremental steps are too large you will constantly
 7   run into resistance from the customer.  The key is to
 8   make sure the hassle factors of change at each step
 9   are just under the customer's threshold of pain."
10       Q.   The customer was who?
11       A.   The customer is the physician.  The
12   point I'm making is that in order to accomplish this
13   paragraph three, you needed to work on your call
14   planning in a quiet, controlled atmosphere, and a car
15   or a doctor's waiting room was not the place where
16   this could have been done.  This was done in the
17   evenings when you could work in your home office.
18       Q.   Do you know whether all reps in CV/Met
19   did this at home in their office or was it just you
20   you're talking about?
21       A.   I know the reps that I know did it at
22   home in their offices.
23       Q.   In the evenings?
24       A.   Yes.
25       Q.   Did they ever do it in the mornings?
```

52 (Pages 202 to 205)

206

B. Amendola

1
2     A.    They couldn't.  Well, maybe some could
3  have done it before eight a.m.
4     Q.    Do you know?
5     A.    I did work before eight a.m.
6     Q.    I'm asking do you know about these other
7  reps?
8     A.    I don't know what time they got up.
9     Q.    Do you know what time they went to
10  sleep?
11     A.    No.
12     Q.    Do you know whether they did any call
13  planning to focus on shifting their customers from A
14  to B during the day?
15     A.    Yes.
16     Q.    What do you know?
17     A.    I know that this was a requirement, it
18  had to be done, and I know that they worked on it at
19  night.
20     Q.    My question I guess is more particular.
21  Do you know whether other pharmaceutical reps in
22  CV/Met did their call planning, their ENGAGE model to
23  shift the doctor's prescribing habits during the day?
24     A.    No, I don't know if they did it during
25  the day.

207

B. Amendola

1
2     Q.    After you made a call to a doctor, I
3  believe you testified that it was at the end of the
4  day you did this, you detailed the call; is that
5  correct?
6     A.    No.
7     Q.    Did you ever write down notes as to what
8  it is that you talked to the doctor about?
9     A.    If there was a place in the call max
10  system to enter notes and if notes were required I
11  did.
12     Q.    Let me ask you this:  You visit a doctor
13  and you discuss a topic, and then you're going to
14  visit that doctor let's say a week later, would you
15  know that you've already covered that topic with him
16  or her?
17     A.    In some cases the answer is yes, in
18  other cases I would have to write it down to remember
19  it.
20     Q.    When you say you would have to write it
21  down, are you talking about entering that in call
22  max?
23     A.    If there was -- if I had it in front of
24  me I could tell you.  I don't remember if the last
25  tablets that I had had provisions for that.  If it

208

B. Amendola

1
2  did then I wrote it in there.
3     Q.    If it didn't did you write it down
4  anywhere else?
5     A.    I probably would write it in my paper
6  call plan this way I would know what to do the next
7  time I went back.
8     Q.    What's a paper call plan?
9     A.    A list on even a scrap piece of paper of
10  where I was going that day.
11     Q.    Did you retain any of your paper call
12  plans?
13     A.    No.
14     Q.    What did you do with them?
15     A.    I disposed of them.  They were mine.
16     Q.    When did you dispose of them?
17     A.    When I was no longer employed by
18  Bristol-Myers Squibb.
19     Q.    Do you recall when you disposed of them?
20     A.    March of '06.
21     Q.    You know that?
22     A.    I'm sure I did.  I cleaned out my
23  office.
24     Q.    The technique or the emphasis of trying
25  to shift a customer's prescribing habits from A to B,

209

B. Amendola

1
2  how did you go about doing?
3        MR. MAAZEL:  Form objection.
4     A.    I went into the call max plan, into the
5  call max in the computer, I looked to see -- the
6  different -- the different products and the
7  competitors were clearly listed in there.  I would
8  see how many RX's there were for my product, how many
9  for the competition, then I would look at the managed
10  care that the doctor was a provider for, and then I
11  would say -- I would also look to see, for example,
12  in hypertension there are beta blockers, there are
13  angiotension receptor blockers, there are calcium
14  channel blockers.  They're all drugs for
15  hypertension, but they're different classes of drugs.
16        I would see what does the doctor use the
17  most of, beta blockers, ARB's and then I could
18  formulate a plan to see what am I fighting against,
19  and I would make a plan that way.  I would use the
20  call max.  I would use whatever I could get out of
21  there.
22     Q.    You were pretty effective at doing this,
23  weren't you?
24     A.    I don't know.
25     Q.    You were an award winner?

53 (Pages 206 to 209)

210

B. Amendola

1
2    A.    Maybe I had a good partner.
3    Q.    Maybe you were good?
4    A.    Maybe, but I don't know that.  Whenever
5    there was --
6    Q.    On a day-to-day basis you were making
7    these calls to the doctors on your call list by
8    yourself, correct?
9    A.    Right.
10   Q.    Approximately once a month your DBM
11   would go and ride-along with you; is that right?
12   A.    Right.
13   Q.    Anybody else do any ride-alongs with
14   you?
15   A.    I think someone from marketing once rode
16   with me, but I don't remember who.
17   Q.    Just one time?
18   A.    I think so.  In fact, he marketed
19   Tequin.  He was in marketing for the antibiotics, I
20   believe.
21   Q.    So that wasn't within the last three
22   years of your employment?
23   A.    No, I don't think so.  No, definitely
24   not.
25   Q.    Other than POA meetings or face-to-face

211

B. Amendola

1
2    meetings which you said were a couple of times a
3    year --
4    A.    Right.
5    Q.    -- and the ride-alongs, did you ever
6    have any face-to-face communications with your DBM?
7    A.    We would have a holiday party.
8    Q.    Other than that?
9    A.    I wouldn't see him at any other things.
10   Q.    Your DBM, when he did a ride-along with
11   you, he evaluated you, correct?
12   A.    Yes.
13   Q.    Isn't it true that you generally
14   received very positive evaluations from your DBM?
15   A.    Yes.
16   Q.    Let me show you what we're going to mark
17   as Amendola 12.
18         (Whereupon, December 2005 performance
19   review was received and marked Amendola Exhibit 12,
20   for identification, as of this date.)
21   Q.    Just let me know when you're finished
22   reviewing that document.
23   A.    I'm ready.
24   Q.    Is that your signature on the second
25   page?

212

B. Amendola

1
2    A.    Yes.
3    Q.    It's dated December 21st, 2005?  Look at
4    your signature.
5    A.    Yes.
6    Q.    Ms. Amendola, is it your signature next
7    to December --
8    A.    I said yes.
9    Q.    I didn't hear you.  I apologize.  This
10   is a performance review, your performance connections
11   review for December 2005, correct?
12   A.    Right.
13   Q.    Do you recognize this document?
14   A.    Yes.
15   Q.    It's correct that you were a territory
16   business manager?
17   A.    Yes.
18   Q.    In the North Miami district?
19   A.    Yes.
20   Q.    And your territory was the Hollywood
21   territory?
22   A.    Yes.
23   Q.    Your manager was Nelson Almerico?
24   A.    Yes.
25   Q.    In the second box it says Assessment of

213

B. Amendola

1
2    Results.  Do you see where I'm referring to?
3    A.    Yes.
4    Q.    It says right below that, quote, Product
5    Sales Objectives.  Do you see that?
6    A.    No.
7    Q.    Right below where it says Assessment of
8    Results it says Product Sales Objectives.
9    A.    Yes, I see assessment, the manager's
10   overall assessment of results.
11   Q.    No.
12   A.    Under his name?
13   Q.    Above that it says "Sales Effectiveness
14   Measures."  Do you see that?
15   A.    Yes.
16   Q.    Above that it says "Product Sales
17   Objectives."
18   A.    Yes.
19   Q.    I'm on BMS 22.  Underneath Product Sales
20   Objectives it says, quote, portfolio attainment.  Do
21   you see that?
22   A.    Yes.
23   Q.    And there's 100 expectation and then the
24   result is 98 percent?
25   A.    Right.

54 (Pages 210 to 213)

214

B. Amendola

1
2  Q.  Do you see that?
3  A.  Yes.
4  Q.  What is that?  What does that mean?
5  A.  That's year to date.  I believe it
6  means -- I think it means that by the end of the year
7  you have to have 100 percent.
8  Q.  What was your portfolio?
9  A.  My portfolio were the products that I
10 was marketing.
11 Q.  Did you have an expectation in terms of
12 dollars that would be sold in your territory for a
13 quarter or for the year?
14 A.  We were given IC scorecards that had --
15 we could never understand them, but there were
16 dollars, dollars that they had done in the preceding
17 12 months versus dollars that they wanted you to do
18 in these 12 months, and you had to either meet that,
19 exceed it, or be below it.
20 Q.  As of I guess year to date was September
21 there, you had achieved 98 percent of that portfolio
22 attainment?
23 A.  Right.
24 Q.  Below that is a measure, it's called
25 Sales Effectiveness Measures.  Do you see that?

215

B. Amendola

1
2  A.  Right.
3  Q.  It has underneath that S-A-S, SAS.
4  A.  Yes, SAS.
5  Q.  What was SAS?
6  A.  SAS was -- these were all tied up with
7  the call max system.
8  Q.  What was SAS?
9  A.  I don't remember.
10 Q.  Was that the --
11 A.  It was something attainment something,
12 but I don't remember.  It was sales calls or calls.
13 I know CAS was call attainment and those were the
14 things -- wait.  SAS was --
15 Q.  Sales effectiveness measures?
16 A.  No, it wasn't effectiveness.  I think it
17 was the number of times.
18     MR. MAAZEL:  If you don't know or don't
19 remember, that's okay.
20 Q.  Are you familiar with the term "Start
21 Adherence Score"?
22 A.  Right, that's what it is, Start
23 Adherence Score.  Why didn't you tell me that?
24 Q.  I didn't know.
25 A.  That is what it is.

216

B. Amendola

1
2  Q.  Do you know what Start Adherence Score
3  reflected?
4  A.  Yes, the number of times -- it was the
5  order of the details, I believe, on your call list.
6  That was the difference -- that your call -- you
7  positioned the products properly when you made the
8  calls, and I think CAS is Call Attainment Score and
9  that was did you call on the people on your call
10 list.
11 Q.  For SAS the expectation was that you
12 would meet --
13 A.  Eighty percent.
14 Q.  -- eighty percent?
15 A.  Right.
16 Q.  And the result as of October 5th was
17 that you were performing at 98.3 percent?
18 A.  Right.
19 Q.  For CAS the expectation is you would
20 have a 90 percent goal or attainment, and you were at
21 122.2 percent, correct?
22 A.  Right.
23 Q.  Manager's overall assessment at this
24 time was that you were fully performing, correct?
25 A.  Right.

217

B. Amendola

1
2  Q.  Your SAS and your CAS scores impacted
3  your compensation, correct?
4  A.  The only way they impacted my
5  compensation was if I achieved 80 and 90 percent.
6  Q.  If you didn't achieve 80 or 90 percent,
7  did it effect your compensation?
8  A.  Yes.
9  Q.  And if you exceeded 80 or 90 percent,
10 did it effect your compensation?
11 A.  Not exactly, but my thinking was if I
12 stuck to the call plan I would fulfill the SAS and
13 CAS, but if I called on additional physicians I
14 would -- I would allocate the samples to doctors that
15 I felt needed them and perhaps move the market share
16 and get a better IC check.
17 Q.  So if you called on more doctors and
18 stuck to the Start Adherence Score, you felt that
19 would move the market share?
20 A.  I hoped so.
21 Q.  In fact, the result here is that you did
22 call on more doctors than what was required, correct?
23 A.  Right.
24 Q.  And you adhered to the Start Adherence
25 Score more than what was expected, correct?

55 (Pages 214 to 217)

218

1           B. Amendola
2    A.    Right.
3    Q.    And you were achieving 98 percent of the
4 portfolio attainment for the sales objective?
5           MR. MAAZEL:  Objection, asked and
6 answered.
7    Q.    Yes?
8           MR. MAAZEL:  I think we've gone through
9 this.
10    Q.    Yes, Ms. Amendola?
11    A.    Could you repeat the question?
12    Q.    Yes.  You were achieving at this time 98
13 percent of the sales attainment calls?
14    A.    Right.
15           MR. MAAZEL:  Form objection.
16    A.    Sales attainment did not mean sales
17 numbers.  It meant the placement of the products in
18 calling on the doctors on the call -- in the call
19 max.
20    Q.    I'm not referring to the SAS and CAS.
21 I'm referring to the portfolio attainment.
22    A.    Right. I was looking at that.  Yes,
23 you're right, 98 percent out of 100 percent.
24    Q.    Achievement on her portfolio attainment
25 for sales?

219

1           B. Amendola
2    A.    Right.
3    Q.    The Strengths and Developments on this
4 page, do you see that?
5    A.    Yes.
6    Q.    It says Performance Strengths Results,
7 do you see that?
8    A.    Yes.
9    Q.    It says, "Beth and the Hollywood pod are
10 consistently in the top 52 in Plavix sales."
11           Do you see that?
12    A.    Yes.
13    Q.    Is that accurate?
14    A.    I don't know.  I'm sure I thought it was
15 accurate at the time I signed it.
16    Q.    It says, "Beth has superior
17 relationships with her Hollywood customers."
18           Do you see that?
19    A.    Yes.
20    Q.    Is that accurate?
21    A.    Yes.
22    Q.    "Beth has identified the top 20
23 customers to drive the new Avalide 300/25 business
24 and has gotten firm commitments to move the
25 Avapro/Avalide business."  Do you see that?

220

1           B. Amendola
2    A.    Yes.
3    Q.    Could you explain what that means, that
4 sentence?
5    A.    It means that Avalide had a strength
6 of -- until this time Avalide's strength was
7 300/12.5.  Now it was increased to a strength of
8 300/25.  Doctors had been asking for a higher
9 strength of the second part of the Avalide.
10           I identified the ones who had been
11 saying if Avalide had more of the hydrochlorothiazide
12 it would be better.  I identified them and I felt
13 they were committed to prescribing it.  They wanted
14 it.  Here it was.
15    Q.    Beneath that it says, "Beth and the
16 Hollywood pod are number three in the Plavix high def
17 contests."  Do you see that?
18    A.    Yes.
19    Q.    Can you explain what that means to me?
20    A.    Well, you saw on the other thing it was
21 number one in the high def contest.  Well, this was
22 December already and now we were number three.
23    Q.    Out of how many?
24    A.    I believe all the pods in the region.
25    Q.    How many pods were in the region?

221

1           B. Amendola
2    A.    I think that varied too.  In the region
3 there could have been -- one year there were 32 pods.
4 I don't know what there was in 2005.
5    Q.    Were there more or less?
6    A.    I don't know how it was divided.
7 Actually, there probably were more.  There were more
8 in 2005.  I believe it was pods, but there were over
9 500 reps -- there were three groups of 500 each or
10 something like, so there were a lot of reps, a lot of
11 groups.
12    Q.    Did you win anything at the end of 2005
13 for this high def contest?
14    A.    I don't know.
15    Q.    Any money?
16    A.    I don't remember.
17    Q.    A trip?
18    A.    No.
19    Q.    Beneath that box it says Performance
20 Strengths, Core BMS Behaviors.  Do you see that?
21    A.    Yes.
22    Q.    It says, "Beth has superior
23 relationships with the matrix team and works closely
24 with them to move key customers."
25           Can you explain what is meant by that

56 (Pages 218 to 221)

222

B. Amendola

1  sentence?
2
3      A.   The matrix team were the hospital reps,
4  the specialty reps who were also promoting the same
5  products that I was promoting.  I worked closely with
6  them.  I would invite them to our pod meetings.  They
7  would invite my pod to theirs.  We shared some
8  doctors, so we would do some team selling.  If I had
9  a lunch I would invite them.  If I didn't have
10 budget, I would ask them to pay for it and vice
11 versa.
12         Instead of being just little groups, if
13 we were all in the same territory we worked together.
14 We were part of a team.  It was encouraged by
15 Bristol-Myers to do that.
16     Q.   If you turn the page under Self
17 Development, this is BMS 23, it asks the question:
18 "What actions have you taken to develop your skills
19 and strengthen your performance in the last year?"
20 Below that are three bullets.  Do you see those?
21     A.   Yes.
22     Q.   The first says, "Beth reads studies on
23 the web that strengthen her knowledge of the disease
24 state and competition."  Do you see that?
25     A.   Yes.

223

B. Amendola

1
2      Q.   Is that accurate?
3      A.   Yes.
4      Q.   Below that it says, "Beth collaborates
5  with the CV specialists to inquire more in depth
6  product knowledge."  Do you see that?
7      A.   Yes.
8      Q.   Is that accurate?
9      A.   Yes.
10     Q.   Below that it says, "Beth uses BMS
11 approved clinical studies to support her sales
12 calls."  Do you see that?
13     A.   Yes.
14     Q.   Is that accurate?
15     A.   Yes.
16     Q.   Were all of your pod mates doing these
17 things to your level?
18     A.   My pod mates were inviting the matrix
19 team to participate with us.
20     Q.   Were they performing at your level?
21         MR. MAAZEL:  Form objection.  You can
22 answer if you understand.
23     A.   Maybe in some areas better, maybe in
24 some areas worse, maybe in some areas the same.
25     Q.   Do you know?

224

B. Amendola

1
2      A.   I know that Freddie was extremely
3  proficient on the computer, and when we had to do
4  Excel spreadsheets, we could all do them, but we gave
5  him that job.
6      Q.   Did you feel that your pod was or
7  believed that your pod was one of the strongest pods
8  in the territory?
9      A.   Most definitely.
10     Q.   Below the box we were just looking at it
11 talks about career aspirations.  Do you see that?
12     A.   Yes.
13     Q.   You wrote in this section, correct?
14     A.   Yes.
15     Q.   You wrote you want to move to a level
16 S04.  Do you see that?
17     A.   Yes.
18     Q.   What was level S04?
19     A.   It was the next level after mine.
20     Q.   Senior territory business manager?
21     A.   I don't know.  I don't know if there was
22 a correlation.
23     Q.   And below that you wrote "I would like a
24 specialty position"?
25     A.   Yes.

225

B. Amendola

1
2      Q.   Why did you want a specialty position?
3      A.   Because I had more information in my
4  head that I would have liked to have imparted to the
5  physicians and yet I was unable to do so because as a
6  primary care rep it wasn't approved for my use.
7      Q.   Underneath, towards the bottom of this
8  page, there's comments on performance assessment.  Do
9  you see that?
10     A.   Yes.
11     Q.   That's something you input into this
12 document?
13     A.   Yes.
14     Q.   Could you read into the record what you
15 wrote.
16     A.   "I have superior relationships with my
17 customers and my peers.  I also love what I do.  I
18 know that this contributes to my selling skills,
19 therefore, I know I can succeed in whatever position
20 I have."
21     Q.   You wrote that?
22     A.   Yes.
23     Q.   Is it accurate?
24     A.   Yes.
25     Q.   I'm going to show you a document that

57 (Pages 222 to 225)

226

1                    B. Amendola
2  we're going to mark as Amendola 13, which is a
3  June 9th, 2005 performance connections review.
4              (Whereupon, June 2005 performance review
5  was received and marked Amendola Exhibit 13, for
6  identification, as of this date.)
7       Q.    Just let me know when you're done
8  reviewing this.
9       A.    I'm ready.
10      Q.    Is that your signature on the second
11 page, BMS 25?
12      A.    Yes.
13      Q.    It's dated July 15, 2005?
14      A.    Yes.
15      Q.    This is your midyear performance review?
16      A.    Yes.
17      Q.    Looking at the third box that says
18 Assessment of Results?
19      A.    Yes.
20      Q.    Underneath it says Product Sales
21 Objectives?
22      A.    Yes.
23      Q.    It lists Plavix as the first?
24      A.    Right.
25      Q.    Is it correct that in or as of

227

1                    B. Amendola
2  March 2005 the sales objectives in your territory for
3  Plavix had exceeded the 100 percent expectation?
4       A.    Yes.
5       Q.    Is it also correct that for
6  Avapro/Avalide that as of March 2005 the sales
7  objectives for your territory were at 96.38 percent?
8       A.    Yes.
9       Q.    And for Pravachol as of March 2005 for
10 your territory the product sales objectives were at
11 95.19 percent of the expectation?
12      A.    Yes.
13      Q.    The Portfolio Attainment, which is the
14 next line, do you see that?
15      A.    Yes.
16      Q.    Is that an average of the three products
17 sales objectives?
18      A.    I believe so.
19      Q.    Beneath that it has a Pinnacle ranking?
20      A.    Right.
21      Q.    What was a Pinnacle ranking?
22      A.    How you would need to be in the top ten
23 percent of your particular sales force in order to
24 win Pinnacle in December.
25      Q.    Beneath that where it says Sales

228

1                    B. Amendola
2  Effectiveness Measures.
3       A.    Right.
4       Q.    It has your SAS and CAS scores?
5       A.    Right.
6       Q.    You were exceeding expectations at this
7  time?
8       A.    Yes.
9       Q.    It also lists your calls per day?
10      A.    Right.
11      Q.    The expectation was eight calls per day,
12 correct?
13      A.    Right.
14      Q.    And you were actually seeing 11.9, on
15 average, doctors per day, correct?
16      A.    Right.
17      Q.    Do you know where that ranked you in
18 terms of numbers of calls per day among the other
19 TBM's in CV/Met primary care?
20      A.    It would show up under the North Miami
21 territory.  There was usually a bar graph.  I was
22 usually up there.  Sometimes I had the most,
23 sometimes the second most, the third most.  This was
24 a very rough year for us because of managed care so
25 we were trying to do whatever we could to counteract

229

1                    B. Amendola
2  that, and you do what you have the power to do, and
3  one thing was calling on doctors.
4       Q.    Underneath Performance Strengths Core
5  BMS Behaviors?
6       A.    Yes.
7       Q.    The third paragraph it says, quote, Beth
8  consistently works with her pod to adapt a business
9  plan to fit the changing needs of the Hollywood
10 territory and the marketplace as a whole.
11           Do you see that?
12      A.    Yes.
13      Q.    Is that accurate?
14           MR. MAAZEL:  Form objection.  You can
15 answer.
16      A.    Yes.
17      Q.    Can you tell me how you went about
18 adapting a business plan in your territory?
19      A.    I believe we made the business plan --
20 we had done business plans.  They would come and go,
21 but if we did it, we did it prior to the calendar
22 year, so it was a wish list, and then once we had our
23 universe of doctors and once we knew what we were
24 doing, then we either stuck to it or we changed it.
25      Q.    Can you recall what it was that you and

58 (Pages 226 to 229)

230

B. Amendola

1  your pod did to adapt your business plan at this
2  time?
3      A.   Instead of doing a dinner program in
4  March, maybe we did a dinner program in April.  Maybe
5  we did a dinner program with a different speaker.
6  Things like that.  Very basic things.  Allocated our
7  money to do lunches at a particular office.
8          If we had a product that was well placed
9  on a certain formulary and we found out that the
10  doctor wasn't taking patients who were covered by
11  that insurance anymore, then we certainly weren't
12  going to do a lunch there or take the doctor out to
13  dinner because he could love the product, but he was
14  not going to prescribe it.
15      Q.   Let me show you what we're going to mark
16  as Amendola 14, which is a December 13, 2004
17  performance connections review.
18          (Whereupon, December 2004 performance
19  review was received and marked Amendola Exhibit 14,
20  for identification, as of this date.)
21      Q.   Let me know when you're finished
22  reviewing that.
23      A.   I'm ready.
24      Q.   Is that your signature on the second

231

B. Amendola

1  page, BMS 27?
2      A.   Yes.
3      Q.   Dated February 22nd, 2005?
4      A.   Yes.
5      Q.   Was this your year end performance
6  connections evaluation for the year 2004?
7      A.   Yes.
8      Q.   Under the third box Assessment of
9  Results Q1 through Q3, do you see that?
10      A.   Yes.
11      Q.   On the first page under BMS 26?
12      A.   Yes.
13      Q.   That's the first through third quarters
14  of results for 2004, right?
15      A.   Right.
16      Q.   Underneath Product Sales Objectives it
17  says "IC attainment."  Do you see that?
18      A.   Yes.
19      Q.   What is IC attainment?
20      A.   That's the bonus, incentive compensation
21  attainment.
22      Q.   Was that -- I guess we talked about --
23      A.   That's for Pinnacle.
24      Q.   Pinnacle?

232

B. Amendola

1      A.   Yes.
2      Q.   Tell me about Pinnacle.
3          MR. MAAZEL:  Form objection.
4      Q.   Tell me what Pinnacle was, please.
5      A.   Pinnacle was being in the top ten
6  percent or at one time I think it was the top
7  25 percent of the sales force and winning a
8  substantial -- and attaining a substantial bonus and
9  winning a trip.
10      Q.   Was that based purely on the volume of
11  sales in your territory?
12          MR. MAAZEL:  Form objection.
13      A.   It was based on what your goals were
14  when you started the year and what you had attained
15  by the end of the year, and if it was attained in a
16  positive growth.
17      Q.   When you say "goals," is that sales
18  goals?
19      A.   Sometimes it was based on growth and
20  sometimes it was based on something else.  It was
21  growth.
22      Q.   Right, growth in sales?
23      A.   Did the number of scripts grow in that
24  territory for that year.

233

B. Amendola

1      Q.   For this year, the end of December 2004,
2  the attainment that you had achieved for the growth
3  in sales -- what did you say?
4      A.   Product growth.
5      Q.   For the product growth, the result was
6  at 126 percent of what the expectation was; is that
7  correct?
8      A.   Right, as of the 5th of September.
9      Q.   As of December 18th, 2005 you were
10  making 12.9 calls on average per day?
11      A.   Right.
12      Q.   And you had exceeded your SAS and your
13  CAS scores?
14      A.   Right.
15      Q.   Strength and Developments, which is five
16  boxes down.
17      A.   Right.
18          MR. MAAZEL:  Sorry, is there a typo
19  here?  I'm confused about the dates.
20          MR. BROWN:  What are you referring to?
21          MR. MAAZEL:  Just that it's dated
22  December '04.  It's signed February '05, but it's
23  talking about September '05 or December '05.
24          MR. BROWN:  It may be that the --

59 (Pages 230 to 233)

234

B. Amendola

1
2  A.  This is the date it came out.
3      MR. BROWN:  That's September '04 I see
4  attainment.
5  A.  No, it's not, it's '05.
6  Q.  You signed this document in February of
7  '05, right?
8  A.  Then I don't know what it is.
9  Q.  Let's move on.  Under Strengths and
10 Development Needs --
11 A.  Yes.
12 Q.  -- do you see performance strengths?
13 A.  Yes.
14 Q.  It says, "Beth was a Pinnacle winner for
15 three of six years."
16 A.  Right.
17 Q.  Is that accurate?
18 A.  Yes.
19 Q.  What did you win?
20 A.  I went to Hawaii, Bermuda, Europe.  I
21 tied for the trip to Cabo San Lucas.
22 Q.  Did you go to Cabo San Lucas?
23 A.  No.
24 Q.  Did you get money instead?
25 A.  Yes.

235

B. Amendola

1
2  Q.  How much?
3  A.  My IC bonus.
4  Q.  How much?  Do you recall?
5  A.  I don't know.
6  Q.  It says, "Beth" -- below that -- "Beth
7  was a trip leader for the first six months of 2004."
8      Do you see that?
9  A.  Yes.
10 Q.  What is a trip leader?
11 A.  That means that if three people could go
12 on the trip, then I was either number one, two or
13 three for the first six months of 2004.
14 Q.  Was this a competition?
15 A.  It's not a competition.  It's just a
16 goal.  It's what a pharmaceutical rep aspires to,
17 either a president's award or a Pinnacle award.
18 Q.  Was this meant to incentivise you in
19 some way?
20 A.  Yes, that's why it's called incentive.
21 Q.  "Beth consistently performs in the top
22 25 percent," which is what it says next.
23      Do you see that?
24 A.  Yes.
25 Q.  Is that accurate?

236

B. Amendola

1
2  A.  Yes.
3  Q.  What's an HISG rep?
4  A.  It's a hospital rep.  Don't ask me what
5  the ISG stands for.
6      MR. BROWN:  We'll take a break now.
7      VIDEOGRAPHER:  The time is approximately
8  2:31.  This ends tape number four.  We're now going
9  off the record.
10     (Whereupon, a recess was taken.)
11     VIDEOGRAPHER:  The time is approximately
12 2:43.  This begins tape number five.  We are now on
13 the record.
14     MR. BROWN:  Could I have the last
15 question and answer read back, please.
16     (The requested portion was read.)
17 Q.  Under Career Aspirations on the second
18 page of this document marked Amendola 14, BMS 27, you
19 wrote, "with my experience in the pharmaceutical
20 industry and as a former teacher, I would like to be
21 a mentor to new reps."  Do you see that?
22 A.  Yes.
23 Q.  Did you write that?
24 A.  Yes.
25 Q.  You also wrote, "I also would like to be

237

B. Amendola

1
2  at the next career level."  Do you see that?
3  A.  Yes.
4  Q.  What was the next career level for you?
5  A.  I don't remember, but whatever it was,
6  it was the next to the one I was at.
7  Q.  If you look a few boxes down you wrote,
8  "I would like to be a specialty rep."  Do you see
9  that?
10 A.  Yes.
11 Q.  Was that the next career level for you?
12 A.  Specialty reps and primary care reps
13 were basically the same thing except specialty reps
14 had additional clinical re-prints to review,
15 predominantly called on specialists, and were paid
16 more money.  I wanted to earn more money and that
17 would be a way to do it.
18 Q.  You also wrote in the comments on
19 Performance Assessment at the end of this document,
20 quote, I have had a good year, but now the challenge
21 of being a CV/Met rep with a new portfolio makes me
22 want to make 2005 a great year, close quote.
23      Do you see that?
24 A.  Yes.
25 Q.  What was the new portfolio?

60 (Pages 234 to 237)

238

B. Amendola

1  A.  I just became a Plavix rep and CV/Met
2  was just -- I believe it was just formulated in
3  December of that year.  It was either -- I believe it
4  was that year.  There was a whole company -- yes, it
5  was.  There was a whole company -- there was a
6  downsizing.  There was a realignment and now we
7  became CV/Met reps.  We weren't CV/Met reps before
8  December of 2004, and now I was selling Plavix and I
9  had a new portfolio.
10        I believe I did sell Avapro and Avalide
11  prior to that, but I also told Tequin and now I was
12  no longer selling Tequin.  It was just cardiovascular
13  metabolic products and I wanted to have a good year.
14  I wanted to do well.
15    Q.  What percentage, on average, was your
16  incentive compensation compared to your base salary?
17    A.  I would say between 20 and 30 percent.
18        MR. BROWN:  Let me mark for
19  identification Amendola 15 a Performance Partnership
20  Summary dated August 3, 2004.
21        (Whereupon, a Performance Partnership
22  Summary was received and marked Amendola Exhibit 15
23  for identification, as of this date.)
24    Q.  Just tell me when you're finished

239

B. Amendola

1  reviewing that.
2    A.  I'm done.
3    Q.  Is that your signature at the bottom of
4  the page?
5    A.  Yes.
6    Q.  Dated August 2nd, 2004?
7    A.  Yes.
8    Q.  What is the Performance Partnership
9  Summary?  Do you know?
10    A.  A Performance Partnership Summary was
11  something that the district manager had to complete I
12  think midyear with input from the representative.
13    Q.  You had input in this document?
14    A.  I probably wrote the document and then
15  the manager tweaked it his way.
16    Q.  In the box below results versus
17  expectations it says that you were ranked third out
18  of 32 with a target index of 162.97 percent.
19        Do you see that?
20    A.  Right.
21    Q.  Do you see that?
22    A.  Yes.
23    Q.  Can you explain what that means?
24    A.  There were 32 reps in my group and I

240

B. Amendola

1  came in third.  My -- we can never figure this out,
2  what was being explained here, but I will try to
3  explain it carefully.
4        You have a goal of 100 percent and my
5  goal came in at 162.92 percent, but there were people
6  who were much better than me.  At least two who came
7  in at one out of 32.  I came in three out of 32, so I
8  was in the top ten percent.  That's what that means.
9    Q.  Twenty-nine people didn't do as well as
10  you did?
11    A.  Maybe by a hair.
12    Q.  Do you know?
13    A.  I knew when the sheet was issued.
14    Q.  Do you know now?
15    A.  I don't remember it.  I don't have it in
16  front of me.
17    Q.  162.97 percent of what?
18    A.  Of the goal.  Say I was supposed to -- I
19  was supposed to have 100 jelly beans.  I ended the
20  year with 162.97 jelly beans, so I had extra.
21    Q.  162.97 percent?
22    A.  Right.
23    Q.  And you exceeded by 62.97 percent?
24    A.  Exactly.

241

B. Amendola

1    Q.  The expectation and my question to you
2  is:  That expectation or that target index that you
3  exceeded, was that for growth and sales or was that
4  sales volume?
5    A.  I don't know.  It could have been both.
6  Sometimes it was growth.  Sometimes it was volume.
7  Everything changed frequently.
8    Q.  You don't remember what it was?
9    A.  I don't remember, no, I don't remember.
10    Q.  Under Supporting Behaviors in the same
11  document it is written, quote, Beth is more effective
12  when she tailors her presentations to the doctor's
13  needs and prescribing habits.  Do you see that?
14    A.  Yes.
15    Q.  Let me go on.  It says, "this gives Beth
16  the opportunity to catch the doctor's attention and
17  extend those 'one-minute' calls into dialogue that
18  helps her obtain commitment."  Do you see that?
19    A.  Yes.
20    Q.  Did you write that?
21    A.  Actually, Henry wrote that.
22    Q.  Your pod mate?
23    A.  No, my manager.  Enrique Fonts is Henry.
24    Q.  Do you agree with his assessment that

61 (Pages 238 to 241)

242

B. Amendola

1 you were most effective when you tailored or more
2 effective when you tailored your presentations to the
3 doctor's needs and prescribing habits?
4       MR. MAAZEL: Form objection. You can
5 answer.
6   A.   I'm most effective when I use the
7 accepted selling promotional materials for the right
8 doctor. We had a slew of promotional materials, so I
9 would pick the one that was appropriate for the
10 doctor and use that.
11   Q.   By doing that, did you feel you were
12 maximizing your effectiveness?
13   A.   I was using my tools in the best way
14 possible.
15   Q.   By the way, when you entered a call into
16 the call max system, did you do that after each call?
17   A.   Yes.
18   Q.   Where did you do that?
19   A.   I either did it immediately after the
20 physician signed for his samples, or I did it on the
21 way to the next call.
22   Q.   In the car?
23   A.   Yes. You didn't proceed to another call
24 until you finished the one there. It's time

243

B. Amendola

1 sensitive.
2   Q.   You didn't have a wireless connection,
3 right?
4   A.   No.
5   Q.   In that same paragraph it says, "Beth
6 understands the physician's habits and knows the key
7 competitors she needs to sell against."
8       Do you see that?
9   A.   Yes.
10   Q.   Is that accurate?
11   A.   Yes.
12       MR. BROWN: I'm going to mark as
13 Amendola 16 a Performance Partnership Summary dated
14 February 22, 2004.
15       (Whereupon, Performance Partnership
16 Summary was received and marked Amendola Exhibit 16
17 for identification, as of this date.)
18   Q.   Did you sign this document?
19   A.   Yes.
20   Q.   It's BMS 30 that I'm referring to, okay?
21   A.   Right.
22   Q.   You signed it on February 22nd, 2004?
23   A.   Right.
24   Q.   This is a Performance Partnership

244

B. Amendola

1 Summary, correct?
2   A.   Yes.
3   Q.   For this Performance Partnership Summary
4 through the period of November 2003 your percentage
5 of your incentive compensation target was at
6 194.95 percent, correct?
7   A.   Yes.
8   Q.   Your year to date standing among the
9 other territory reps was seven out of 35; is that
10 correct?
11   A.   Yes.
12   Q.   Under supporting behaviors --
13   A.   Yes.
14   Q.   -- could you just read into the record
15 that first paragraph beginning with "Beth has
16 consistently"?
17   A.   Me?
18   Q.   Yes.
19   A.   "Beth has consistently imparted disease
20 state knowledge to her customers on every call. This
21 has allowed her to keep her calls fresh and attention
22 getting. Her customers are always learning the most
23 up-to-date features and benefits of her products
24 versus the competition. By engaging the customers

245

B. Amendola

1 with exciting information, they always have time for
2 this rep."
3   Q.   Did you write that?
4   A.   Probably.
5   Q.   Do you agree with that?
6   A.   I wasn't doing anything that any other
7 rep wasn't doing. Do I agree with it? Yes, this is
8 what we were supposed to do.
9   Q.   Did you ever see any performance
10 partnership summaries for any other pharmaceutical
11 rep?
12   A.   Now?
13   Q.   Then.
14   A.   No.
15   Q.   Do you know if other pharmaceutical reps
16 received evaluations that were as good as yours?
17   A.   Most definitely. Most of them did.
18   Q.   How do you know that?
19   A.   Because after we handed this in and
20 after we got it back we would hear oh, my performance
21 partnership was great. I might say to someone what
22 do you have to improve in. We were all pleased. Not
23 all. The ones that I spoke to were pleased with
24 their performance partnership.

62 (Pages 242 to 245)

246

B. Amendola
1
2    Q.    Who was that?
3    A.    B.J. Reeves, Jay Lakritz, L-A-K-R-I-T-Z.
4    If Alfredo was my partner, then most certainly
5    Alfredo.
6    Q.    Anybody dissatisfied with their
7    Performance Partnership Summary?
8    A.    If they were they weren't going to say
9    so.
10    Q.    You don't know though?
11    A.    They never told me.
12    Q.    Do you know who is ranked 35 year to
13    date as of February 2004?
14    A.    No.
15    MR. BROWN:  I'm going to mark this as
16    Amendola 17, which is an Annual Development Summary
17    dated 1/19/04.
18    (Whereupon, Annual Development Summary
19    was received and marked Amendola Exhibit 17, for
20    identification, as of this date.)
21    Q.    Do you recognize this document,
22    Ms. Amendola.
23    A.    I would recognize it better if I knew
24    who signed it.  There's no signature.
25    Q.    Do you recognize this document?

247

B. Amendola
1
2    A.    I recognize annual development
3    summaries, but I'm not sure -- I don't remember this
4    one.
5    Q.    Do you see your name in the upper left
6    corner?
7    A.    Yes.
8    Q.    Was there anything -- strike that.  Does
9    everything on this document look accurate to you?
10    MR. MAAZEL:  Form objection.
11    Q.    Is there anything on this document that
12    looks inaccurate?
13    MR. MAAZEL:  Form objection.
14    A.    Yes, I never did hospital selling with
15    Bristol-Myers Squibb, so I don't know why that's
16    there.  Increase experience in hospital selling.
17    Selling what?  And I didn't go to hospitals, so I
18    really don't know about that.
19    Q.    Anything else?
20    MR. MAAZEL:  Form objection.
21    A.    Yes, there's another thing.
22    "Incorporate hospitals in routing.  Meet regularly
23    with HISG rep and share experiences."  I was not a
24    hospital rep.  I didn't call on hospitals.
25    Q.    Anything else that you believe is

248

B. Amendola
1
2    inaccurate in this document?
3    A.    I don't think so.
4    Q.    You don't think so?
5    A.    I don't think so.
6    Q.    You could put that aside.  Do you recall
7    what your base compensation was in 2004?
8    A.    No.
9    Q.    Do you recall what it was in 2005?
10    A.    I believe it was 62,5.
11    Q.    In the time that you worked in 2006,
12    what was your base annual salary?
13    A.    It was 62,5.
14    Q.    Do you recall what you received in
15    incentive compensation in 2004?
16    A.    No.
17    Q.    What about in 2005?
18    A.    No.
19    Q.    Did you receive any incentive
20    compensation in 2006?
21    A.    Yes, I did.
22    Q.    How much?
23    A.    In June of 2006 because if a territory
24    performed at a certain level, the incentive
25    compensation was doubled, and my last date of

249

B. Amendola
1
2    employment was considered March 17th of '06, I was
3    entitled to it, and I got somewhere between, I think,
4    nine and $10,000.  I don't remember if that was
5    before taxes or after taxes, but that's what I got.
6    Q.    Did you keep any of your pay records?
7    A.    I think so.
8    Q.    Did you produce those to your attorneys?
9    A.    Yes.
10    Q.    All of them?
11    A.    Whatever I had.
12    Q.    What do you recall having in terms of
13    pay records?
14    A.    I don't know.  I don't remember.  I
15    don't know which ones I had and which ones were
16    missing.  Clerical work is not my strong suit.
17    Q.    I'm going to show you what we're marking
18    as Amendola 18.
19    (Whereupon, Bristol-Myers Squibb IC Plan
20    Scorecard was received and marked Amendola Exhibit
21    18, for identification, as of this date.)
22    Q.    This is a document entitled
23    Bristol-Myers Squibb IC Plan Scorecard.  It is dated
24    October 2004 to December 2004.
25    A.    I'm ready.

63 (Pages 246 to 249)

250

B. Amendola

2  Q.  Are you familiar with this document?
3  A.  Yes.
4  Q.  Can you explain to me what it is?
5  A.  This is the IC plan scorecard. This is
6  the document that I told you that we could barely
7  understand, but would give us the amount of dollars
8  that we were entitled to.
9  Q.  Under the incentive compensation plan?
10  A.  Right.
11  Q.  In terms of the incentive compensation
12  that you received, if you would look to the very
13  bottom of this page, which is BMS 1611, in box five,
14  and it has earnings by period. Do you see that?
15  A.  Yes.
16  Q.  It has four periods, which is -- is it
17  correct to assume that's the entire year of 2004?
18  A.  Yes.
19  Q.  It has under year to date earnings
20  $22,185.90. Do you see that?
21  A.  Yes.
22  Q.  Was that the incentive compensation that
23  you received in 2004?
24  A.  Yes.
25  Q.  The incentive compensation that you

251

B. Amendola

2  received in 2004, do you know what factors went into
3  determining how you received this $22,000?
4  A.  According to this sheet?
5  Q.  Either according to this sheet or your
6  recollection.
7  A.  Using the core message on every call,
8  allocating samples to the right prescribers, calling
9  on the right number of physicians the right number of
10  times, allocating the budget that I was given in the
11  right places, frequency of calls, using the approved
12  promotional materials, following the ENGAGE plan,
13  doing what I was supposed to, and having the support
14  of specialists who were doing the same thing,
15  hospital reps doing the same thing, direct to
16  consumer commercials, coupons in the newspapers.
17  Q.  Was one of the primary factors in
18  determining your incentive compensation the growth in
19  sales of the product in your territory?
20  A.  I think so because growth is on here and
21  that's all I can tell you about it. I don't know
22  what it means by maintenance or metric. I have no
23  clue. I never did, I never could, and it was
24  explained to us, and I would say that 95 percent of
25  us didn't have a clue. We just looked at the bottom

252

B. Amendola

2  line. There was no way to prove any of this. It was
3  just there.
4  Q.  Did you ever try and prove it?
5  A.  How?
6  Q.  I'm asking you.
7  A.  There was no way.
8  Q.  Do you think Bristol-Myers made these
9  numbers up?
10  A.  No, but I think their formulary was
11  beyond me.
12  Q.  I'm going to show you what we're going
13  to mark as Amendola 19, which is the IC Plan
14  Scorecard for Period 4, November 2005 to
15  December 2005.
16  (Whereupon, Bristol-Myers Squibb IC Plan
17  Scorecard was received and marked Amendola Exhibit
18  19, for identification, as of this date.)
19  Q.  Ms. Amendola, looking at what's been
20  marked as Amendola 19 and in particular -- it's a
21  document entitled Bristol-Myers Squibb IC Plan
22  Scorecard, Period 4, November 2005 to December 2005.
23  Do you see that at the top?
24  A.  Yes.
25  Q.  It has your name?

253

B. Amendola

2  A.  Yes.
3  Q.  If you look at box three, which is the
4  Pinnacle ranking.
5  A.  Yes.
6  Q.  It says, "current trip standing 146 out
7  of 514." Do you see that?
8  A.  Yes.
9  Q.  It says, "average national portfolio
10  attainment 97.11 percent." Do you see that?
11  A.  Right.
12  Q.  Did you win a Pinnacle award in 2005?
13  A.  No, not at all.
14  Q.  Under box four, year to date summary,
15  under earnings, did you receive in 2005 incentive
16  compensation of $13,792.12?
17  A.  Yep.
18  Q.  The receipt of that incentive
19  compensation was based on the factors we just went
20  over?
21  A.  Yes.
22  Q.  Who decided what the requirements were
23  for receiving incentive compensation?
24  A.  I guess the accounting department. I
25  really don't know.

64 (Pages 250 to 253)

254

B. Amendola

1
2    Q.    Do you know?
3    A.    No, I don't know.
4    Q.    Did you ever win any awards while you
5    were a TBM at Bristol-Myers?
6    A.    I won the Pinnacle awards.
7    Q.    Any other awards?
8    A.    I was put on the clinical advisory
9    board, which was considered a semi-award, the June
10   Jump contest. I'm trying to think what else.
11   Q.    Did you ever receive an excellence
12   award?
13   A.    I may have. I got an excellence award
14   for Tequin.
15   Q.    What was the clinical advisory board?
16   A.    The clinical advisory board was a group
17   of representatives who were invited away for the
18   weekend, and I believe these representatives would
19   have won Pinnacle that year except that the standings
20   were changed. It used to be either 20 percent or
21   25 percent of the sales force.
22          That year it was switched to ten percent
23   and the regional business head decided that this
24   group of people really should have won Pinnacle,
25   therefore, he would put them on a clinical advisory

255

B. Amendola

1
2    board.
3    Q.    What did you do on the clinical advisory
4    board?
5    A.    We had a meeting.
6    Q.    One meeting?
7    A.    One meeting and we just discussed
8    different things at Bristol-Myers. I don't remember
9    what. The meeting was when we were away for the
10   weekend.
11   Q.    Where were you away?
12   A.    In Bonita Springs at the Hyatt.
13   Q.    Where is that?
14   A.    In Bonita Springs. It's near Naples.
15   It's in Florida.
16   Q.    Do you know whether there were incentive
17   compensation plans in place in other divisions aside
18   from CV/Met?
19   A.    There's incentive compensation plans
20   throughout Bristol-Myers Squibb.
21   Q.    How do you know that?
22   A.    Because I know that Bristol-Myers Squibb
23   is known for Pinnacle awards, and also, whenever I
24   would go on one of the Pinnacle award trips there
25   would be people who couldn't make their division's

256

B. Amendola

1
2    Pinnacle award trips so they could come on another
3    one, like a CV/Met Pinnacle award trip instead of
4    whatever they were with.
5    Q.    When did you last win a Pinnacle award?
6    A.    I think 2004.
7    Q.    On that 2004 trip there were reps from
8    other divisions?
9    A.    That was the one that I tied for that I
10   couldn't go on the trip for so I don't know.
11   Q.    When was the last time you went on a
12   trip?
13   A.    When I went to Europe, 2003. I don't
14   remember the year.
15   Q.    Do you know whether the incentive
16   compensation plan, if there was one for another
17   division, was the same as the one for CV/Met?
18   A.    I don't know.
19   Q.    Do you know whether the call
20   expectations per day were the same for reps in
21   divisions other than CV/Met?
22   A.    I don't know. I think so.
23   Q.    You think so?
24   A.    I think so.
25   Q.    What are you basing that on?

257

B. Amendola

1
2    A.    Just supposition, just being in the
3    business.
4    Q.    Do you know whether other divisions use
5    samples?
6    A.    Yes.
7    Q.    What divisions use samples other than
8    CV/Met?
9    A.    Neurology uses samples.
10   Q.    Any others?
11   A.    I don't know.
12   Q.    How do you know that neurology uses
13   samples?
14   A.    Because I know neurology markets
15   Abilify. Abilify is a drug that is sampled.
16   MR. BROWN: We're going to take a break.
17   VIDEOGRAPHER: The time is approximately
18   3:19. We're now going off the record.
19   (Whereupon, a recess was taken.)
20   VIDEOGRAPHER: The time is approximately
21   3:32. We're now back on the record.
22   Q.    Ms. Amendola, are you familiar with a
23   speaker program at Bristol-Myers Squibb?
24   A.    Yes.
25   Q.    What was the speaker program as it

65 (Pages 254 to 257)

258

B. Amendola

1  applied to you and CV/Met?
2
3      A.    The speaker program consisted of doctors
4  from around the country who were trained by BMS to
5  put on programs at dinner functions for other
6  doctors.
7      Q.    How many doctors were on the list, if
8  you recall?
9      A.    I don't know.
10     Q.    Do you know how many doctors were
11 trained?
12     A.    I have no idea.
13     Q.    Did you ever put on a speaker program?
14     A.    Many times.
15     Q.    In the last three years that you were at
16 Bristol-Myers Squibb, how many speaker programs did
17 you put on?
18     A.    I don't know.
19     Q.    Can you approximate?
20     A.    It would just be a guesstimate.
21     Q.    Was it more than one time a year?
22     A.    Yes, it was more than one, probably more
23 than five, perhaps more than ten.  During three years
24 maybe up to 20.
25     Q.    Could be less?  Could be more?

259

B. Amendola

1
2      A.    Yes.
3      Q.    Were these all dinner programs?
4      A.    The speaker programs were dinner
5  programs.
6      Q.    Did you ever have a breakfast meeting?
7      A.    A breakfast would have been more
8  informal without a speaker.
9      Q.    What about a lunch and learn?
10     A.    Lunch and learn would be no speaker.
11     Q.    Did you decide who to pick to be a
12 speaker at your programs?
13     MR. MAAZEL:  Form objection.
14     A.    I could go to the approved list and I
15 could put a first, second and third choice and then
16 the vendor would contact the speaker in some
17 instances, and if the speaker was willing and the
18 speaker was available and the honorarium was agreed
19 upon, then that speaker would speak at my program.
20     Q.    Did you decide among topics that the
21 speaker would talk about?
22     MR. MAAZEL:  Form objection.
23     MR. BROWN:  Let me rephrase that.
24     Q.    Were there topics that these speakers on
25 this list had associated with them?

260

B. Amendola

1
2      A.    The speakers --
3      MR. MAAZEL:  Form objection.  You can
4  answer.
5      A.    The speakers were trained to speak on
6  different topics.  They were provided with slides
7  pertaining to the topics.  They were trained by a
8  special trainer, and on this vendor's website there
9  was a list of topics, and I could pick one, and that
10 would be what my speaker would speak about.
11     Q.    What went into your evaluation of what
12 topic you wanted to present to the doctors in your
13 territory?
14     MR. MAAZEL:  Form objection.
15     A.    I was given a budget that was passed to
16 me through my district sales manager and I was told
17 to do, let's say, an Avapro program, and that's how I
18 would pick a topic.
19     Q.    Did you ever pick a topic based on what
20 you felt were the needs of your customers?
21     A.    If the topic wasn't a choice provided to
22 me by Bristol-Myers Squibb, I was unable to -- I
23 could only use what they provided and hopefully I
24 would invite the right customers.
25     Q.    How did you decide what customers to

261

B. Amendola

1
2  invite?
3      A.    I wanted more time with them.  I wanted
4  to build a rapport with them.  I wanted them to be
5  more knowledgeable about the product so that they
6  would write more prescriptions on a product.
7      Q.    You didn't pick every single doctor on
8  your call list, did you?
9      A.    No.
10     Q.    You selected among the doctors on your
11 call list who would be attending these dinners?
12     A.    I selected who would be most appropriate
13 as a first tier, and then I selected others for a
14 second tier because it was very difficult to get
15 physicians to attend a dinner program.
16     Q.    Did other people in your pod also have
17 speakers at programs?
18     A.    Yes.  Sometimes we were given pod money,
19 sometimes we were given individual money, but because
20 we were a pod, we worked together, we were invited
21 together, we decided on a speaker together, on a
22 topic.  We worked together.  We even involved the
23 matrix team because we wanted attendance to be at the
24 maximum at a program.
25     Q.    Did you use the I plan program?

66 (Pages 258 to 261)

262

1           B. Amendola
2     A.    I don't know what the I plan is.
3     Q.    What about the Mercy program?
4     A.    We had Mercy.
5     Q.    What was Mercy?
6     A.    Mercy was a program that had all this
7  information in there, and you would go to the Mercy
8  program, and you could not do the Mercy program
9  during the day because the Mercy program never worked
10 properly, and where it should have taken 20 minutes
11 to register a program, it took hours and days.
12         Also, you needed to connect to the
13 Internet and my computer was not wireless, so I spent
14 hour after hour registering a program on Mercy in the
15 evenings.
16    Q.    You're not familiar with I plan?
17    A.    No.
18    Q.    Did the Mercy program or the Mercy plan
19 keep track of all of your dinner programs?
20    A.    I think so. I don't know. There were
21 always glitches.
22    Q.    Glitches in the Mercy program?
23    A.    Yes.
24    Q.    How often did you speak to your DBM the
25 last three years that you were at Bristol-Myers?

263

1           B. Amendola
2     A.    I don't know.
3     Q.    Weekly?
4     A.    No.
5     Q.    Monthly?
6     A.    Definitely monthly.
7     Q.    In those monthly -- was it a phone call?
8     A.    Either a phone call or we rode together.
9     Q.    Let's talk about a phone call. Do you
10 recall what generally you would talk about with your
11 DBM?
12    A.    I might talk to him about the budget. I
13 might talk to him if he could get me additional
14 samples because he was responsible for allocating the
15 samples to us, if I needed other materials, things
16 like that.
17    Q.    We talked about your call plan before
18 and I believe you testified that you had put some
19 additional doctors on your call plan; is that
20 accurate?
21    A.    Yes.
22    Q.    Did you have to get any kind of approval
23 to put a doctor on your call plan?
24    A.    I had to have a reason why and then I
25 could submit the doctor's name, but either the doctor

264

1           B. Amendola
2  wasn't added or the doctor never showed up on the
3  call plan. There were glitches in that system as
4  well.
5     Q.    Let me ask you this: Did anyone at
6  Bristol-Myers ever reject a doctor that you put on a
7  list?
8     A.    Not outright. The doctor just might
9  never have shown up there. We could call on that
10 doctor with paper. We could submit a paper where
11 they sign for it on paper.
12    Q.    Even if they weren't on your call list?
13    A.    Yes, but then there was the risk that
14 the paper would be lost or the samples that the
15 doctor took would not be deducted from the sample
16 count.
17    Q.    Did that ever happen to you?
18    A.    Once I had a discrepancy, but it was
19 completely straightened out.
20    Q.    Did it ever happen in the last three
21 years you were employed at Bristol-Myers?
22    A.    No.
23    Q.    But in the last three years you were
24 employed at Bristol-Myers you added doctors to your
25 call plan, correct?

265

1           B. Amendola
2     A.    Here and there.
3     Q.    Did you ever take doctors off your call
4  plan?
5     A.    If they were dead.
6     Q.    Any other reason?
7     A.    If they moved out of the territory.
8     Q.    Any other reason?
9     A.    Not just because I didn't want them.
10    Q.    Was there any other reason other than
11 the ones you've identified?
12    A.    I don't think so.
13    Q.    Have you ever gone on a call with
14 representatives from other divisions?
15    A.    No.
16    Q.    Did you consider yourself to be the face
17 of Bristol-Myers Squibb to the doctors or prescribers
18 in your territory?
19    A.    No, because there were so many other
20 reps from Bristol-Myers Squibb who were in my
21 territory just like me.
22    Q.    Were other Bristol-Myers Squibb reps,
23 other than your pod mates, visiting your doctors?
24    A.    Yes.
25    Q.    Who were those people? Who were they?

67 (Pages 262 to 265)

266

B. Amendola

1
2    A.    In some cases neurology reps, specialty
3    reps, cardiovascular specialty reps, the urologists.
4    Q.    What did you say?
5    A.    I called on urologists with Tequin, but
6    there were -- I also called on OB/GYN oncologists, a
7    few of those.  So there were oncology reps calling on
8    them.
9    Q.    In the last three years of your
10   employment at Bristol-Myers Squibb in CV/Met, were
11   there reps outside your pod mates who visited those
12   doctors you visited?
13   A.    More than likely, yes, because while I
14   was CV/Met, I was calling on family practice, DO's,
15   internal medicine.  They see specialty
16   representatives from every area.
17   Q.    But you don't know?
18        MR. MAAZEL:  Form objection.
19   A.    I don't know for sure.
20   Q.    With regard to Avapro, Avalide, Plavix
21   and Pravachol, were you and your pod mates the only
22   ones marketing and promoting for the doctors in your
23   territory?
24   A.    No.
25   Q.    There were other BMS reps?

267

B. Amendola

1
2    A.    Yes.
3    Q.    Who?
4    A.    Subosh Dassani, senior territory
5    business manager, specialty rep.
6    Q.    Is that a man or woman?
7    A.    A man.
8    Q.    Mr. Dassani was a specialty rep?
9    A.    Yes.
10   Q.    What was the overlap in terms of him
11   promoting and making calls to your doctors?
12   A.    We had some of the same products.
13   Q.    How many?
14   A.    I don't know.  I know he marketed
15   Plavix.  I know he marketed Pravachol.  He's been
16   with the company 30 years or more.
17   Q.    What doctors did he visit that were on
18   your call list?
19   A.    Antonio Reyes.
20   Q.    Anybody else?
21   A.    A specialist Dr. Barry Harris,
22   cardiologist.
23   Q.    Anybody else?
24   A.    Dr. David Berndt.
25   Q.    Anyone else?

268

B. Amendola

1
2    A.    There were many.
3    Q.    How many?
4    A.    There were many.
5    Q.    More than ten?
6    A.    Yes.  I haven't done this in a few
7    years.  John Hyatt.  Some of those are primary care
8    physicians.  Some of those are specialists.  Lerner
9    is another one.  There are a lot.
10   Q.    Other than the doctors that Mr. Dassani
11   called on, were there any other BMS reps calling on
12   your doctors who sold Pravachol, Plavix, Avapro and
13   Avalide?
14   A.    Bill Aguayo, specialty rep; Jay Lakritz,
15   primary care rep; Courtney O'Lauglin.
16        MR. BROWN:  Just give us a minute.  I
17   think we may be done for today.
18        VIDEOGRAPHER:  The time is approximately
19   3:46.  We're now going off the record.
20        (Whereupon, a recess was taken.)
21        VIDEOGRAPHER:  The time is approximately
22   3:49.  We're now back on the record.
23        MR. BROWN:  Thank you for your time.  I
24   don't have anymore questions.
25        MR. MAAZEL:  I have a few follow-up

269

B. Amendola

1
2    questions.
3    EXAMINATION BY
4    MR. MAAZEL:
5    Q.    You said there were specialty reps who
6    visited the very same doctors as you, yes?
7    A.    Yes.
8    Q.    They were doing the exact same job as
9    you?
10   A.    Yes, there were reps who were in the
11   neurology division who marketed a drug and were
12   promoting it to some primary care physicians.
13   Q.    Starting with specialty reps.
14   A.    They were specialty reps.
15   Q.    I see.  You had specialty reps in other
16   divisions of BMS who were calling on the same doctors
17   as you?
18   A.    The neurology reps.
19   Q.    They were doing the same job as you?
20   A.    Yes.
21   Q.    I think you testified specialty and
22   primary care are the same thing.  Do you remember
23   that testimony?
24   A.    Yes.
25   Q.    What do you mean by that?

68 (Pages 266 to 269)

270

B. Amendola
1    A.    We get the same initial training.  We
2    work for the same company.  Our territories are very
3    often the same.  Our duties are the same, to market
4    the product.  The only differences are that specialty
5    reps have more materials, more clinical re-prints to
6    use with the specialists.
7
8    Q.    And specialty reps get paid more
9    usually?
10    A.    Yes, it's considered a promotion.
11    Q.    So the job duties and responsibilities
12    of specialty reps and primary care reps are the same?
13    A.    Yes.
14    Q.    Towards the beginning of the deposition
15    you told Mr. Brown that whenever you use the word
16    "sell" you mean promote.  Do you remember that
17    testimony?
18    A.    Yes.
19    Q.    And that whenever anyone at BMS uses the
20    word "sell," referring to pharmaceutical reps, they
21    mean promote; is that correct?
22        MR. BROWN: I'm going to object.  I
23    don't think that was her testimony.
24    Q.    Is that a fair statement?
25    A.    What I said was that we never sold

271

B. Amendola
1    anything.  We marketed.  We promoted.  Even our
2    materials were called promotional materials, but we
3    were called sales reps, but we did not sell anything.
4    In fact --
5        THE WITNESS:  Your name is?
6        MR. BROWN:  Mr. Brown.
7        MR. MAAZEL:  Jeremy Brown.
8    A.    When he asked me if I ever sold
9    anything, I told him that if I had sold the samples I
10    would have lost my job because we were not allowed to
11    sell anything.
12    Q.    Let me just ask you very simply.  Have
13    you ever sold any drug in your entire career at BMS?
14    A.    No.
15    Q.    Has any pharmaceutical rep, to your
16    knowledge, at BMS ever sold a drug?
17    A.    No.
18    Q.    If you were to sell a drug, in your view
19    you would be fired?
20    A.    Yes.
21    Q.    So there were a couple of times today
22    where you used the word "sale" or "sell," were you
23    referring to promote?
24    A.    Yes, I was referring to promote.  It's

272

B. Amendola
1    interchangeable in pharmaceuticals.
2    Q.    So to the extent you used the word
3    "sale" at all today, what you meant was promote as
4    you testified to earlier; is that correct?
5    A.    That's correct.
6    Q.    Mr. Brown asked you a little bit about
7    quote, unquote, closing a sale.  Is that just
8    language that's used at BMS?
9        MR. BROWN:  Objection to form.
10    Q.    You can answer.
11    A.    It's closing the call.  It's thanking
12    the doctor for his time, asking the doctor to write
13    scripts for the product, and leaving the doctor's
14    office.
15    Q.    Can you actually close a sale at a
16    doctor's office, yes or no?
17    A.    You can close the doctor, but you can't
18    close a sale because you don't have a sale.
19    Q.    When you say "close the doctor," you
20    mean try to get some kind of commitment?
21    A.    Right.
22    Q.    But can any doctor actually give you a
23    commitment?
24    A.    They can say that they will do it, but

273

B. Amendola
1    they're not -- there's no way to enforce it.  They do
2    or they don't.
3    Q.    So no contract is made with any doctor?
4    A.    No.
5    Q.    Money never exchanges hands?
6    A.    No.
7    Q.    No written commitments?
8    A.    No.
9    Q.    Just a promise by the doctor that he
10    will consider the product at some later point?
11    A.    Not even a promise.  You ask the doctor
12    will you do it, will you write it, and the doctor
13    will say I will.
14    Q.    But you have no idea if that will happen
15    or not?
16    A.    No.
17    Q.    Now, how many calls were you expected to
18    do in the field every day?
19    A.    I was expected to make 8.5 calls.
20    Q.    A day?
21    A.    A day.
22    Q.    In addition, were you expected to be in
23    the field from eight to five?
24    A.    I was expected to be in the field from

69 (Pages 270 to 273)

274

B. Amendola

1
2  eight to five. I didn't spend all my time shopping.
3      Q.   Hold on.
4           MR. BROWN: I'm going to object to that
5  answer as non-responsive.
6      Q.   Just listen to my question and answer
7  the question. If you completed nine calls in a day,
8  were you expected to be in the field from eight to
9  five?
10     A.   I had to be in the field from eight to
11 five.
12     Q.   So if that meant nine calls or 20 calls
13 or 100 calls, you had to be in the field?
14     A.   Eight to five.
15     Q.   Do you understand in the field to be
16 doing work for BMS as opposed to merely being present
17 in the territory, yes?
18     A.   Yes.
19     Q.   You referred earlier to sometimes you'd
20 start work earlier than eight in the field?
21     A.   Right.
22     Q.   Did that happen a fair number of times?
23     A.   If I was doing a breakfast. If my
24 budget was small and I did a breakfast because it was
25 more cost effective, I would be in the field before

275

B. Amendola

1
2  eight o'clock.
3      Q.   Sometimes at seven?
4      A.   Sometimes at seven. Sometimes I had a
5  teleconference prior to eight o'clock and I would
6  start work early.
7           MR. BROWN: Can we have a time frame
8  here?
9      Q.   During your last three years at BMS?
10     A.   Yes.
11     Q.   Did you sometimes have lunches that were
12 less than an hour?
13     A.   I sometimes had lunches that were less
14 than hour. Sometimes I had no lunch at all because I
15 had a working lunch.
16     Q.   You referred earlier to the occasional
17 time when you would go to a dentist or go to a store.
18 Deducting that time from your time in the field, but
19 also taking into account that you frequently didn't
20 take lunches, or had shorter lunches, or went to work
21 before eight, on average, would you say you were in
22 the field working for BMS for how long per week?
23     A.   I was in the field 40 plus hours a week.
24     Q.   In addition to your work in the field,
25 was the work that you did outside of eight to five

276

B. Amendola

1
2  that you were expected to do as part of your job for
3  BMS?
4      A.   Yes, I had my teleconferences. I
5  attended them when they were -- they were always
6  mandatory teleconferences prior to going out to work.
7  Sometimes there were mandatory teleconferences after
8  to work. I couldn't connect my computer. I couldn't
9  transmit my calls. I couldn't do any of that until I
10 was home after five o'clock.
11     Q.   When did you check your e-mails for
12 work?
13     A.   I checked my e-mails before I went to
14 work and I checked my e-mails -- the same day e-mails
15 after work.
16     Q.   When did you check your voice mail from
17 supervisors and from others?
18     A.   I did my voice mails in-between calls
19 and then I completed them after work.
20     Q.   When did you prepare to meet with
21 doctors?
22     A.   I did my preparation either prior to
23 going out in the morning, prior to eight o'clock, or
24 I did my preparation after six o'clock.
25     Q.   When did you do the dinner

277

B. Amendola

1
2  presentations?
3      A.   The dinner programs were done -- usually
4  they started at 6:30 or seven and they lasted until
5  10:30, eleven, twelve o'clock.
6      Q.   In the evening?
7      A.   In the evening. When we had the budget,
8  we did the dinner programs.
9      Q.   When did you prepare for the dinner
10 programs?
11     A.   I did them in the evening.
12     Q.   When did you do your online training?
13     A.   My online trainings I did in the
14 evenings, I did them on Sunday morning, sometimes I
15 did them on Saturday mornings.
16     Q.   On average during your last three years
17 at BMS, about how many hours did you work for BMS per
18 week?
19     A.   I would say conservatively 50 hours a
20 week. Sometimes more. Sometimes less.
21     Q.   There you're including not just time in
22 the field, but time in the evenings and weekdays and
23 weekends?
24     A.   I'm talking about administrative time.
25     Q.   You're talking about days, evenings and

70 (Pages 274 to 277)

278

B. Amendola

1  weekends, right?
2     A.    Yes, days, evenings and weekends.
3     Q.    You said that -- you made references to
4  moving market share. Do you remember that testimony?
5     A.    Yes.
6     Q.    Is it your understanding that everyone
7  in BMS is trying to sell BMS products?
8     A.    Everyone is trying to move market share.
9     Q.    Everyone at BMS?
10    A.    Everyone. That's what we were there
11 for.
12    Q.    The people who were making ads for BMS,
13 they're trying to move market share?
14    A.    Yes.
15    Q.    So there's nothing special for you about
16 trying to move market share, that's what everybody is
17 doing?
18    A.    Right.
19    Q.    You mentioned or Mr. Brown brought up
20 speakers. Could you just pick any speaker, or did
21 BMS come up with a speaker list?
22    A.    It had to be an approved BMS speaker who
23 was approved by -- who was trained by Bristol-Myers
24 staff in what was acceptable to teach at dinner

279

B. Amendola

1  programs to the other doctors.
2     Q.    Was every speaker that you ever were
3  involved with, was every single speaker approved by
4  BMS?
5     A.    Yes.
6     Q.    Is that true for all pharmaceutical
7  representatives, to your knowledge?
8     A.    Yes.
9     Q.    How about the topics, could you just
10 make up a topic, or were all those topics
11 pre-approved by BMS?
12    A.    The topics were pre-selected by BMS. We
13 could just pick one.
14    Q.    Was it BMS that devised the topics
15 originally?
16    MR. BROWN: Objection to form.
17    A.    I don't know.
18    Q.    All you know is they gave you a list of
19 topics?
20    A.    They gave us a list.
21    Q.    All the materials that were used in the
22 speaker programs, I take it each and every one was
23 created, devised, and approved by BMS?
24    A.    There was no homemade bread even for the

280

B. Amendola

1  speakers.
2     Q.    Am I correct that BMS created the
3  materials?
4     A.    Yes.
5     Q.    And they required that only those
6  materials be used?
7     A.    Yes.
8     Q.    And that's true for you and all the
9  pharmaceutical reps, to your knowledge?
10    A.    Yes.
11    Q.    You mentioned that you mentored a Lali
12 Bahlawan, was it?
13    A.    Yes.
14    Q.    Did you ever supervise Ms. Bahlawan?
15    A.    No.
16    Q.    Could you hire her or did you hire her?
17    A.    No.
18    Q.    Could you fire her?
19    A.    No.
20    Q.    Did you ever supervise anyone in your
21 entire career at BMS?
22    A.    No.
23    Q.    Could you have supervised anyone in your
24 entire career at BMS?

281

B. Amendola

1     A.    No.
2     Q.    Is that because you were at the lower
3  rung of the ladder at BMS?
4     MR. BROWN: Objection.
5     Q.    You can answer.
6     A.    I was a primary care representative.
7     Q.    You didn't supervise people?
8     A.    No.
9     MR. MAAZEL: Nothing else.
10    MR. BROWN: I may have a few so let's
11 take a break.
12    VIDEOGRAPHER: The time is approximately
13 four o'clock. We're now going off the record.
14    (Whereupon, a recess was taken.)
15    VIDEOGRAPHER: The time is approximately
16 4:06. We're now back on the record.
17 FURTHER EXAMINATION
18 BY MR. BROWN:
19    Q.    Ms. Amendola, do you know whether
20 specialty reps at BMS received additional training
21 compared to primary care reps?
22    A.    I would have to say yes because they had
23 more clinical re-prints to go over, and occasionally
24 they would go to a sales meeting before other reps.

71 (Pages 278 to 281)

282

```
1                B. Amendola
2   So they had more work to do.
3          MR. BROWN:  I don't have any other
4   questions.
5          MR. MAAZEL:  Thank you.
6          VIDEOGRAPHER:  The time is approximately
7   4:06.  This concludes today's deposition.  We're now
8   going off the record.
9          (Time Noted:  4:06 p.m.)
10            J U R A T
11
12      I, Beth Amendola, the witness herein, do hereby
13  certify the foregoing testimony of the pages of this
14  deposition to be a true and correct transcript,
15  subject to the corrections, if any, shown on the
16  attached page.
17
18        _____
             BETH AMENDOLA
19
20
21  Subscribed and sworn to before me
22  This _____ day of _____, 2008.
23
24
     _____
25       NOTARY PUBLIC
```

283

```
1
2   STATE OF NEW YORK  )
3                     ) ss:
4   COUNTY OF NEW YORK )
5
        I wish to make the following changes, for the
6
    following reasons:
7
8   PAGE  LINE
9
     ---- ---- CHANGE: -------------------------------
10
        REASON: -------------------------------------
11
     ---- ---- CHANGE: -------------------------------
12
        REASON: -------------------------------------
13
     ---- ---- CHANGE: -------------------------------
14
        REASON: -------------------------------------
15
     ---- ---- CHANGE: -------------------------------
16
        REASON: -------------------------------------
17
     ---- ---- CHANGE: -------------------------------
18
        REASON: -------------------------------------
19
     ---- ---- CHANGE: -------------------------------
20
        REASON: -------------------------------------
21
     ---- ---- CHANGE: -------------------------------
22
        REASON: -------------------------------------
23
     ---- ---- CHANGE: -------------------------------
24
        REASON: -------------------------------------
25
```

284

```
1
2   PAGE LINE
3
     ---- CHANGE: ------------------------------------
4
        REASON: ----------------------------------
5
     ---- CHANGE: ------------------------------------
6
        REASON: ----------------------------------
7
     ---- CHANGE: ------------------------------------
8
        REASON: ----------------------------------
9
     ---- CHANGE: ------------------------------------
10
        REASON: ----------------------------------
11
     ---- CHANGE: ------------------------------------
12
        REASON: ----------------------------------
13
     ---- CHANGE: ------------------------------------
14
        REASON: ----------------------------------
15
     ---- CHANGE: ------------------------------------
16
        REASON: ----------------------------------
17
     ---- CHANGE: ------------------------------------
18
        REASON: ----------------------------------
19
     ---- CHANGE: ------------------------------------
20
        REASON: ----------------------------------
21
     ---- CHANGE: ------------------------------------
22
        REASON: ----------------------------------
23
24
25
```

285

```
1
2            I N D E X
3
    WITNESS       EXAMINATION BY       PAGE
4
    Beth Amendola    Mr. Brown      4, 281
5
                  Mr. Maazel      269
6
7
            EXHIBITS
8
9   AMENDOLA      DESCRIPTION      FOR IDENT
10   1    Complaint              4
11   2    Plaintiff's Initial Disclosures    4
12   3    Plaintiff's Responses to Defendants'
          First Set of Interrogatories      4
13
     4    Plaintiff's Responses to Defendants'
14        Request for Production of Documents  4
15   5    Declaration of Beth Amendola       4
16   6    1/27/98 employment offer letter    85
17   7    Excel Sales Career Progression Program
          Primary Care Rep Guidebook       91
18
19   8    Beth Amendola's resume           101
20   9    Application for employment       118
21   10   ENGAGE learning system           199
22   11   ENGAGE Selling Skills Model Pre-Work 201
23   12   December 2005 performance review   211
24   13   June 2005 performance review     226
25   14   December 2004 performance review   230
```

72 (Pages 282 to 285)

286

```
 1
 2              EXHIBITS
 3
      AMENDOLA         DESCRIPTION        FOR IDENT
 4
 5    15   Performance Partnership Summary    238
 6    16   Performance Partnership Summary    243
 7    17   Annual Development Summary         246
 8    18   BMS IC Plan Scorecard         249
 9    19   BMS IC Plan Scorecard         252
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

287

```
 1
 2              C E R T I F I C A T E
 3
 4    STATE OF NEW YORK   )
 5                        )  ss:
 6    COUNTY OF NEW YORK  )
 7
 8         I, BRENDA FITZGERALD, a Shorthand
 9    Reporter and Notary Public within and for the State
10    of New York, do hereby certify:
11         That, Beth Amendola, the witness whose
12    DEPOSITION was held on January 28, 2008, as
13    hereinbefore set forth, was duly sworn by me, and
14    that this transcript of such Examination is a true
15    and accurate record of the testimony given by such
16    witness.
17         I further certify that I am not related
18    to any of the parties to this action by blood or by
19    marriage, and that I am in no way interested in the
20    outcome of this matter.
21         IN WITNESS WHEREOF, I have hereunto set
22    my hand this 31st day of January, 2008.
23
                 _____
24                    BRENDA FITZGERALD
25
```

73 (Pages 286 to 287)

Doerner & Goldberg New York * A Veritext Company
1350 Broadway * New York, NY 10018 * 212-564-8808