UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                                :

BETH AMENDOLA, on behalf of herself and :
others similarly situated,              :
                    Plaintiff,     :        07 Civ. 6088 (DLC)
                                        :
             -v-              :        OPINION & ORDER
                                        :
BRISTOL-MYERS SQUIBB COMPANY, and Does  :
1 through 20, inclusive,                :
                    Defendants.    :
                                            :
----------------------------------------X

Appearances:

For Plaintiff:

Ilann M. Maazel
Elizabeth S. Saylor
Jonathan S. Abady
Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019

James A. Jones
Gillespie, Rozen, Watsky & Jones, P.C.
3402 Oak Grove Ave., Suite 200
Dallas, Texas 75204

David Sanford
Stefanie Roemer
Sanford, Wittels & Heisler, LLP
1666 Connecticut Avenue, North West
Suite 310
Washington, District of Columbia 20009

Eric B. Kingsley
Kingsley & Kingsley
City National Bank Building, 7th Floor
16133 Ventura Boulevard
Encino, California 91436

For Defendant Bristol-Myers Squibb Company:

Bettina B. Plevan
Joshua F. Alloy
Proskauer Rose LLP
1585 Broadway
New York, New York 10036

DENISE COTE, District Judge:

This litigation raises the question of whether pharmaceutical representatives ("PRs") employed by a major pharmaceutical company are properly classified as exempt from the overtime compensation rules prescribed by the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"). Plaintiff Beth Amendola ("Amendola") has moved for discovery of the names and addresses of the defendant's PRs, authorization for notice of this collective action to be sent to those potential plaintiffs, and equitable tolling of any claims they may file. Finding among other things that the defendant's PRs are not exempt from the FLSA's overtime compensation provisions under the exemption which applies to outside salespersons, but that they are likely subject to the exemption for administrative employees, the plaintiff is not authorized to send notice to the defendant's PRs. The request for equitable tolling is denied.

PROCEDURAL HISTORY

Amendola was employed by defendant Bristol-Myers Squibb Company ("BMS") as a PR from February 1998 through March 2006. She filed this action, individually and on behalf of other similarly situated BMS employees, on June 28, 2007, alleging that BMS often required her to work more than forty hours per week but never paid her overtime wages.  She quickly demanded that BMS provide her with the names and contact information of all PRs, or, in the alternative, that BMS consent to the equitable tolling of any FLSA claims.  BMS refused, and Amendola requested discovery tailored to and in anticipation of her motion for authorization of notice of this collective action to all PRs employed by BMS.

At a conference held to address the parties' disputes over the scope of discovery, BMS explained that its PRs include four levels of seniority and are employed by five distinct business units, each of which is subdivided across several geographic regions.  BMS asserted that it would challenge Amendola's contention that all of its PRs are "similarly situated" for purposes of the FLSA collective action without regard to their seniority, business unit, or geographic location.  The Court rejected Amendola's assertion that she immediately needed the names of <u>all</u> PRs -- roughly 4,500 in total -- employed by BMS during a three-year period.  Instead, the Court instructed BMS

to provide Amendola with the names of two or three PRs randomly selected from each business unit, geographic region, and job level.  By October 19, BMS had provided Amendola with the names and addresses of 350 employees, as well as more than 6,000 documents.  In response to Amendola's Rule 30(b)(6) notice, BMS produced five witnesses for depositions -- one vice president or manager overseeing each of BMS's five business divisions. Amendola deposed solely these five witnesses, and BMS deposed Amendola.

Following this preliminary discovery, Amendola moved for authorization to send notice of this collective action to all of BMS's PRs.[1]  BMS has opposed the motion, arguing principally that its PRs are exempted from the FLSA overtime compensation rules by one or more of four statutory and regulatory exemptions. Following a description of the evidentiary record presented by

---

[1] Amendola has also moved for "conditional certification" of this case as a collective action.  In contrast to the procedural requirements set forth in Rule 23 of the Federal Rules of Civil Procedure for class actions, however, neither the FLSA nor the Federal Rules of Civil Procedure provide for the certification of an FLSA collective action.  Actions brought under the FLSA often also allege related state labor law claims for which class action certification may be sought.  It is perhaps for this reason that district courts have imported the term "certification" to describe the authorization of notice of the collective action to potential plaintiffs.  This Opinion will treat Amendola's motion as a request for authorization of notice and will not further refer to the motion as one for certification.

the parties on this motion, the Opinion will address each of
these four exemptions.

BACKGROUND

I. Structure of BMS's Operations

BMS is a global pharmaceutical company with headquarters in
New York.  It employs about 2,400 PRs to promote BMS products to
physicians, hospitals, clinics, and medical institutions across
the United States.[2]  BMS, like other pharmaceutical companies,
classifies these employees -- who work from their own homes --
as exempt from the FLSA.  PRs receive a salary plus incentive
compensation.  They do not record the hours they work, nor do
they receive payments for overtime work.

BMS's PRs are all employed within its U.S. Pharmaceutical
Group.  The U.S. Pharmaceutical Group consists of five separate
business units: (i) Cardiovascular/Metabolics ("CV/Met"); (ii)
Virology; (iii) Oncology; (iv) Immunoscience; and (v)
Neuroscience.  Within CV/Met, PRs are assigned to either
"Primary Care" or "Specialty Sales."  Those assigned to
Specialty Sales "call on different customers, they have deeper
product and disease state knowledge, they have deeper market and
industry knowledge, [and] they are usually more experienced"

---

[2] While BMS currently employs about 2,400 PRs, the total number
of PRs that were employed by BMS over the time period relevant
to this motion is estimated at 4,500.

than Primary Care PRs.  Primary Care PRs typically receive lower base salaries than PRs assigned to Specialty Sales and BMS's four other business units.  The five business units have separate management, training resources, customers, and incentive compensation structures.

The five business units are each divided geographically into "Regions," and then further divided into "Districts," which are in turn subdivided into "Territories."  At least one PR is assigned to each Territory.

Finally, PRs are appointed to one of at least three levels of seniority: Territory Business Manager ("TBM"), Senior TBM, and Executive TBM.  The Primary Care sector of CV/Met also has a trainee or Associate TBM ("ATBM") position.  All PRs, at whatever level of seniority, are supervised by District Business Managers.

II. Duties of PRs[3]

PRs are required to be in the field visiting medical providers from 8 a.m. to 5 p.m., and spend time in the evenings preparing for these visits.  The goal of the visits is to influence the prescription practices of the providers.  PRs record notes about their "calls" -- as these visits are known in the pharmaceutical industry -- in a "Call Max" system.  They are required to attend online and in-person training, which includes instruction on the BMS "ENGAGE" method -- a tool to teach PRs how to prepare for, conduct, and record calls to medical providers.  BMS has developed a "core message" about each drug and trains PRs to relay that message on every visit.  District Business Managers supervise PRs principally by joining them on their calls about once every month.

---

[3] When analyzed with care, the parties' factual submissions are largely consistent in their description of PR duties at BMS. While the plaintiff's declarations submitted by Amendola and four former PRs, each of whom worked as a Primary Care TBM, do not contain the detail added by the defendant's witness declarations, they do not disagree in any material way with the defendant's evidence.  BMS has submitted affidavits from a Senior TBM in the Specialty Sales sector of CV/Met, a Senior TBM in Immunoscience, an Executive TBM in Neuroscience, and a Senior TBM in Virology, as well as the transcript of Amendola's deposition.  In her deposition, Amendola essentially confirmed the accuracy of the job description provided by the defendant's declarants.  In addition, one of Amendola's four declarants had worked for a period as a TBM in the Neuroscience unit and asserted that her job duties were essentially identical to those of a Primary Care TBM.

BMS provides a list of medical providers upon whom PRs are expected to call, and sets guidelines as to how many calls they should average per day.  BMS assigns one to three drugs to each PR, and often specifies the order in which the drugs should be promoted during a call.  A PR's adherence to these guidelines affects the employee's bonus.

PRs have flexibility in determining which provider to call upon on any given day and how often to do so, setting their own daily and weekly schedules.  Subject to the approval of their supervisors, they can also add to and subtract from their lists of assigned providers.  Amendola often did so, explaining that "[a]s long as you fulfilled your requirement, then you could add to your call list."  She noted that in one instance an antibiotic she was assigned to promote had an indication appropriate for urologists and she decided to "pick ten urologists and start calling on them."  This strategy resulted in the antibiotic becoming "a number one product" for her.

Physicians do not generally purchase drugs.[4]  Instead, they write prescriptions, which their patients present to pharmacies, or they order that drugs be administered within a hospital

---

[4] A Senior TBM working in Immunoscience reports that the drug he represents, Orencia, is an intravenous product and is, therefore, usually purchased by the physicians themselves from pharmacies or wholesalers for infusion into their patients. Thus, unlike other PRs who seek to influence physicians to write more prescriptions for a drug, his goal is to convince medical providers to purchase the drug from pharmacies or wholesalers.

setting.  Similarly, PRs do not sell drugs to providers or take orders for drugs from the providers on whom they call.  PRs will ask the providers they visit, however, for a non-binding "commitment" to prescribe a BMS drug when it is appropriate for their patients.[5]  Amendola testified at her deposition that she would ask doctors for non-binding commitments to prescribe BMS drugs as "one other way to possibly move the business."  Amendola taught these "closing skills" to other PRs.

BMS provides PRs with data about the prescribing practices of each medical provider on their lists.  PRs tailor their presentations to each medical provider based, for instance, on the provider's past prescribing habits, patient population, and individual personality.  They also use the data to structure their call schedules.  As Amendola described, "you never picked a doctor to call on who wouldn't see you.  You would sit down and analyze the data that you had and see the doctor's history with either your product or the competition and you decide, well, this is a good target."

Guidelines set by BMS and the U.S. Food and Drug Administration ("FDA") restrict the materials and information that PRs can present during their calls and that they can use to

---

[5] The parties do not explain what a "commitment" by a provider to prescribe a drug actually entails since it is undisputed that a provider remains entirely free to prescribe any drug she believes will benefit an individual patient.

answer providers' questions.[6]  For example, PRs cannot highlight
any information on the written materials that BMS provides for
distribution to physicians, and PRs can only offer pre-approved
information to the medical providers.  Yet, PRs determine which
visual aids to use in each presentation to a provider, as well
as how many samples and promotional materials, if any, to
distribute.  Amendola explained that she "had a slew of
promotional materials" and so "would pick the one that was
appropriate for the doctor and use that."  "To drive the
business," Amendola testified that it was important to "allocate
the right amount of samples to the right people."  In deciding
how to allocate the samples she was allotted, Amendola would
determine "if an office was busy or not," "note the patient
population," "go into the sample closet to see if there were any
samples," and "look to see if there were a lot of the
competitor's samples there and would it be worthwhile to buck
the competition by putting the samples."  She sought to avoid
allocating samples to medical providers who would not distribute
samples or would just give them to family members.

       PRs are also allotted promotional budgets, which they spend
on breakfasts, lunches, or dinners for the medical providers on

_____

[6] While the parties agree on this point, neither has provided
citations to the pertinent FDA regulations.

their lists.[7]  Although these meals may include lecture programs,
the speakers must be chosen from a list approved by BMS.  PRs
decide which of the medical providers on their lists to invite
to these programs, as well as how many such programs to
organize.  Amendola explained that she spent her budget "where
[she] thought that [she] would get a return on [her]
investment."  For example, if a drug was given preferred status
by a particular insurance plan but "we found out that the doctor
wasn't taking patients who were covered by that insurance
anymore, then we certainly weren't going to do a lunch there or
take the doctor out to dinner because he could love the product,
but he was not going to prescribe it."

       Although all of BMS's PRs share these same basic job duties
and restrictions, compensation levels vary across business units
and seniority levels.  In recent years, each of BMS's affiants
has earned over $100,000 in annual base salary plus incentive
compensation as either a Senior or Executive TBM.  In contrast,
Amendola was earning an annual base salary of $62,000 as a TBM
when she left BMS; her incentive compensation varied by year,
but in 2004 it totaled about $22,000.

_____

[7] Each PR in CV/Met, for example, receives an average budget of
$15,000 per year.

DISCUSSION

Amendola asserts that all of the defendant's PRs are "similarly situated" to her in that they perform essentially similar work and are also entitled under the FLSA to overtime compensation.  In addition, Amendola asserts that BMS has acted improperly, such that the statute of limitations should be equitably tolled for all potential plaintiffs.  BMS classifies all of its PRs as exempt from the FLSA's overtime compensation requirements.  It relies on four FLSA exemptions to the overtime compensation law to justify its classification of PRs as "exempt" employees.  It also argues that differences in the job responsibilities among classes of PRs may affect the application of these exemptions and that, therefore, this action is not well-suited to collective adjudication.

Although BMS initially resisted Amendola's claims in this lawsuit with arguments that there were at least three material distinctions among PRs based on their business unit, assigned geographic territory, and seniority level, it has presented no evidence in opposition to this motion to warrant a finding that geographic territory affects a PR's duties in any material way. BMS has offered some evidence that the PRs promoting pharmaceuticals to specialized medical providers have more responsibility and discretion than PRs promoting BMS drugs to primary care providers, and that PRs holding positions of

12

greater seniority also have more discretion in the performance
of their jobs.[8]  Most of the evidence that has been presented,
however, describes responsibilities and areas of discretion that
are common to all of BMS's PRs, irrespective of their business
unit or seniority level.  Thus, the thrust of BMS's argument is
that all of its PRs are properly classified as exempt employees
and that Amendola's "mere allegations" to the contrary are
insufficient to justify court-authorized notice to thousands of
PRs.

While each of the four exemptions on which BMS relies to
defend its classification of PRs as exempt from FLSA overtime
compensation law will be discussed in turn, it is the second of
these exemptions that dictates the outcome of this motion.  For
the reasons explained below, it appears at this stage of the
litigation that BMS's PRs fall under the exemption for
administrative employees, and, therefore, it is not appropriate
to authorize notice of this collective action to other PRs.

Before turning to the standard for authorizing notice of a
collective action and a discussion of the four exemptions upon
which BMS relies, it is appropriate to address an additional
argument that the defendant makes in opposition to this motion.

---

[8] For example, PRs in the specialty divisions discuss products in
greater detail because they are frequently able to refer to more
clinical studies than Primary Care PRs during their calls on
specialists.  Even so, they are restricted to using pre-approved
materials.

BMS argues that Amendola is not entitled to authorized notice of this collective action because she has not demonstrated a sufficient interest in her lawsuit by other PRs.  BMS points out that while Amendola has been given the names of 350 PRs and has widely publicized this action in news articles and online, not one other PR has joined this action.

FLSA plaintiffs are not required to show that putative members of the collective action are interested in the lawsuit in order to obtain authorization for notice of the collective action to be sent to potential plaintiffs.  See Neary v. Metro. Prop. & Cas. Ins. Co., 517 F. Supp. 2d 606, 622-23 & n.7 (D. Conn. 2007).  There are many reasons why current employees of BMS might hesitate to join a lawsuit against their employer. The cases on which BMS relies in support of its argument are neither controlling nor persuasive, particularly in light of the "broad remedial purpose of the [FLSA], which should be given a liberal construction." Braunstein v. E. Photographic Labs., Inc., 600 F.2d 335, 336 (2d Cir. 1978) (per curiam).

I. Authorization of Notice

Congress enacted the FLSA in 1938 "to protect all covered workers from substandard wages and oppressive working hours, labor conditions that are detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers." Barrentine v. Arkansas-Best

Freight Sys., Inc., 450 U.S. 728, 739 (1981) (citation omitted).
Among other protections from workplace abuse, the FLSA mandates
increased wages for overtime work.  Section 207(a)(1) provides
that "no employer shall employ any of his employees . . . for a
workweek longer than forty hours unless such employee receives
compensation for his employment in excess of the hours above
specified at a rate not less than one and one-half times the
regular rate at which he is employed."  29 U.S.C. § 207(a)(1);
Grochowski v. Phoenix Constr., 318 F.3d 80, 87 (2d Cir. 2003).

      The FLSA permits one or more employees alleging violations
of the FLSA to pursue an action in a representative capacity for
"other employees similarly situated."  29 U.S.C. § 216(b).
Section 216(b) states, in relevant part, that an action to
recover damages under the FLSA:

      may be maintained against any employer . . . by any
      one or more employees for and on behalf of himself or
      themselves and other employees similarly situated.  No
      employee shall be a party plaintiff to any such action
      unless he gives his consent in writing to become such
      a party and such consent is filed in the court in
      which such action is brought.

Id.  Thus, to join an FLSA action an employee must file written
consent with the court, that is, "opt in."

      District courts may set the conditions under which a
plaintiff gives notice to fellow employees of the existence of a
collective action and the steps they must take if they wish to
join the action.  Hoffman-La Roche Inc. v. Sperling, 493 U.S.

165, 169 (1989) (construing 29 U.S.C. § 216(b) in the context of
an ADEA lawsuit).  This authority derives from courts' inherent
power "to manage their own affairs so as to achieve the orderly
and expeditious disposition of cases." Id. at 173 (citation
omitted).  "By monitoring preparation and distribution of the
notice, a court can ensure that it is timely, accurate, and
informative." Id. at 172.  Thus, "[a]lthough one might read the
[FLSA], by deliberate omission, as not providing for notice,
. . . it makes more sense, in light of the 'opt-in' provision of
§ 16(b) of the Act, 29 U.S.C. § 216(b), to read the statute as
permitting, rather than prohibiting, notice in an appropriate
case." Braunstein, 600 F.2d at 336.

     Ordinarily, a federal court authorizes notice of the
litigation to employees after making a preliminary determination
that the employees who will be receiving the notice are
similarly situated to the plaintiff.  See, e.g., Lynch v. United
Servs. Auto Ass'n, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007).  To
obtain such authorization, a plaintiff must make only a "modest
factual showing" that she and the other putative collective
action members "were victims of a common policy or plan that
violated the law." Realite v. Ark Restaurants Corp., 7 F. Supp.
2d 303, 306 (S.D.N.Y. 1998) (collecting cases).  Where a
plaintiff fails to carry this burden or where a defendant
employer shows either that the potential recipients of the

notice are not similarly situated to the plaintiff or that it will likely succeed at trial in proving that the employees are not entitled under the FLSA to overtime compensation, a court may refuse to authorize notice or postpone deciding the issue pending further discovery and motion practice.[9]

In this case, Amendola alleges that BMS misclassified all PRs as exempt employees under the FLSA and wrongfully failed to pay them overtime.  Congress has expressly exempted certain categories of employees from the FLSA's overtime requirements. See 29 U.S.C. § 213.  In light of the Act's remedial purpose, though, "exemptions to the FLSA are narrowly construed against the employers seeking to assert them," and "[t]he burden of invoking these exemptions rests upon the employer."  Bilyou v. Dutchess Beer Distributors, Inc., 300 F.3d 217, 222 (2d Cir. 2002) (citation omitted).  BMS asserts that four exemptions

---

[9] Although district courts have held that the merits of a plaintiff's FLSA claim should not be evaluated in determining whether to authorize notice, see, e.g., Lynch, 491 F. Supp. 2d at 368, these holdings may have derived from jurisprudence discouraging engagement with the merits that was developed in the context of Rule 23 class action certification.  Fed. R. Civ. P. 23.  But, the Second Circuit in In re Initial Pub. Offering Sec. Litig. ("In re IPO"), 471 F.3d 24 (2d Cir. 2006), recently clarified that courts deciding whether to certify a class action must determine that each Rule 23 requirement has been met, and that "the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue." Id. at 41.  This Court will, therefore, scrutinize the merits based on the record developed to date by the parties and to the extent necessary to address this motion for authorization of notice.

apply to all or at least some of its PRs.  These are the "outside sales exemption," the "administrative exemption," the exemption for "highly compensated employees," and the "motor carrier exemption."  BMS argues that consideration of these exemptions "inevitably requires an individualized fact-based analysis that is inappropriate for collective adjudication."

A. Outside sales exemption

BMS argues that all PRs are exempt from the requirement that overtime compensation be paid because they are outside salespersons.  The FLSA exempts "any employee employed . . . in the capacity of outside salesman."  29 U.S.C. § 213(a)(1). Under the authority granted to it by the statute, see id., the Department of Labor ("DOL") has defined the outside sales exemption as follows:

> (a) The term "employee employed in the capacity of outside salesman" in section 13(a)(1) of the Act shall mean any employee:
>
> (1) Whose primary duty is:
>
> (i) making sales within the meaning of section 3(k) of the Act, or
>
> (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
>
> (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.
>
> (b) The term "primary duty" is defined at § 541.700. In determining the primary duty of an outside sales employee, work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and

collections, shall be regarded as exempt outside sales
work.  Other work that furthers the employee's sales
efforts also shall be regarded as exempt work
including, for example, writing sales reports,
updating or revising the employee's sales or display
catalogue, planning itineraries and attending sales
conferences.

29 C.F.R. § 541.500 (emphasis added).[10]  Section 3(k) of the FLSA

specifies that the terms "sale" or "sell" include "any sale,

exchange, contract to sell, consignment for sale, shipment for

sale, or other disposition."  29 U.S.C. § 203(k).  The

regulations further explain that "[s]ales within the meaning of

section 3(k) of the Act include the transfer of title to tangible

property, and in certain cases, of tangible and valuable

---

[10] In 2004, the DOL issued revisions to the regulations defining
this and other FLSA exemptions.  These revisions represented a
major overhaul to regulations that had remained unchanged for
decades; the minimum salary level and the job duty requirements
had last been updated in 1975 and 1949, respectively.  Defining
and Delimiting the Exemptions for Executive, Administrative,
Professional, Outside Sales and Computer Employees ("Defining
and Delimiting the Exemptions"), 69 Fed. Reg. 22122, 22122 (Apr.
23, 2004).  Apart from increasing the minimum salary level,
however, the revisions generally were not meant to introduce
substantive changes but to streamline the job duty requirements
and "provide needed simplification and more clarity to a complex
regulation."  Id. at 22126-27.  For example, whereas the current
definition of "outside salesman" requires that the "primary
duty" of the employee involve "making sales" or "obtaining
orders," the prior version of the regulation used a cumbersome,
percentage-based definition, which provided that any hours spent
on work other than "making sales" or "obtaining orders" could
"not exceed 20 percent of the hours worked in the workweek by
nonexempt employees of the employer."  See 29 C.F.R. § 541.500
(2004).  Except where noted below, the 2004 regulations did not
materially alter the legal standards that are of relevance to
this Opinion; accordingly, case law interpreting the prior
regulations continues to have relevance.

evidences of intangible property." 29 C.F.R. § 541.501(b). DOL regulations "have the force of law and are to be given controlling weight unless they are found to be arbitrary, capricious, or manifestly contrary to the statute." Freeman v. Nat'l Broad. Co., Inc., 80 F.3d 78, 82 (2d Cir. 1996) (citation omitted). The DOL's interpretations of its own regulations, moreover, are given deference unless they are plainly erroneous or inconsistent with the statute or regulations. See Roth ex rel. Beacon Power Corp. v. Perseus, L.L.C., 522 F.3d 242, 247-48 (2d Cir. 2008).

For the purpose of this exemption, the regulations distinguish sales work from promotional work. "Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work. On the other hand, promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work." 29 C.F.R. § 541.503(a).

This distinction between promotional and sales work was also drawn in a 1999 DOL Opinion Letter.[11] The DOL expressed its view that college recruitment counselors were not exempt outside

---

[11] Under the more limited deference described in Skidmore v. Swift & Co., 323 U.S. 134 (1944), agency interpretations contained in opinion letters are "entitled to respect . . . to the extent that those interpretations have the power to persuade." Christensen v. Harris County, 529 U.S. 576, 587 (2000); see Boykin v. KeyCorp, 521 F.3d 202, 208 (2d Cir. 2008).

salespersons because they were "not engaged in making sales of the college's services, or obtaining contracts for its services." Opinion Letter No. 2138, [1999-02 Wages-Hours] Lab. L. Rep. (CCH) ¶ 33,030 (Apr. 20, 1999).  Rather, their work was akin to "sales promotion work" because they were "engaged in identifying qualified customers, i.e., students, and inducing their application to the college, which in turn decides whether to make a contractual offer of its educational services to the applicant."  Id.

The purpose of the outside sales exemption has been explained by the Tenth Circuit:

> Such salesmen, to a great extent, work[]
> individually.  There are no restrictions respecting the
> time he shall work and he can earn as much or as
> little, within the range of his ability, as his
> ambition dictates.  In lieu of overtime, he ordinarily
> receives commissions as extra compensation.  He works
> away from his employer's place of business, is not
> subject to the personal supervision of his employer,
> and his employer has no way of knowing the number of
> hours he works per day.

Jewel Tea Co. v. Williams, 118 F.2d 202, 207-08 (10th Cir. 1941).

The DOL explained the reasoning behind this and other so-called "white collar" FLSA exemptions from the overtime compensation rules in 2004.

> The legislative history indicates that the section
> 13(a)(1) exemptions were premised on the belief that
> the workers exempted typically earned salaries well
> above the minimum wage, and they were presumed to enjoy
> other compensatory privileges such as above average
> fringe benefits and better opportunities for

advancement, setting them apart from the nonexempt
workers entitled to overtime pay.  Further, the type of
work they performed was difficult to standardize to any
time frame and could not be easily spread to other
workers after 40 hours in a week, making compliance
with the overtime provisions difficult and generally
precluding the potential job expansion intended by the
FLSA's time-and-a-half overtime premium.

Defining and Delimiting the Exemptions, 69 Fed. Reg. at 22123-24.

The cases that have upheld the outside sales exemption have
typically involved employees whose primary duties include clearly
exempt sales work, such as either obtaining orders for goods or
services or actually selling goods.  Compare Ackerman v. Coca-
Cola Enters., Inc., 179 F.3d 1260, 1266-68 (10th Cir. 1999)
(sales representatives who obtained orders and engaged in
merchandising activities for soft drink company were exempt), and
Jewel Tea, 118 F.2d at 207-08 (route salesmen who sold and
delivered products to customers in their homes were exempt), with
Hodgson v. Klages Coal & Ice Co., 435 F.2d 377, 382-84 (6th Cir.
1970) (routemen for drink bottler, whose work consisted
principally of restocking store shelves and who occasionally
solicited additional shelf space or new customers, were not
exempt).  Thus, in almost every case where the exemption has been
upheld, the employee either sold goods or services or took
purchase orders.  But see Nielsen v. Devry, Inc., 302 F. Supp. 2d
747, 760 (W.D. Mich. 2003) (college's field representatives
exempt as outside salespersons where college used only objective

admissions criteria and representatives "performed the essential role in getting students to sign the enrollment agreement").

The parties in this case agree that all PRs regularly work out of their homes.  They disagree as to whether they are engaged in sales.  BMS, which bears the burden of establishing the exemption, has failed to show that it is likely to prevail at trial on its contention that the "outside sales" exemption applies to PRs.

As a starting point, the interpretation of the exemption rests on the plain meaning of the statutory and regulatory texts that define it.  "To interpret the terms of a statute, we look first to the statutory language itself." Puello v. Bureau of Citizenship and Immigration Servs., 511 F.3d 324, 327 (2d Cir. 2007) (citation omitted).  Likewise, "[i]n interpreting an administrative regulation, . . . we must begin by examining the language of the provision at issue." Am. Fed'n of State, County & Mun. Employees v. Am. Int'l Group, Inc., 462 F.3d 121, 125 (2d Cir. 2006) (citation omitted).  Thus, the "analysis necessarily begins with the 'plain meaning' of a law's text and, absent ambiguity, will generally end there." Puello, 511 F.3d at 327 (citation omitted).  "In ascertaining the plain meaning of a statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." Id. (citation omitted).

Influencing physicians to prescribe BMS drugs to patients or even obtaining non-binding "commitments" from the physicians to do so does not constitute a "sale, exchange, contract to sell, consignment for sale, [or] shipment for sale" as these terms from 29 U.S.C. § 203(k) are customarily understood. The Oxford English Dictionary (2d ed. 1989) defines a sale as "[t]he action or an act of selling or making over to another for a price," or "the exchange of a commodity for money or other valuable consideration." 14 id. at 388. It defines an exchange as "[t]he action, or an act, of reciprocal giving and receiving . . . of things in general" or "of goods." 5 id. at 501.

The catch-all phrase "or other disposition," which completes the statutory definition of the terms "sale" and "sell," see 29 U.S.C. § 203(k), does not expand the definition to encompass promotional work by PRs. "[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 114-115 (2001) (citation omitted).

The conclusion that the promotional work by PRs does not constitute a sale is unsurprising since the parties agree that medical providers do not purchase BMS products from PRs and that

24

federal law prohibits PRs from selling pharmaceutical products.[12]
BMS has nonetheless relied on this exemption as the principal
reason why notice of a collective action should not be
authorized.  It makes essentially two arguments.

First, BMS relies on a multi-factor test that courts have
used to determine whether employees are exempt salespersons.[13]
The factors in this test include "whether the employee: must
solicit new business; receives specialized sales training; was
hired and denominated as a salesperson; and whether the position
was advertised as a sales position." Nielsen, 302 F. Supp. 2d at
756.  Additional factors that support application of the outside
sales exemption are receipt of commission compensation and the
"lack of direct or constant supervision." Id.  While BMS may be
correct in its contention that most of these factors apply to its
PRs, it has failed to show that this test has any applicability
here.

The multi-factored test originated from the former 29 C.F.R.
§ 541.505(e) (2004), in a section titled "Driver salesmen." See

_____

[12] The Prescription Drug Manufacturing Act, for example, imposes
criminal penalties for "knowingly selling, purchasing, or
trading a drug or drug sample."  21 U.S.C. § 333(b)(1)(B).

[13] BMS's argument concerning the outside sales exemption is not
based on an analysis of whether all PRs are "similarly
situated."  BMS does note, however, that in the case of Orencia
and other infusible drugs, physicians purchase the products
themselves, albeit from pharmacies or wholesalers and not from
PRs.

Hodgson, 435 F.2d at 382-83.  Section 541.505 was withdrawn in 2004, but the language of this subsection is preserved in the current 29 C.F.R. § 541.504, titled "Drivers who sell," which provides:

> Several factors should be considered in determining if a
> driver has a primary duty of making sales, including,
> but not limited to: a comparison of the drivers duties
> with those of other employees engaged as truck drivers
> and as salespersons; possession of a selling or
> solicitor's license when such license is required by law
> or ordinances; presence or absence of customary or
> contractual arrangements concerning amounts of products
> to be delivered; description of the employee's
> occupation in collective bargaining agreements; the
> employer's specifications as to qualifications for
> hiring; sales training; attendance at sales conferences;
> method of payment; and proportion of earnings directly
> attributable to sales.

29 C.F.R. § 541.504(b).  Thus, this test was developed to assist in the adjudication of "mixed duties" cases, where the employees engage in sales and also perform a significant amount of non-sales work, and specifically in the adjudication of overtime claims brought by drivers who perform mixed duties.  See, e.g., Hodgson, 435 F.2d at 382-83; Jewel Tea, 118 F.2d at 208.  In such cases, the question is not -- as it is here -- whether the employees make sales at all, but whether their work primarily consists of making those sales.

    Second, BMS relies on a series of recent cases in which California federal courts have found PRs to be exempt from California's overtime laws as outside salespersons.  See Menes v.

26

Roche Labs. Inc., No. 07 Civ. 1444, 2008 U.S. Dist. LEXIS 4230, at *7 (C.D. Cal. Jan. 7, 2008); Barnick v. Wyeth, 522 F. Supp. 2d 1257, 1264 (C.D. Cal. 2007); D'Este v. Bayer Corp., No. 07 Civ. 3206, 2007 U.S. Dist. LEXIS 87229, at *13-14 (C.D. Cal. Oct. 9, 2007). These cases analyze the exemption's application to PRs using the multi-factor test developed in the FLSA context that is now contained in 29 C.F.R. § 541.504. While acknowledging that PRs do not sell products to providers "in the classic sense," Menes, 2008 U.S. Dist. LEXIS 4230, at *4, the California federal courts nonetheless utilize the multi-factor test to conclude that the exclusion of PRs from the outside sales exemption would constitute "an illogical elevation of form over substance." Barnick, 522 F. Supp. 2d at 1264; see Menes, 2008 U.S. Dist. LEXIS 4230, at *7; D'Este, 2007 U.S. Dist. LEXIS 87229, at *12. These California decisions will not be followed here. Of course, these cases apply California's labor laws, and not the FLSA. More significantly, however, they do not acknowledge that the FLSA's exemptions must be narrowly construed against employers, or address the governing principles of statutory construction in grappling with the plain meaning of the regulatory term "sales."[14]

---

[14] Barnick is further distinguishable because the plaintiff there occasionally took orders from physicians for certain vaccines that he represented. See Barnick, 522 F. Supp. 2d at 1258.

BMS has not demonstrated at this stage that it is likely that the outside sales exemption will apply to PRs. Consideration of this exemption does not, therefore, weigh against issuing notice of this action to other PRs.

B. Administrative exemption

BMS next contends that all PRs are exempted from overtime compensation because they are administrative employees. The FLSA exempts from its overtime compensation provisions "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1); Freeman, 80 F.3d at 82. The regulations promulgated by the DOL in 2004 define an "employee employed in a bona fide administrative capacity" as someone whose (1) "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and whose (2) "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."[15]  29 C.F.R. § 541.200(a).

---

[15] Before they were amended in 2004, the regulations provided a "long test" and a "short test" for determining whether an employee worked in an administrative capacity. The "long test" required an employee to earn a minimum weekly salary of $155, but it could be substituted by the "short test" if the employee earned at least $250 per week. See 29 C.F.R. § 541.2 (2004). When the DOL revised the regulations in 2004, it replaced these two tests with the current universal definition. This revised rule is substantially equivalent to the "short test," except that it requires that the employee receive a salary "not less

To satisfy the first requirement, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." Id. § 541.201(a). The types of work that satisfy this first requirement include "advertising," "marketing," and "public relations" work. Id. § 541.201(b).

An interpretive regulation enacted in 2004 and addressed to the financial services industry provides further guidance about the distinction between marketing and sales.[16] Subsection 541.203(b) provides:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the

---

than $455 per week." Id. § 541.200(a)(1); see Defining and Delimiting the Exemptions, 69 Fed. Reg. at 22142-43. Amendola does not contend that the salaries of BMS's PRs fall below this minimum.

[16] Regulations withdrawn in 2004 had also explained that employees engaged in production or in sales in a retail or service establishment were non-exempt employees. The regulations stated that "[t]he phrase 'directly related to management policies or general business operations . . . ' describes those types of activities relating to the administrative operations of a business as distinguished from 'production,' or in a retail or service establishment, 'sales' work." 29 C.F.R. § 541.205(a) (2004). "Administrative operations" were meant to "include the work performed by so-called white collar employees engaged in 'servicing' a business," such as "representing the company" and "promoting sales." Id. § 541.205(b) (2004) (emphasis added).

> customer's needs and financial circumstances; advising
> the customer regarding the advantages and
> disadvantages of different financial products; and
> <u>marketing, servicing or promoting the employer's</u>
> <u>financial products</u>.  However, an employee whose
> primary duty is <u>selling financial products does not</u>
> <u>qualify</u> for the administrative exemption.

<u>Id.</u> § 541.203(b) (emphasis added).  Subsection 203(b) gives

detailed guidance "in the financial services industry because of

growing litigation in this area," but it is intended to be

consistent with the more general principles found in case law

which distinguish between exempt and non-exempt employees "based

on the duties they perform, not the identity of the customers

they serve."  Defining and Delimiting the Exemptions, 69 Fed.

Reg. at 22145-46.

    As to the second requirement for the administrative

exemption, "the exercise of discretion and independent judgment

involves the comparison and the evaluation of possible courses of

conduct, and acting or making a decision after the various

possibilities have been considered;" "[t]he term 'matters of

significance' refers to the level of importance or consequence of

the work performed."  29 C.F.R. § 541.202(a).  This second

requirement "must be applied in the light of all the facts

involved in the particular employment situation."  <u>Id.</u> §

541.202(b).

A non-exclusive list of factors that may be relevant to the determination of whether a job entails sufficient discretion and independent judgment includes:

> whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; . . . whether the employee has authority to waive or deviate from established policies and procedures without prior approval; . . . whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; . . . and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

Id. The regulations further explain that "[t]he exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision." Id. § 541.202(c). Employees' work performance may satisfy this requirement "even if their decisions or recommendations are reviewed at a higher level."

Id. Thus,

> the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment.

31

Id.  In addition, the regulations explain that "[a]n employer's
volume of business may make it necessary to employ a number of
employees to perform the same or similar work;" therefore, "[t]he
fact that many employees perform identical work or work of the
same relative importance does not mean that the work of each such
employee does not involve the exercise of discretion and
independent judgment with respect to matters of significance."
Id. § 541.202(d).  But, to qualify for this exemption "[t]he
exercise of discretion and independent judgment must be more than
the use of skill in applying well-established techniques,
procedures or specific standards described in manuals or other
sources."  Id. § 541.202(e).

        The administrative exemption has been applied in a variety
of contexts.  Of particular relevance to this case, a 1945
Opinion Letter from the DOL applying this exemption found that a
pharmaceutical company's "medical detailists" were exempt from
overtime compensation.  See Applicability of Exemption for
Administrative Employees to Medical Detailists, [1943-48 Wages-
Hours] Lab. L. Rep. (CCH) ¶ 33,093 (May 19, 1945).  These
employees were "engaged principally in work apparently aimed at
increasing the use of subject's product in hospitals and through
physicians' recommendations" -- work which required "a high
degree of technical knowledge."  Id.  The Opinion Letter
summarized the job duties of these "detailists" as follows:

> They train personnel, make special surveys and reports,
> and in general maintain this company's relations with
> the medical and associated professions.  They are
> consulted with respect to individual nutritional
> problems encountered by hospitals and physicians, such
> as determining whether the use of subject's product in
> a hospital was related to the occurrence of an
> epidemic.  When necessary, they arrange for added
> deliveries of subject's product to take care of
> emergencies.  They instruct the firm's salesmen in such
> technical matters as disease prevention, the chemical
> components of their product and nutritional research.
> They work virtually without supervision and are paid
> salaries in excess of $200 per month.

Id.  On the basis of these facts, the DOL determined that the

"medical detailists" were "engaged in a form of promotional or

missionary work having for its object not the making of specific

transactions but concerning itself with matters directly related

to general business operations."  Id.  In doing so, the

detailists carried out "special assignments requiring the use of

their discretion and independent judgment and, furthermore,

frequently calling for the employment by them of skills or

knowledge acquired through special training or experience."  Id.

See also Cote v. Burroughs Wellcome Co., 558 F. Supp. 883, 887

(E.D. Pa. 1982) ("detail person" for pharmaceutical company

exempt from FLSA as administrative employee).[17]

---

[17] Amendola argues that the scope of discretion granted to
today's PRs may differ significantly from that given to the
medical detailists whose work was reviewed in the Cote decision
as well as the 1945 Opinion Letter.  The pharmaceutical industry
is now more tightly regulated.  For example, in finding that the
plaintiff exercised significant discretion, the Cote court
explained that "[c]learly, on entering the physicians office

There are also several opinions that, in construing the
administrative exemption, have elaborated on issues of relevance
here.  For instance, a First Circuit decision has shed light on
the distinction in the FLSA administrative exemption regulation
between non-exempt "production" employees and exempt
administrative employees.[18]  In Reich v. John Alden Life Ins.
Co., 126 F.3d 1 (1st Cir. 1997),[19] the First Circuit affirmed the
district court's determination that the "marketing
representatives" of an insurance company were exempt
administrative employees.  Id. at 14.  The representatives were
the company's primary contacts with the licensed independent
insurance agents who sold insurance products to consumers.  Id.
at 3.  Drawing a distinction between administrative and
production workers, the First Circuit explained that the

---

[18] As described above, § 541.201(a) distinguishes between "work
directly related to assisting with the running or servicing of
the business" and "working on a manufacturing production line or
selling a product in a retail or service establishment."  29
C.F.R. § 541.201(a)

[19] John Alden relied in part on the "promoting sales" language
from 29 C.F.R. § 541.205(b) (2004), a regulation that has since
been withdrawn.  John Alden, 126 F.3d at 10.  Nonetheless, the
DOL referred to John Alden with approval when it issued the
revised regulations in 2004.  See Defining and Delimiting the
Exemptions, 69 Fed. Reg. at 22145-46.  Thus, the First Circuit's
analysis remains relevant.

(even if plaintiff had very little choice in deciding which
physician to visit or which product to detail) the detail person
was expected to use a wide degree of discretion in deciding how
to encourage the use of the product."  Cote, 558 F. Supp. at
887.

marketing representatives were not "production" employees because John Alden's "products" were its insurance policies, and "the marketing representatives are in no way involved in the design or generation of insurance policies." Id. at 9. Thus, "the activities of the marketing representatives are clearly ancillary to John Alden's principal production activity -- the creation of insurance policies." Id. at 10. Moreover, the nature and impact of the representatives' work indicated that it was "directly related to the management policies or general business operations" of their company; by "disseminating information to the marketplace, understanding customers and competitors, and gathering available information," the representatives were "directly related to operations, and at the heart of John Alden's business success." Id. at 11-12 & n.8 (citation omitted).

In determining whether employees exercise discretion and independent judgment sufficient to satisfy the second requirement for the administrative exemption, courts have pointed to factors beyond those enumerated in the regulations. One additional factor is an employee's discretion to set her schedule and to tailor communications to a client's individual needs. For instance, the John Alden court found it significant that the marketing representatives had "discretion in choosing which agent to contact on any given day, and concerning which products to discuss with each agent," and that they relied "on their own

35

knowledge of an agent's business to help tailor proposals for the agent's end-customers." Id. at 13. But, in doing so the representatives did "not use prepared scripts or read from a required verbatim statement, nor [did] they operate within the contours of a prescribed technique or 'sales pitch.'" Id. at 14. See also Savage v. UNITE HERE, No. 05 Civ. 10812 (LTS), 2008 WL 1790402, at *9-10 (S.D.N.Y. Apr. 17, 2008) (organizer for international labor union qualified for administrative exemption because she "made her own decisions about whom to approach and tailored her approach to each individual worker," and "also exercised discretion in identifying and developing potential leaders from amongst the workers at the plants").

Finally, courts have frequently concluded that the administrative exemption applies even in those situations in which the employee's discretion in the performance of her duties is circumscribed by an employer's detailed instructions or industry regulations. As recently explained by the Seventh Circuit, "independent judgment is not foreclosed by the fact that an employee's work is performed in accordance with strict guidelines." Roe-Midgett v. CC Servs., Inc., 512 F.3d 865, 875 (7th Cir. 2008) (claims adjusters exercised independent judgment even though they used manuals and estimating software to guide their work). See also Kennedy v. Commonwealth Edison Co., 410 F.3d 365, 374 (7th Cir. 2005) (employees of nuclear power plant

qualified for administrative exemption although their discretion was channeled by regulation); Donovan v. Burger King Corp., 675 F.2d 516, 521-22 (2d Cir. 1982) (assistant managers in fast food restaurants exercised discretion sufficient for managerial exemption even though this performance was "circumscribed by prior instruction" and "detailed guidelines"). But see Schaefer v. Indiana Michigan Power Co., 358 F.3d 394, 404 (6th Cir. 2004) ("The fact that the industry is heavily regulated may indeed mean that a [nuclear] facility . . . may employ fewer individuals who actually exercise discretion.").

BMS has shown that its PRs perform non-manual work directly related to the general business operations of the company.  Each PR represents BMS in meetings with medical providers and promotes BMS drugs.[20]  The success of BMS's business depends in part on the success of its PRs in educating physicians about BMS

---

[20] Amendola argues that PRs do not "promote" sales in the manner intended by the regulations because PRs promote only individual sales, not the company's sales generally.  But, Amendola's argument and her reliance on cases such as Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 903-05 (3d Cir. 1991) (inside salespersons are "production" workers and not administrative employees), and Casas v. Conseco Fin. Corp., No. Civ. 00-1512, 2002 WL 507059, at *9 (D. Minn. Mar. 31, 2002) (loan originators are "production" workers and not administrative employees), are unavailing because PRs have no contact with individual purchasers.  In Martin and Casas, the employees sold the company's products to customers.  Amendola's work more closely resembles the work performed by the marketing representatives in John Alden, 126 F.3d at 3.  Just as the insurance agents in John Alden did not purchase policies from the plaintiff representatives, physicians do not purchase BMS drugs from PRs.

drugs.  Thus, the nature of the work performed by PRs is directly related to BMS's management or business operations.

Relying on the distinction in 29 C.F.R. § 541.201(a) between employees who assist in servicing or running the business and those who work "on a manufacturing production line," Amendola argues that PRs are production workers.  BMS's products, however, are the drugs it designs, patents, and manufactures.  PRs do not produce those products.  See John Alden, 126 F.3d at 9-10 (marketing representatives do not produce the company's insurance policies).  Therefore, PRs are not properly classified as "production" employees.

The record assembled to date indicates that BMS is also likely to be able to prove at trial that the second prong of the administrative exemption is satisfied.  Its PRs tailor the content of their presentations to each medical provider based on the provider's patient population, prescription practices, and other factors, and independently decide what promotional message will be most effective.  For each medical provider, PRs individually determine whether to request a "commitment" and, if so, the extent of that "commitment."  They strategically manage their call lists, exercising their own judgment in deciding how often to visit a doctor and whether to add new providers to their lists.  PRs, moreover, allocate their allotted samples in accordance with their own assessment of how effectively each

provider will utilize those samples.  They also determine how to spend their sizeable promotional budgets, deciding for example whether to organize group lecture programs or to order meals for individual providers.  Each of these daily acts reflects "the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered," and each of these decisions is made "free from immediate direction or supervision."  29 C.F.R. § 541.202(a),(c).  Further, these areas of discretion and independent judgment involve "matters of significance" because, in making each of these decisions, PRs seek to influence prescription writing practices -- a matter of great consequence to BMS's business.  Indeed, Amendola described these exercises of judgment as ways to "drive the business" or "move market share," and she worked to develop relationships with medical providers "[b]ecause it was important for the company, because if the doctor didn't like me, then the doctor was not going to prescribe the drug."

In sum, BMS has shown that all of its PRs qualify for the administrative exemption under the first prong of the pertinent regulation, and that it will likely succeed in proving that they operate with the discretion required by the second prong of the exemption.  In light of this likelihood, notice of this lawsuit to BMS's thousands of PRs is not authorized.  Such notice would

not promote the fair and expeditious resolution of the claims
raised in this action.

C. Exemption for highly compensated employees

BMS also argues that the exemption for highly compensated
employees will apply to many PRs.  Effective August 2004, a
regulation titled "Highly compensated employees" provides that
"[a]n employee with total annual compensation of at least
$100,000 is deemed exempt under section 13(a)(1) of the Act if
the employee customarily and regularly performs any one or more
of the exempt duties or responsibilities of an executive,
administrative or professional employee."[21]  29 C.F.R. §
541.601(a).  Total compensation may "include commissions,
nondiscretionary bonuses and other nondiscretionary
compensation."  Id.  The regulation explains that "[a] high
level of compensation is a strong indicator of an employee's
exempt status, thus eliminating the need for a detailed analysis
of the employee's job duties."  Id. § 541.601(c).  Among other
things, this exemption removes any requirement that an employer
prove that an administrative employee exercised discretion in
the performance of her duties.

---

[21] The regulation specifies that this exemption "applies only to
employees whose primary duty includes performing office or non-
manual work."  29 C.F.R. § 541.601(d).  Thus, "employees who
perform work involving repetitive operations with their hands,
physical skill and energy are not exempt under this section no
matter how highly paid they might be."  Id.

This exemption applies to many but not all of BMS's PRs. While it is undisputed that Amendola never earned $100,000 in annual compensation at BMS, BMS has shown that Senior and Executive TBMs in four specialty business units -- namely, Virology, Oncology, Immunoscience, and Neuroscience -- commonly earn more than $100,000 in base salary plus incentive compensation, and thus since August 2004 have been exempted as highly compensated employees from the FLSA's overtime requirements.  In light of the conclusion already reached, however, that notice of this collective action will not be authorized, the exemption for highly compensated employees has no impact on the scope of notice in this action.[22]

D. Motor carrier exemption

The fourth and final exemption upon which BMS relies in opposing Amendola's motion for collective action notice is the motor carrier exemption.  The FLSA exempts from its overtime requirement "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service."  29 U.S.C. § 213(b)(1).  This exemption is limited to employees who (1) "[a]re employed by carriers whose transportation of passengers or property by motor vehicle is

---

[22] Given this result, it is unnecessary to address Amendola's argument that the "highly compensated employees" exemption exceeds the scope of the DOL's regulatory authority and is therefore ultra vires.

subject to . . . the Motor Carrier Act," and who (2) "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act."  29 C.F.R. § 782.2(a).  Effective August 2005, Congress amended the Motor Carrier Act to limit its coverage to persons transporting property by commercial motor vehicles, which are defined as weighing at least 10,001 pounds.  49 U.S.C. § 13102(15); 49 U.S.C. § 31132(1).

The statute of limitations for violation of the FLSA is ordinarily two years, but for willful violations it is extended to three years.  29 U.S.C. § 255(a); Brock v. Superior Care, Ind., 840 F.2d 1054, 1061 (2d Cir. 1988).  A willful violation exists when an employer knew or recklessly disregarded the fact that its conduct violated the FLSA.  McLoughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988); Brock, 840 F.2d at 1062.  Thus, absent equitable tolling, the motor carrier exemption will not apply to any PR who joins this lawsuit unless the PR joins before August 2008 and is able to show that BMS willfully violated the FLSA.  And even then, it will apply for at most three months.  Given the minimal time period during which the motor carrier exemption could apply to potential plaintiffs, further consideration of this exemption on this motion would be

42

unwarranted even if the administrative exemption did not control the outcome of the motion.

II. Equitable Tolling

Amendola requests that the claims of any PRs who opt in to this litigation be deemed filed as of June 23, 2007, the date she filed her complaint.  Notwithstanding the conclusion that court-authorized notice of this action to other PRs is inappropriate, Amendola's request merits consideration because PRs who are aware of this litigation by other means may still join this litigation.

"Equitable tolling allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances."  Johnson v. Nyack Hosp., 86 F.3d 8, 12 (2d Cir. 1996).  It is, however, "a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs."  Wallace v. Kato, 127 S. Ct. 1091, 1100 (2007); see Zerilli-Edelglass v. New York City Transit Auth., 333 F.3d 74, 80 (2d Cir. 2003) ("[E]quitable tolling is only appropriate in rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising his rights." (citation omitted)).

Equitable tolling is generally considered appropriate in situations where the complainant has "actively pursued his judicial remedies by filing a defective pleading during the

statutory period, or where the complainant has been induced or
tricked by his adversary's misconduct into allowing the filing
deadline to pass." Irwin v. Dep't of Veterans Affairs, 498 U.S.
89, 96 (1990). See also Dodds v. Cigna Sec., Inc., 12 F.3d 346,
350 (2d Cir. 1993). Although this remedy is regularly granted
where defendants have engaged in fraudulent concealment, "the
application of the doctrine of equitable tolling is not limited
to such cases," and "it does not assume a wrongful -- or any --
effort by the defendant to prevent the plaintiff from suing."
Valdez ex rel. Donely v. United States, 518 F.3d 173, 182-83 (2d
Cir. 2008) (citation omitted). Rather,

> [w]hen determining whether equitable tolling is
> applicable, a court must consider whether the person
> seeking application of the equitable tolling doctrine
> (1) has acted with reasonable diligence during the time
> period she seeks to have tolled, and (2) has proved
> that the circumstances are so extraordinary that the
> doctrine should apply.

Zerilli-Edelglass, 333 F.3d at 80-81 (citation omitted).

Amendola has not shown that the claims of any PRs who join
this lawsuit should be equitably tolled. She has not shown the
existence of extraordinary circumstances to justify this remedy.
She does not contend that other PRs have acted with reasonable
diligence during the intervening months since she filed suit.[23]

---

[23] As noted above, through initial discovery Amendola was given
the names and contact information of 350 BMS PRs and has widely
publicized this litigation. As of today, no PRs have joined
Amendola to prosecute this litigation.

She also has not shown that BMS caused any delay in connection with either discovery or this motion practice or that it has interfered with its employees' assertion of their FLSA rights.

Despite Amendola's assertions to the contrary, FLSA defendants are not obligated from the inception of a litigation either to provide contact information of putative collective action members or to toll potential claims voluntarily.  To grant the exceptional remedy of equitable tolling any time an FLSA defendant declines to provide contact information or to toll claims would, in effect, require that the statute of limitations for FLSA claims be tolled as a matter of course for all potential plaintiffs whenever the first plaintiff files her complaint -- a result plainly contrary to the procedural rules that govern FLSA collective actions.  See also Boykin, 521 F.3d at 211 n.10 ("[T]o permit equitable tolling for [an] entire class of individuals would threaten to extend the doctrine beyond its limitation to 'rare and exceptional circumstances.'").  As this very case illustrates, such a rule would also be unwise.  The analysis of who is a similarly situated employee may be a complicated issue and a plaintiff's request for notice may be overbroad.  Requiring the scope of notice to be dictated by the formulation in a complaint may lead to excessive litigation costs that grossly outweigh the benefits that can be justly achieved through the litigation.  To the

extent that other courts have concluded differently, see, e.g., Adams v. Inter-Con Sec. Sys., Inc., 242 F.R.D. 530, 542-43 (N.D. Cal. 2007); Baldozier v. Am. Family Mut. Ins. Co., 375 F. Supp. 2d 1089, 1092-93 (D. Colo. 2005), their decisions will not be followed here.

Further, the fact that BMS classified PRs as "exempt" from the FLSA's overtime pay requirements does not warrant equitable tolling. To hold that "a failure to disclose that an employee is entitled to overtime pay is sufficient to work an equitable toll would be tantamount to holding that the statute is tolled in all or substantially all cases seeking unpaid overtime." Patraker v. Council on the Env't of New York City, No. 02 Civ. 7283(LAK), 2003 WL 22703522, at *2 (S.D.N.Y. Nov. 17, 2003).

CONCLUSION

Plaintiff's January 22, 2008 motion for discovery of names, authorization of notice, and equitable tolling is denied.

SO ORDERED:

Dated:   New York, New York
         June 4, 2008

                                    _____
                                    DENISE COTE
                                    United States District Judge